## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No: 2:23-cv-11286 |
| BLUE CROSS BLUE SHIELD | ) | |
| OF MICHIGAN MUTUAL INSURANCE | ) | Judge: Hon. Linda V. Parker |
| COMPANY | ) | |
| | ) | Magistrate Judge: Hon. Elizabeth A. |
| and | ) | Stafford |
| | ) | |
| THE BLUE CROSS BLUE SHIELD | ) | **ORAL ARGUMENT** |
| ASSOCIATION, | ) | **REQUESTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S MOTION TO DISMISS FORD MOTOR COMPANY'S COMPLAINT

Defendant Blue Cross Blue Shield of Michigan ("BCBSM"), by its undersigned counsel of record, submits this motion to dismiss, with prejudice, Plaintiff Ford Motor Company's ("Ford") complaint. Specifically, BCBSM seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

In support of this motion, BCBSM relies upon the authorities and arguments set forth in the incorporated brief, as well as its attachments. BCBSM also joins and

incorporates by reference the motion to dismiss contemporaneously filed by the Blue

Cross Blue Shield Association ("BCBSA").

As required by Local Rule 7.1(a)(2)(A), BCBSM's counsel conferred with

counsel for Ford and explained the nature of the motion and its legal basis.  *See*

Exhibit 1.  BCBSM did not obtain concurrence in the relief sought.


Dated: August 24, 2023                    Respectfully submitted,

                                          SHEARMAN & STERLING LLP
                                          By: */s/ Todd M. Stenerson*
                                          Todd M. Stenerson (P51953)
                                          Brian Hauser (*admitted in E.D. Mich.*,
                                          Washington, DC Bar 1024406)
                                          401 9th Street, Suite 800
                                          Washington, DC 20004
                                          (202) 508-8000
                                          todd.stenerson@shearman.com
                                          brian.hauser@shearman.com

                                          Rachel Mossman Zieminski (*admitted in
                                          E.D. Mich.*, Texas Bar 24131967)
                                          2601 Olive Street, Suite 1700
                                          Dallas, TX 75201
                                          (214) 271-5777
                                          rachel.zieminski@shearman.com

                                          Susan Loeb (*application for admission
                                          forthcoming*)
                                          Sophie Copenhaver (*application for
                                          admission forthcoming*)
                                          599 Lexington Avenue
                                          New York, NY 10022
                                          (212) 848-4000
                                          susan.loeb@shearman.com
                                          sophie.copenhaver@shearman.com

Sarah L. Cylkowski (P75952)
Alexandra C. Markel (P81705)
BODMAN PLC
6th Floor at Ford Field
1901 Saint Antoine Street
Detroit, Michigan 48226
(313) 392-1077
scylkowski@bodmanlaw.com
amarkel@bodmanlaw.com

*Attorneys for Defendant Blue Cross*
*Blue Shield of Michigan*

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No: 2:23-cv-11286 |
| BLUE CROSS BLUE SHIELD OF | ) | |
| MICHIGAN MUTUAL INSURANCE | ) | Judge: Hon. Linda V. Parker |
| COMPANY | ) | |
| | ) | Magistrate Judge: Hon. Elizabeth A. |
| and | ) | Stafford |
| | ) | |
| THE BLUE CROSS BLUE SHIELD | ) | **ORAL ARGUMENT** |
| ASSOCIATION, | ) | **REQUESTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S
## BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
## FORD MOTOR COMPANY'S COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

BACKGROUND .....................................................................................2

    I.    Ford.......................................................................................2

    II.   History of the Blues System and its Trademarks ....................2

    III.  The Present-Day Blues System .............................................4

    IV.  The Alabama Multi-District Litigation .................................5

LEGAL STANDARD..............................................................................5

ARGUMENT ...........................................................................................6

    I.    Ford Fails to Plausibly Allege Antitrust Injury.....................6

    II.   Ford Does Not Plausibly Allege that BCBSM Prevented Any Competitors from Selling Insurance Products. ...................11

    III.  Ford Fails to Plausibly Plead that BCBSM has Market Power. .........16

    IV.  Ford's Damages and Injunctive Claims are Time Barred...................17

        A.    Ford's Damages Claims Are Barred by the Statute of Limitations ...............................................................18

            1.    Ford has Not Alleged Blocked Entry in the Last Thirty Years...................................................18

            2.    The Continuing Violation Doctrine Does Not Apply ....20

        B.    Ford's Injunctive Relief Claims are Barred by Laches ...........23

CONCLUSION......................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC*,
  1 F.4th 102 (2d Cir. 2021) ....................................................................12, 13, 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................5, 6, 11

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)......................................................................................7

*Axis, S.p.A. v. Micafil, Inc.*,
  870 F.2d 1105 (6th Cir. 1989) ..........................................................7, 8, 10, 11

*Barnosky Oils, Inc. v. Union Oil Co. of Cal.*,
  665 F.2d 74 (6th Cir.1981) ...........................................................................21

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
  528 F.3d 426 (6th Cir. 2008) ..........................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................6, 11

*In re Blue Cross Blue Shield Antitrust Litig.*,
  26 F. Supp. 3d 1172 (N.D. Ala. 2014)..............................................................5

*In re Blue Cross Blue Shield Antitrust Litig.*,
  MDL No. 2406, No. 2:13-CV-20000-RDP, 2022 WL 3221887
  (N.D. Ala. Aug. 9, 2022) .....................................................................3, 4, 5, 13

*Cerven v. Blue Cross and Blue Shield of North Carolina*,
  No. 2:12-cv-04169 (N.D. Ala. 2012)...............................................................23

*Clorox Co. v. Sterling Winthrop, Inc.*,
  117 F.3d 50 (2d Cir. 1997) .......................................................................12, 13

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
  100 F.3d 462 (6th Cir. 1996) .........................................................................22

*Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.*,
  153 F. Supp. 589 (D.N.J. 1957) ..........................................................................18

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*,
  244 F.3d 521 (6th Cir. 2001) ...............................................................................16

*Gen. Baking Co. v. Goldblatt Bros.*,
  90 F.2d 241 (7th Cir. 1937) .................................................................................8

*Gumwood HP Shopping Partners v. Simon Property Group*,
  221 F. Supp. 3d 1033 (N.D. Ind. 2016) .............................................................20

*Hodges v. WSM, Inc.*,
  26 F.3d 36 (6th Cir. 1994) ...............................................................7, 8, 10, 11

*Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*,
  931 F.2d 1100 (6th Cir.1991) .............................................................................8

*Kaw Valley Elec. Co-op Co. v. Kan. Elec. Power Co-op, Inc.*,
  872 F.2d 931 (10th Cir. 1989) ...........................................................................18

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997).............................................................................................18

*Lie v. St. Joseph Hosp. of Mount Clemens*,
  Mich., 964 F.2d 567 (6th Cir. 1992).....................................................................16

*Litovich v. Bank of Am. Corp.*,
  568 F. Supp. 3d 398 (S.D.N.Y. Oct. 25, 2021) .................................................22

*Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc.*,
  392 F.3d 265 (8th Cir. 2004) .............................................................................24

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
  734 F.2d 705 (11th Cir. 1984) ...........................................................................18

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002)............................................................................................23

*New York v. Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021)...............................................................*passim*

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ...........................................................................6, 7

*Nosse v. City of Ann Arbor*,
    2023 WL 2250621 (E.D. Mich. Feb. 27, 2023) (Parker, J.)......................5, 6, 11

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)........................................................................................14

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ..........................................................................25

*Peck v. General Motors Corp.*,
    894 F.2d 844 (6th Cir. 1990) ......................................................................21, 23

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th
    Cir.1975)  ...........................................................................................................21

*Pro-Football, Inc. v. Harjo*,
    567 F. Supp. 2d 46 (D.D.C. 2008), *aff'd in relevant part*, 565 F.3d
    880 (D.C. Cir. 2009) ..........................................................................................24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ..............................................................................14

*Shain v. Advanced Techs. Grp.*,
    2017 WL 768929 (E.D. Mich. Feb. 28, 2017) (Parker, J.)...................................7

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) .....................................................22

*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*,
    12 F.3d 609 (6th Cir. 1993) ...............................................................................14

*Truck Equip. Serv. Co. v. Fruehauf Corp.*,
    536 F.2d 1210 (8th Cir. 1976) ...........................................................................12

*U.S. v. Anthem, Inc.*,
    236 F. Supp. 3d 171, 196 (D.D.C. 2017)............................................................15

*Valley Prods. Co. v. Landmark, a Div. of Hosp. Franchise Sys., Inc.*,
    128 F.3d 398 (6th Cir. 1997) ...............................................................................7

*VMG Enters., Inc. v. F. Quesada & Franco, Inc.*,
    788 F. Supp. 648 (D.P.R. 1992) ......................................................................8, 12

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) .................................................................20, 21, 22

*Zenith Radio Corp. v. Hazeltine Rsch.*,
    401 U.S. 321 (1971).............................................................................................18

**Statutes**

15 U.S.C. § 15b.............................................................................................................18

**Rules**

Fed. R. Civ. P. 12(b)(6).........................................................................................5, 6, 25

## STATEMENT OF ISSUES PRESENTED

1. Should the Court dismiss Ford's complaint because any injury to Ford was caused by BCBSM's lawful use of trademarks and therefore Ford does not plausibly plead antitrust injury?

   **BCBSM's Answer: Yes.**

2. Should the Court dismiss Ford's complaint because BCBSM's use of a single brand did not prevent any competitor from selling insurance products in a properly defined, relevant antitrust market and therefore did not result in any anticompetitive harm?

   **BCBSM's Answer: Yes.**

3. Should the Court dismiss Ford's complaint because Ford does not plead that BCBSM has market power in the nationwide market for insurance products defined by Ford?

   **BCBSM's Answer: Yes.**

4. Should the Court dismiss Ford's complaint because the alleged blocked expansion of a Blue-branded Company into a nationwide competitor would have had to have occurred decades ago, and therefore Ford's claim for damages is barred by the statute of limitations and its claim for injunctive relief is barred by laches?

   **BCBSM's Answer: Yes.**

## CONTROLLING/MOST APPROPRIATE AUTHORITIES

*1-800 Contacts Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989)

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

*In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, No. 2:13-CV-20000-RDP, 2022 WL 3221887 (N.D. Ala. Aug. 9, 2022)

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997)

*Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir. 1994)

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)

*Lie v. St. Joseph Hosp. of Mount Clemens*, Mich., 964 F.2d 567 (6th Cir. 1992)

*Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984)

*New York v. Facebook*, 549 F. Supp. 3d 6 (D.D.C. 2021)

*Nosse v. City of Ann Arbor*, 2023 WL 2250621 (E.D. Mich. Feb. 27, 2023)

*Peck v. Gen. Motors Corp.*, 894 F.2d 844 (6th Cir. 1990)

*Shain v. Advanced Techs. Grp.*, 2017 WL 768929 (E.D. Mich. Feb. 28, 2017)

*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609 (6th Cir. 1993)

*Valley Prods. Co. v. Landmark, a Div. of Hosp. Franchise Sys., Inc.*, 128 F.3d 398 (6th Cir. 1997)

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014)

## **INTRODUCTION**

Ford Motor Company's ("Ford") complaint against Blue Cross Blue Shield of Michigan ("BCBSM") must be dismissed because the conduct it challenges—BCBSM's lawful use of longstanding trademarks—is not an antitrust violation.

Since the 1940s, BCBSM has been selling insurance products under the Blue Cross and Blue Shield brand ("Blue brand") in Michigan. Much as Henry Ford had the right to prevent other car manufacturers from putting his name on their automobiles, at no time has any Company[1] other than BCBSM been able to freely use the Blue brand in Michigan. Because of similar use in other geographies by other Companies, BCBSM likewise cannot freely use the Blue brand outside of Michigan. Ford ostensibly complains that it is not able purchase "Blue" insurance products from more Companies, but that is not an injury in any sense of the word. It is merely the result of lawful trademark use. Further, Ford has not plausibly alleged that BCBSM's use of the Blue brand in Michigan has prevented any competition for national health insurance products nor that BCBSM—a Michigan-based health insurer—has market power in the national markets alleged here.

Finally, Ford's damages and injunctive relief claims are time barred. The Blue brand has been used by individual Companies in particular geographies throughout

---

[1] "Company" as used in this brief means entities that provide commercial health coverage in the United States, and does not include BCBSA (defined below) as the owner of the federally registered trademarks, *see infra*.

the United States for almost 90 years.  Ford claims that these Companies were
"blocked" from expanding into different geographies, yet Ford never specifies when
that blocked expansion should have occurred.  Given the time and investment needed
for a Company to develop into a national competitor, the only plausible reading of
the complaint is that any blocked expansion would have occurred decades ago.
BCBSM has been operating openly—in full view of Ford—for years and invested
billions of dollars building the Blue brand in Michigan.  If Ford had a claim to bring,
it should have brought it long ago.  Ford's claims must be dismissed with prejudice.

## BACKGROUND

### I.  Ford

Ford is "one of the largest automobile manufacturers in the United States" with
"over 170,000 employees worldwide," and is a self-described "national account."
Compl., PageID.8 (¶ 15), PageID.25 (¶ 78).  A national account is typically a multi-
site employer or plan that covers 5,000 or more employees.  *Id.* at PageID.22 (¶ 69).
Ford is headquartered in Michigan and has offices and operations in at least seven
states.[2]  Ford has a long history of contracting with BCBSM for health insurance
products.  *See id.* at PageID.34 (¶¶ 105-07); *see infra* Background, § 2.

### II. History of the Blues System and its Trademarks

The history of the Blues System began with the development of prepaid

---

[2] Compl., PageID.8 (¶ 15); *see generally* LOCATIONS, FORD, https://corporate.ford.
com/operations/locations.html (Ex. 2).

hospital and medical plans in the 1930s. Compl., PageID.10 (¶ 19). These prepaid plans using Blue Cross or Blue Shield symbols ultimately developed into what are now known as "the Blues" health insurance plans. *See id.* at PageID.10 (¶¶ 19, 22).

BCBSM's origins date back as early as 1940, when it developed from one of the Blues prepaid plans called the Michigan Medical Service and began using a Blue Shield symbol. ROBERT CUNNINGHAM III & ROBERT M. CUNNINGHAM JR., A HISTORY OF THE BLUE CROSS AND BLUE SHIELD SYSTEM 47-48 (1997) (incorporated into Compl. at PageID.13) (Ex. 3). Notably, Ford was one of its first enrollees. *Id.* at 18-19, 47-48. BCBSM has continuously used the Blue brand since then and has been the only Company to use the Blue brand in Michigan.

In 1946, Congress enacted the Lanham Act, which provided for federally registered trademarks. Companies using the Blue brand, including BCBSM, assigned their rights to the Blue Cross Association and the Blue Shield Association, as appropriate, to facilitate registration, and the Blue brands were federally registered (the "Blue Trademarks").[3] In the early 1950s, the Blue Trademarks were then licensed out to Companies in the geographic areas those Companies had historically used the Blue brand, including BCBSM in Michigan. *See In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 3221887, at *2 (Ex. 4). In 1982, the

---

[3] *See* Compl., PageID.11 (¶¶ 26-27); *In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, No. 2:13-CV-20000-RDP, 2022 WL 3221887, at *2 (N.D. Ala. Aug. 9, 2022) (Ex. 4).

Blue Cross Association merged with the Blue Shield Association, creating the Blue Cross Blue Shield Association ("BCBSA"). Compl., PageID.11 (¶ 28). At that time, BCBSA became the sole owner of the Blue Trademarks and in 1991 BCBSA re-issued license agreements to the Blue plans, including BCBSA. *Id.* ¶¶ 26-28; *In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 3221887, at *3 (Ex. 4). Under the re-issued license agreements, BCBSA licenses the use of the Blue Trademarks within particular territories (known as "Exclusive Service Areas" or "ESAs") to the individual Blue plans. Compl., PageID.12-13 (¶¶ 31, 33-34). The license agreements affirm the licensee's prior, historical use of the Blue brand. *Id.* at PageID.15 (¶ 40) (citing license agreement stating that "each BCBS Licensee's ESA [is] 'the geographical area(s) served by the Plan on June 10, 1972 . . . .'").

### III.      The Present-Day Blues System

The Blues System is made up of over thirty individual Companies using the Blue Trademarks. *Id.* at PageID.9 (¶ 17). Although each Company operates its Blue-branded insurance business locally, together they create a national brand capable of competing with national insurers like United Healthcare, Cigna, and Aetna by coordinating the use of the Blue Trademarks. *Id.* at PageID.9 (¶ 18), PageID.23 (¶ 71). This coordination allows them to compete for and service even the largest subscribers, including national accounts like Ford. *Id.* at PageID.22-23 (¶ 56 (citing Wellpoint, Inc., Annual Report (Feb. 17, 2011), at 8).

4

IV.      **The Alabama Multi-District Litigation**

Beginning in 2012, the Judicial Panel for Multidistrict Litigation consolidated several lawsuits challenging the Blues System structure into a multi-district litigation. *In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, No. 2:13-CV-20000-RDP (N.D. Ala.) (the "MDL"). The MDL has been separated into two tracks—the subscriber track and the provider track.[4] The parties reached a class action settlement in the subscriber track in 2020 and it was approved by the MDL court in 2022. Compl., PageID.4 (¶ 5). Subsequently, several would-be class members exercised their right to opt out of the settlement and brought their own lawsuits, including Ford. *Id.* ¶ 6. The provider track is currently ongoing.[5]

## LEGAL STANDARD

"A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint." *Nosse v. City of Ann Arbor*, 2023 WL 2250621, at *1 (E.D. Mich. Feb. 27, 2023) (Parker, J.) (Ex. 5). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

---

[4] *See In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1179-80 (N.D. Ala. 2014). The MDL court denied a motion to dismiss but, among other differences from the present matter, did not consider whether antitrust injury was plausibly pled. *See generally id.*

[5] Ford filed this case in the Eastern District of Michigan and the parties do not believe transfer to the MDL is required. However, the parties are filing a notice of potential tag-along action, notifying the Panel of the action.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief," meaning that the *facts* alleged must plausibly support each element of a plaintiff's claims. *Iqbal*, 556 U.S. at 678-79. In the context of antitrust claims in particular, this Court must "tak[e] care" to closely scrutinize the complaint "to avoid the potentially enormous expense of discovery" in cases that fail to state a claim as a matter of law and "federal courts have been 'reasonably aggressive' in weeding out meritless antitrust claims at the pleading stage." *Twombly*, 550 U.S. at 559; *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (citations omitted).[6]

## ARGUMENT

### I. Ford Fails to Plausibly Allege Antitrust Injury.

Due to longstanding trademark use, no single Company can use the Blue brand nationwide. Ford seems to complain about the lack of multiple "Blue" options in Michigan, but because Ford's purported injury necessarily flows from BCBSM and other Companies' lawful use of trademarks, Ford has not alleged antitrust injury.

---

[6] It is well-established in the Sixth Circuit that when evaluating a Rule 12(b)(6) motion a court "may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *Nosse*, 2023 WL 2250621, at *2 (Ex. 5).

To state a valid antitrust claim, Ford must have suffered an "antitrust injury," that is, an injury "*causally linked*" to the conduct that constituted the supposed antitrust violation and "*of the type* the antitrust laws were intended to prevent." *Shain v. Advanced Techs. Grp.*, 2017 WL 768929, at \*5 (E.D. Mich. Feb. 28, 2017) (Parker, J.) (emphasis added) (Ex. 6).[7] "[W]here a complaint fails to establish an antitrust injury, the court must dismiss it as a matter of law." *Id.* (dismissing complaint where injury was the result of security restrictions rather than defendants' alleged anticompetitive conduct). The legal principles in *Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir. 1994), and *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989), mandate dismissal on this basis.[8] In *Hodges*, the plaintiffs claimed exclusion from the shuttle service market due to an alleged market division conspiracy by which defendants refused to allow plaintiffs' shuttles access to defendants' personal property, Opryland. 26 F.3d at 37. The Sixth Circuit, however, affirmed the district court's grant of defendants' motion to dismiss, finding that even assuming defendants' conduct (the alleged conspiracy) violated Section 1, any blocked entry was caused by "the lawful refusal to grant plaintiffs access to [defendants'] private

---

[7] *See also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007) (antitrust injury must be "attributable to an anticompetitive aspect of the practice under scrutiny"). Antitrust injury is a requirement under either the rule of reason or the *per se* standard. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990).

[8] *Cf. Valley Prods. Co. v. Landmark, a Div. of Hosp. Franchise Sys., Inc.*, 128 F.3d 398, 403-04 (6th Cir. 1997).

property," not any antitrust violation. *Id.* at 39. Therefore, plaintiffs could not establish an "antitrust injury." *Id.* Similarly, in *Axis*, the Sixth Circuit affirmed dismissal because the defendant had a lawful right to exclude others by managing access to its patent rights. 870 F.2d at 1111. In other words, when a plaintiff's claimed harm is caused by some lawful, alternative reason (like a property right), as a matter of law there is no antitrust injury and no antitrust claim.[9]

Trademarks are a form of intellectual property that grant the owner the exclusive use of the trademark.[10] Ford's complaint does not and cannot challenge that in the early days of the Blues System, various individual Companies—including BCBSM—developed common law trademark rights based on their actual use of the Blue brand in the geographic areas they served. *See* Compl., PageID.11 (¶¶ 26-27) (admitting Companies that eventually became the "BCBS Licensees" had ownership of trademarks and trade names); *supra* Background, § II. BCBSM, for example, continuously used and built the Blue brand in Michigan and Ford cannot allege

---

[9] Courts have, on several occasions, noted the interplay between intellectual property rights and the antitrust laws and found the enforcement of exclusionary property rights to be lawful. *See Axis*, 870 F.2d at 1111 ("[A] lawfully acquired patent creates a monopoly that does not violate the antitrust laws."); *VMG Enters., Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 659 (D.P.R. 1992) ("There is not now nor has there ever been, a conflict between the antitrust laws and trademark laws or the laws of unfair competition.").

[10] *Gen. Baking Co. v. Goldblatt Bros.*, 90 F.2d 241, 242 (7th Cir. 1937); *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105-06 (6th Cir.1991).

otherwise.   BCBSM and other Companies eventually assigned the common law trademark rights they developed through actual use to BCBSA's predecessors, those rights were assigned to BCBSA, and then BCBSA licensed the Blue Trademarks back to the Companies in a way that *coincided with the Companies' use of the Blue brand in historic service areas* (*e.g.*, BCBSM was assigned back the right to continue using the trademarks in Michigan).  *See supra* Background, § II.

This means that since the 1940s, BCBSM has been the *only* Company with the right to use the Blue brand in Michigan, based on either the common law or license agreements.  No other Company—not even another Company using the Blue brand elsewhere—has ever been able to simultaneously use the Blue brand in Michigan where BCBSM built the goodwill under that brand.  And even in Ford's but-for world where the current license agreements never existed, based on BCBSM's sole right to use the Blue brand in Michigan, no other Blue plan could have independently expanded *into Michigan* using the Blue brand to service Ford's employees there.   Likewise, BCBSM could not have independently expanded *outside of Michigan* using the Blue brand to service Ford's other employees—which would require BCBSM to either expand nationwide or to a bespoke geographic footprint specific to Ford (*see* Compl., PageID.23 (¶ 71); *supra* Background, § I).

There is an irreconcilable disconnect between the above realities and Ford's theory of injury, which requires two or more Companies to have the right to

9

simultaneously use the Blue brand in multiple states (or perhaps every state) so as to be able to service national accounts like Ford.  *See* Compl., PageID.29-30 (¶¶ 89-90); *supra* Background, § I.  In Ford's home state of Michigan in particular, BCBSM is the only Company that has had the ability to use the Blue brand for close to a century.  Ford's alleged injury, if any, is foreclosed as matter of trademark law. Any "injury" is a function of the lawful use and management of trademarks, *not* any allegedly anticompetitive agreement.  As such, Ford has not suffered antitrust injury. *See Hodges*, 26 F.3d at 39.

This is the same principle that the Sixth Circuit applied in *Hodges* and *Axis*, which both held that the plaintiffs did not suffer antitrust injuries (even though defendants' rights removed potential competitors from the market) because plaintiffs lacked the legal right to engage in the conduct they desired.  Here, Ford has not suffered antitrust injury because none of the Companies Ford contends would sell insurance products nationwide under the Blue brand in its but-for world independently have the legal right to do so.  Indeed, this case presents a less extreme case of supposed exclusion than either *Hodges* (in which access to private property completely blocked an existing competitor) or *Axis* (in which the manufacture and sale of the patented product completely blocked a potential competitor), as the license agreements here merely prevent the use of the Blue brand, not actual competition.  *See infra* Argument, § II.

10

Since there is an independent and lawful cause of Ford's supposed harm separate from any alleged antitrust violation—BCBSM's right to use of the Blue brand in Michigan—no antitrust injury exists. *See Hodges*, 26 F.3d at 139; *Axis*, 870 F.2d at 1111. And for that same reason, there has never been one Company that has the ability to use the Blue brand everywhere in the United States. Therefore, for the same reason that Ford lacks antitrust injury, its entire theory of multiple, nationwide Blue branded competitors is implausible. *Twombly*, 550 U.S. at 570.

## II. Ford Does Not Plausibly Allege that BCBSM Prevented Any Competitors from Selling Insurance Products.

As a separate basis for dismissal, Ford does not explain how BCBSA and BCBSM's regulated use of a single brand name prevents any other actual or potential competitors' ability to sell insurance products in Ford's defined market,[11] resulting in any anticompetitive harm. *Iqbal*, 556 U.S. at 679; *Nosse*, 2023 WL 2250621, at *1 (facts must allow a "reasonable inference" that defendant is liable) (Ex. 5).

Ford's central criticism of the Blues System seems to be that specifically licensing the Blue Trademarks in designated geographies prevented other individual Blue licensees from expanding to independently service national account customers. Compl., PageID.29-30 (¶¶ 89-90). Because of this, Ford says, competition for its

---

[11] Ford defines its antitrust market to be the sale of commercial health insurance services to national accounts throughout the entire United States. Compl., PageID.24-25 (¶¶ 75-76).

business is limited to only one Blue licensee. *Id.* at PageID.29 (¶ 88). However, even if only one Blue licensee bids on Ford's business, Ford does not plausibly allege how that results in anticompetitive harm in a properly defined, relevant market.

*First*, the use of the Blue brand in distinct geographies under the license agreements does not in any way prevent the Blue plans (or anyone else) from selling insurance products in those geographies, and therefore there is no legal or factual argument that competition is reduced. *See id.* at PageID.13 (¶ 33), PageID.15 (¶ 40), PageID.18 (¶ 52). Several courts have observed that trademarks "are the essence of competition, because they make possible a choice between competing articles by enabling the buyer to distinguish one from the other."[12] Trademarks and agreements governing their use are rarely a cause for antitrust concern because they foster competition between brands and are inherently non-exclusionary.[13] Unlike a patent, for example, a trademark "does not confer a legal monopoly on any good or idea; it confers rights to a name only."[14] In other words, any company wanting to compete to sell a particular product—here, insurance products to national accounts like Ford—can easily "escape the clutches of an alleged trademark monopoly [by]

---

[12] *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1215 (8th Cir. 1976) (quoting Lanham Act legislative history); *see also VMG Enters., Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 659 (D.P.R. 1992).

[13] *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 119 (2d Cir. 2021).

[14] *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2d Cir. 1997).

market[ing] his product under a different name."[15]   For that reason, agreements between companies regarding trademarks are "presume[d] to be *procompetitive*."[16] Since, in the real world, the license agreements governing use of the Blue Trademarks do not prevent the Blue licensees or any other Company from selling insurance products, Ford's issue must be with the conditions on selling insurance products under the Blue brand.   Notably, Ford alleges *nothing* about what one specific brand name has to do with competition.   Ford therefore does not plausibly plead anticompetitive harm in the national accounts market.[17]

---

[15] *Id.* at 57.

[16] *1-800 Contacts*, 1 F.4th at 116; *In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 3221887, at *4-5 (holding that the Blues System ESAs should be analyzed under the rule of reason because, among other reasons "trademark agreements are 'common, and favored, under the law,'" and "trademark agreements do not immediately appear 'obviously anticompetitive'") (Ex. 4).

[17] At most, Ford refers to the "Local Best Efforts" and "National Best Efforts" rules in its complaint, which, for a relatively short portion of the Blues System's history, placed some conditions on Blue plans' non-Blue branded businesses (*i.e.*, business lines not using the Blue Trademarks).   Compl., PageID.15-16 (¶¶ 43-44).   But the complaint says almost nothing about whether Ford is alleging that these rules have adversely affected competition for national accounts.   *Id.* at PageID.20-21 (¶¶ 62-64).   Ford's allegations about those rules do not make its theory of anticompetitive harm any more plausible.   Ford admits that neither of these rules existed for the first 55 years of the Blues System's existence, *see id.* at PageID.15-16 (¶¶ 43-44), but does not allege that any Company otherwise using the Blue brand tried to build a non-Blue brand to service national accounts during that timeframe.   Ford also does not allege any plausible factual basis to support an inference that any non-Blue brand would have succeeded to become on par with United, Cigna, or Aetna, as opposed to the "many" other Companies that Ford says cannot service national accounts.   *Id.* at PageID.23 (¶ 71); *see infra* n.20.

*Second*, the use of the Blue brand in distinct geographies under the license agreements does not affect the abilities of competitors *other than* the Blue plans in the national accounts market. Ford acknowledges that at least three other insurance Companies compete for national accounts (United, Aetna, and Cigna). Compl., PageID.23 (¶ 71). Ford does not plead that the challenged conditions affect the ability of *these* Companies to compete for its business. Nor does Ford allege that the challenged conditions impact the ability of a *single* Blue plan to compete for its business. Rather, Ford claims harm because *multiple* Blue plans (using the Blue brand) could not simultaneously compete for all of its business. *Id.* at PageID.29-30 (¶¶ 89-90). As a matter of law, there is no such thing as a single brand market when the plaintiff admits, as Ford does, that products under different brands—*i.e.*, United, Aetna, and Cigna—are interchangeable.[18]

Moreover, Ford does not plausibly allege why it is so critically important for there to be multiple *Blue-branded* competitors in its national accounts market, rather than other potential competitors operating under different brands. Ford is not, as a

---

[18] *See, e.g.*, *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 614-15 (6th Cir. 1993) (holding that one brand of a product was not an antitrust market where three categories of parts could be used to repair the relevant equipment); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997) (holding that Domino's-approved dough was not a relevant antitrust market because it was reasonably interchangeable with other brands of pizza dough); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2290 (2018) ("And it is '[t]he promotion of interbrand competition,' after all, that 'is . . . "the primary purpose of the antitrust laws."'").

matter of law, entitled to multiple nationwide Blue-branded competitors.[19]   Nor is this plausible given Companies' respective trademark rights.  *See supra* Argument, Section I.  And as Ford's complaint makes plain, it is the *capability* to service the significant "size and geographic dispersion" of national accounts that dictates whether an insurer can compete for its business, not any particular *brand* name.  *Id.* at PageID.23 (¶ 71) (admitting there are "many" industry participants that are not party to any Blue Trademark licensing agreement that lack the ability to service national accounts).[20]

   Accordingly, BCBSA has the right to reasonably manage the use of the Blue

---

[19] Ford seems to assume in its but-for world that each Blue plan would have nationwide use of the Blue brand and that this would increase national account competition (a big assumption on its own), but further assumes nothing else would change.  It is implausible that the drastic change to unfettered nationwide use of the Blue brand—which has never existed in the nearly 90 year history of the Blues System—would result in no other changes in the incentives and actual behavior of the Blue plans.  And it is further implausible to assume that any changes would automatically lead to better results, particularly since the Blues System in the real world already incentivizes procompetitive behavior such as significant investment in and development of each Blue plan's product in its service area.

[20] For example, in the *U.S. v. Anthem, Inc.* decision that Ford cites in support of its national accounts market, Compl., PageID.23 (¶ 70), the relevant capabilities an insurer needed to serve national accounts included (1) "in-network providers in all of the locations where their employees live, work, and travel, and even where they may relocate as retirees," and (2) "customized plans, technological platforms that enable employees to access claims information, data reporting so that the customers can understand and manage their healthcare costs, and . . . sophisticated data security measures."  236 F. Supp. 3d 171, 196 (D.D.C. 2017).  Even with the necessary technological infrastructure already in place, a business of this scale would require sufficient time to build a robust network with competitive pricing with healthcare providers in each relevant location.

Trademarks through license agreements even if this means Ford can only receive one Blue bid at a time.[21]  Without plausibly alleging *why* there specifically *must* be multiple, nationwide Blue-branded competitors, Ford does not plead any anticompetitive harm in a properly defined, relevant antitrust market.

### III.   Ford Fails to Plausibly Plead that BCBSM has Market Power.

The proper analysis of market power in this case is BCBSM's level of market power in Ford's defined national markets.  A "plaintiff must show that his defendant has market power in the relevant market to prove an antitrust injury."  *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530-31 (6th Cir. 2001); *Lie v. St. Joseph Hosp. of Mount Clemens*, Mich., 964 F.2d 567, 570 (6th Cir. 1992).  Without market power, no legitimate anticompetitive concerns exist.  Ford does not and cannot plead that BCBSM has market power in the nationwide insurance markets it alleges.  *See, e.g.*, Compl., PageID.25 (¶ 80) (pleading, at most, collective market power of separate Blue plans combined).

As discussed, the conduct Ford complains of—as it relates to BCBSM—is BCBSM's use of the Blue brand within Michigan.  *See supra* Argument, §§ I, III.

---

[21] *See, e.g.*, *1-800*,1 F.4th at 109, 116, 119-20 (finding agreements with competitors restricting bidding on trademarked search terms to plausibly have procompetitive effects, even in the more extreme case of agreements between companies that are existing, direct horizontal competitors).  Similarly, Ford takes steps it deems necessary to protect its brand.  *See* Global Brand Protection, Ford, https://www.fordbrandprotection.com/About.aspx (last visited Aug. 22, 2023) (Ex. 7).

However, BCBSM's use under the license agreement in Michigan does not come close to giving BCBSM market power in a market with the geographic component of "the entire United States."  *See* Compl., PageID.25 (¶ 76).  Accordingly, Ford cannot plausibly plead that BCBSM has market power, such that BCBSM's conduct could potentially have genuine adverse effects on competition in Ford's alleged insurance market for national accounts in the United States.  The complaint should be dismissed on this basis alone.

## IV.   Ford's Damages and Injunctive Claims are Time Barred.

Ford does not specify *when* any other Blue licensee would have expanded into a national competitor capable of bidding on and servicing Ford's business.  By necessity, however, any such blocked expansion that could support a plausible claim would have had to occurred *decades* ago for an insurer to reach the scale required to compete for and service a national account.[22]  *See supra* Argument, § II & n.20.  Ford's claims are thus barred by either the statute of limitations, the doctrine of laches, or both and for that reason should be dismissed.[23]

---

[22] The common thread running through the four competitors Ford alleges are capable of servicing national accounts (the Blue plans, United HealthCare, Cigna, and Aetna) is that they have each spent decades building their businesses into national competitors.

[23] Additionally, for the reasons explained in BCBSA's contemporaneously filed motion, even if the Court found the complaint to not be *completely* time barred at this stage, Ford's claim related to the purchase of "ASO" products must be limited to, at most, any alleged conduct and resulting injuries occurring after November 2, 2016 because that claim was not tolled by the initial proceedings in the MDL.

### A. Ford's Damages Claims Are Barred by the Statute of Limitations

1.    Ford has Not Alleged Blocked Entry in the Last Thirty Years

Ford's claim is barred by the statute of limitations because the alleged blocked expansion of any other Company using the Blue brand would have occurred decades ago. A plaintiff has four years from the time its antitrust claim accrues to file suit or the claim is "forever barred." 15 U.S.C. § 15b. An antitrust claim "accrues and the statute begins to run when a defendant *commits an act* that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch.*, 401 U.S. 321, 338 (1971) (emphasis added). The Supreme Court has a bright line rule that a plaintiff may not recover damages caused by *conduct* that takes place outside of the limitations period even if the *injury* from that conduct may be felt within the limitations period.[24] As is the case here, for alleged wrongful conduct involving blocked expansion or the elimination of a competitor, an antitrust claim accrues when the competitor is blocked or eliminated.[25]

---

[24] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997) ("[P]laintiff cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period").

[25] *See, e.g.*, *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714-15 (11th Cir. 1984); *Kaw Valley Elec. Co-op Co. v. Kan. Elec. Power Co-op, Inc.*, 872 F.2d 931, 934 (10th Cir. 1989) (holding that the final refusal of the defendant to allow access to the electric power market was the injurious act) (citing *Midwestern Waffles*, 734 F.2d at 714-15); *Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.*, 153 F. Supp. 589, 593 (D.N.J. 1957) (holding that a competitor's blocked entry from the market was the injurious act and any general inability to enter the market is the "consequence of the earlier conduct of the defendant").

Ford alleges it has been injured because multiple Companies have not been allowed to independently expand outside their territories due to use of the Blue brand or Blue Trademarks in their respective service areas—in other words, that the Blues System has "blocked" entry of multiple Blue plans operating nationwide.  Compl., PageID.29-30 (¶¶ 89-90).  Thus, the act that started the statute of limitations was when another Blue plan was "blocked"—in this case, from entering Michigan. When did the alleged blocked entry occur that prevented another Company from building itself into a national competitor? Ford does not specifically identify when the hypothetical blocked entry would have occurred. But for Ford's business in Michigan, entry by other Companies using the Blue brand has been blocked since the 1940s because entry was first blocked by BCBSM's initial use of the Blue brand there. *See supra* Background, § II; Argument, § I. Entry remained blocked in Michigan when the Blue Trademarks were federally registered and licensed in the 1950s. *See supra* Background, § II. Therefore, entry into Michigan has been blocked for decades and Ford's claim began to accrue (and ran) far beyond four years ago.

Ford will likely argue that the payment of allegedly inflated prices within the statutory period saves its claim.  *See* Compl., PageID.35 (¶ 113), PageID.36 (¶115); *see also infra* Argument, § IV.A.2.  But in a case about an alleged market division, the relevant date for statute of limitations purposes is the date of blocked entry, not the payment of higher prices supposedly caused by that blocked entry.  For example,

in *Gumwood HP Shopping Partners v. Simon Property Group*, the court held that there could be no recovery for a "snowball effect" of lost revenues from a blocked entry which predated the limitations period, "or for any portion of the snowball that may have accumulated because of the [blocked entry]." 221 F. Supp. 3d 1033, 1044-45 (N.D. Ind. 2016). So too here, the statute of limitations on Ford's claim began to run many decades ago when the alleged blocked entry first occurred. Since Ford has failed to allege any *new* blocked entry that also occurred within the statute of limitations, its claim for damages is time barred.

2. The Continuing Violation Doctrine Does Not Apply

Ford tacitly admits that the act causing its alleged injury and started the statute of limitations occurred more than four years ago by pleading that its claim is timely pursuant to the continuing violation doctrine. *See* Compl., PageID.36 (¶ 115). Specifically, Ford alleges that because it has entered into new contracts and amendments with BCBSM each year, this has "tolled" the statute of limitations. *Id.*

The continuing violation doctrine permits a plaintiff to pursue a claim based on an allegedly unlawful agreement consummated before the start of the relevant limitations period, but does not toll the statute of limitations. Even under this doctrine the plaintiff may only recover damages caused by *new conduct* (called an overt act) *within* the limitations period. *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 601 (6th Cir. 2014). In other words, it merely "restart['s] the statute of

20

limitations," and then only if *both* the conduct causing the plaintiff's injuries and the injuries occur within the statutory period.[26]  Here, for Ford's claim to be timely this means that the hypothetical blocked expansion of a Company into all areas needed to serve Ford (including Michigan) and payment of allegedly higher prices as a result both must have occurred entirely within the limitations period.

It is crucial not to conflate *new* conduct causing injury with *consequences that flow* from old conduct, because a defendant cannot be held liable for the "abatable but unabated inertial consequences of some pre-limitations actions."[27]  For example, in the recent *New York v. Facebook, Inc.* decision, the D.C. district court held that while Facebook's acquisitions may have violated antitrust laws at the time of the initial acquisitions, Facebook's continued ownership (without more) did not toll the statute of limitations as a "continuing violation."  549 F. Supp. 3d 6, 42 (D.D.C. 2021) ("[E]ven if Facebook's continued holding of Instagram and WhatsApp violates [the Clayton Act] in some sense at this very moment, that does not make a

---

[26] *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990); *see also Z Tech. Corp.*, 753 F.3d at 600 ("The most important tenet of the Sixth Circuit's continuing violations doctrine is that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period.") (internal quotations omitted).

[27] *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir.1981) (citing *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir.1975)); *Peck*, 894 F.2d at 849 (that plaintiffs' "injuries have a rippling effect into the future only establishes that they might have been entitled to future damages if they had brought suit within four years of the commission of the last antitrust violation").

present challenge timely.").  Moreover, the court held that even though there may have been an increase in consumer prices following the acquisitions, that increase did not constitute an overt act which restarted the statute of limitations.[28]

As in *Facebook*, Ford may have alleged that there are continuing *consequences* of the challenged conditions—*i.e.*, allegedly higher prices on each contract Ford negotiated and entered into with BCBSM due to BCBSM's longstanding, exclusive use of the Blue brand in Michigan.  Compl., PageID.35 (¶ 113), PageID.36 (¶ 115).  But those consequences do not constitute new overt acts sufficient to restart the statute of limitations—there needs to be new blocked entry within the statutory period, which Ford cannot plausibly plead.[29]  Indeed, to find that the statute of limitations is renewed simply because Ford has entered into agreements with BCBSM during the limitations period would effectively make the statute of

---

[28] *See Facebook*, 549 F. Supp. 3d at 43 ("Post-acquisition increases in price or decreases in output . . . 'are mere inertial consequences that one expects to flow from' an anticompetitive merger, and such consequences, the law is clear 'do not restart the statute of limitations.'") (quoting *Z Techs. Corp.*, 753 F.3d at 604) (relying on *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467–68 (6th Cir. 1996)).

[29] *See Facebook*, 549 F. Supp. 3d at 42; *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *16 (E.D. Cal. Sept. 3, 2010) ("The acts of purchasing the defendants' products over [two decades] is not a 'continuing act' for purposes of restarting the statute of limitations. Continual purchasing of the products is merely an affirmation of defendants' prior conduct and does not inflict a 'new and accumulating' injury on plaintiff."); *Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 434 (S.D.N.Y. Oct. 25, 2021) (finding new claims did not accrue even where plaintiff allegedly paid inflated prices within the statutory period, since those prices were merely the consequence of old conduct and were not overt acts in themselves).

limitations meaningless.[30]   Rather, any allegedly higher prices paid under Ford's

agreements with BCBSM are properly characterized as a mere "rippling effect" from

the original alleged antitrust violation, that is, the inability of another Blue plan to

spend decades expanding into a competing, nationwide option for Ford's business.

*See Peck*, 894 F.2d at 849.  Such consequences of the alleged violation are not new

overt acts, and the continuing violations doctrine does not make Ford's damages

claim timely.[31]

### B. *Ford's Injunctive Relief Claims are Barred by Laches*

Ford's request for injunctive relief is time barred just like its claim for

damages.  The doctrine of laches "bars a plaintiff from maintaining a suit if he

unreasonably delays in filing a suit and as a result harms the defendant."  *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002).  While what constitutes an

"unreasonable delay" in filing suit is a fact dependent question, many courts have

held that injunctive actions under Section 16 of the Clayton Act should use the Act's

four-year statute of limitations as a guideline for "computing the laches period."[32]

---

[30] *See Facebook*, 549 F. Supp. 3d at 42.

[31] Additionally, no other basis for tolling saves Ford's claim.  *See* Compl., PageID.35 (¶ 114), PageID.36 (¶ 116).  The *Cerven* case (*Cerven v. Blue Cross and Blue Shield of North Carolina*, No. 2:12-cv-04169 (N.D. Ala. 2012)) and the tolling agreement with BCBSM would, at best, theoretically toll the running of the statute of limitations back to 2008.  But since neither extends Ford's claim back to the Reagan era, neither comes close to making Ford's claim timely.  *See also supra* n.23 (providing further basis to dismiss aspects of claim per BCBSA's motion).

[32] *Facebook*, 549 F. Supp. 3d at 34 (quoting *Oliver v. SD-3C LLC*, 751 F.3d 1081,

And, like for the statute of limitations, an antitrust claim for injunctive relief accrues when the competitor is blocked or eliminated. Using the four-year statute of limitations as a guideline, Ford has missed its window to sue for injunctive relief by decades and has not alleged a continuing violation that would circumvent application of laches. *See supra* Argument, § IV.A.1-2. Having "slumbered on its rights," Ford's "equitable claims are now barred" as well.[33] The mere continued existence of the Blues System cannot be sufficient on its own, as that would eliminate the laches defense. *See Facebook*, 549 F. Supp. 3d at 42.

Moreover, BCBSM and BCBSA would be severely prejudiced if equitable relief were to be awarded now. BCBSM and BCBSA have made countless business decisions and allocated resources based on the ESAs for nearly nine decades.[34] In fact, because of the ability to use the Blue brand in their territories, the Blue plans have been incentivized to significantly invest in those areas, allowing them to each provide quality products throughout the country at a low price. Ironically, this

---

1085 (9th Cir. 2014).

[33] *Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265, 277 (8th Cir. 2004) (dismissing equitable claims when "the comparable statute of limitations period ha[d] run . . . twice over").

[34] *See Facebook*, 549 F. Supp. 3d at 37; *Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46, 59, 62 (D.D.C. 2008) (holding that laches barred cancellation action against trademark where "[e]conomic prejudice ar[ose] from investment in and development of the trademark") (citation omitted), *aff'd in relevant part*, 565 F.3d 880, 884 (D.C. Cir. 2009) (agreeing that sufficient "evidence of prejudice . . . may arise from mere proof of continued investment in the late-attacked mark").

investment is *exactly why* Ford continues to choose BCBSM over other competitors (*see* Compl., PageID.34 (¶ 105, 107) (admitting that Ford continues to purchase insurance products from BCBSM and other the Blue plans "*through the present*"))—BCBSM provides a higher quality product at the best price. Ford cannot now argue that the Blue plans' products should be *even better*, especially when Ford admits there are other national insurers who have the unfettered opportunity to provide a more competitive product. *Id.* at PageID.23 (¶ 71). It is therefore obvious that BCBSM and BCBSA would be severely prejudiced if injunctive relief were granted in this lawsuit, such that laches should be triggered.

Finally, Ford has not alleged—and cannot—that it "lacked notice of the threatened injury" on which its claim is based. Ford cannot allege that it was "uncertain or speculative" whether BCBSM and BCBSA's alleged antitrust violation "injured [Ford] at the time of the violation," such that the laches period should not "begin[] on the date that [Ford's] damages first accrued." *Oliver*, 751 F.3d at 1086. Therefore, laches should be applied to bar Ford's injunctive claim.

## CONCLUSION

BCBSM's motion to dismiss Ford's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted, with prejudice.

Dated: August 24, 2023                      Respectfully submitted,

                                            SHEARMAN & STERLING LLP
                                            By: */s/ Todd M. Stenerson*

Todd M. Stenerson (P51953)
Brian Hauser (*admitted in E.D. Mich.*,
Washington, DC Bar 1024406)
401 9th Street, Suite 800
Washington, DC 20004
(202) 508-8000
todd.stenerson@shearman.com
brian.hauser@shearman.com

Rachel Mossman Zieminski (*admitted in E.D. Mich*., Texas Bar 24131967)
2601 Olive Street, Suite 1700
Dallas, TX 75201
(214) 271-5777
rachel.zieminski@shearman.com

Susan Loeb (*application for admission forthcoming*)
Sophie Copenhaver (*application for admission forthcoming*)
599 Lexington Avenue
New York, NY 10022
(212) 848-4000
susan.loeb@shearman.com
sophie.copenhaver@shearman.com

Sarah L. Cylkowski (P75952)
Alexandra C. Markel (P81705)
BODMAN PLC
6th Floor at Ford Field
1901 Saint Antoine Street
Detroit, Michigan 48226
(313) 392-1077
scylkowski@bodmanlaw.com
amarkel@bodmanlaw.com

*Attorneys for Defendant Blue Cross Blue Shield of Michigan*

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2023, I caused the foregoing document to be served via ECF on all attorneys of record. I declare under penalty of perjury that the foregoing statements are true and correct.

By: */s/ Todd M. Stenerson*
Todd M. Stenerson (P51953)
401 9th Street, Suite 800
Washington, DC 20004
(202) 508-8000
todd.stenerson@shearman.com

*Attorney for Defendant Blue Cross Blue Shield of Michigan*