## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

FORD MOTOR COMPANY,     )
     )
     Plaintiff,     )
     )
v.     )
     )   Case No: 2:23-cv-11286
BLUE CROSS BLUE SHIELD OF     )
MICHIGAN MUTUAL INSURANCE     )   Judge: Hon. Linda V. Parker
COMPANY     )
     )   Magistrate Judge: Hon. Elizabeth A.
and     )   Stafford
     )
THE BLUE CROSS BLUE SHIELD     )
ASSOCIATION,     )
     )
     Defendants.     )
     )

## DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY'S ANSWER TO COMPLAINT

Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSM"), by and through its counsel, hereby answers and sets forth its affirmative defenses to the complaint ("Complaint") filed by Ford Motor Company ("Plaintiff" or "Ford") in the above-captioned action on May 31, 2023 (ECF No. 1, PageID.1-40).

This lawsuit is between two companies who share a deep commitment to serving the local Michigan communities that they have operated in for the last

century.  BCBSM provides access to quality, affordable healthcare to Ford and all its customers, and its membership in the Blue Cross Blue Shield Association ("BCBSA") is a critical component that facilitates BCBSM to deliver that access. This suit challenges the license agreements that BCBSA enters into with BCBSM and the other community-based and locally operated Blue Cross and Blue Shield companies, which regulate the companies to sell insurance under the Blue Cross and/or Blue Shield trademarks in geographic service areas.  Together, BCBSM and its 32 sister Blue Plans focus on the needs of their local communities while providing nationwide healthcare coverage to large, multi-state employers like Ford, and adapt to the demands of a highly competitive, complex, and ever-changing marketplace.  Despite this suit, BCBSM values the parties' long-standing productive relationship and looks forward to its continuation for years to come.

Except as otherwise expressly set forth below, BCBSM denies each and every allegation contained in the Complaint including, without limitation, the section headings of the Complaint.  BCBSM expressly reserves the right to amend and/or supplement its answer and defenses.  BCBSM states that no response is necessary to the unnumbered paragraphs or footnotes in the Complaint.  To the extent a response is required, BCBSM denies the allegations.  Subject to the foregoing, as and for its Answer to Plaintiff's Complaint, BCBSM pleads as follows:

## I.    INTRODUCTION

1.    The Defendants, as part of a larger conspiracy, have divided territory and fixed prices thereby increasing the cost of health services. Defendants reduced competition for their own gain resulting in astronomical profits and extraordinary salaries, all at the substantial expense of consumers.

**ANSWER:** BCBSM denies the allegations in Paragraph 1.

2.    Defendants conspired — in violation of Section 1 of the Sherman Act — to restrict output and to allocate customers across the United States, which resulted in Ford being overcharged for the commercial health insurance products it purchased from certain Blue Cross Blue Shield ("BCBS") entities including Defendant BCBS MI, as well as Blue Cross and Blue Shield of Kansas City ("BCBS KC"); Blue Cross Blue Shield of Tennessee ("BCBS TN"); Elevance Health, Inc. f/k/a Anthem, Inc. f/k/a WellPoint, Inc., ("Anthem") and also doing business through its wholly-owned subsidiaries HMO Missouri, Inc. ("Anthem MO") and Community Insurance Company ("Anthem OH") ( collectively "Anthem"); and Health Care Services Corporation, doing business as Blue Cross and Blue Shield of Illinois ("BCBS IL," collectively "BCBS Entities").

**ANSWER:** BCBSM denies the allegations in Paragraph 2.

3.    While not named as defendants in this complaint BCBS KC, BCBS TN, Anthem, Anthem MO, Anthem OH, and BCBS IL are separate and distinct

legal entities each with their own board of directors, employees, and principal place of business.

**ANSWER:** BCBSM admits that BCBS KC, BCBS TN, Anthem, Anthem MO, Anthem OH, and BCBS IL are not named as defendants in this complaint. BCBSM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 and therefore denies those allegations.

4.     Ford's claims relate to the multi-district class action litigation styled, *In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, United States District Court for the Northern District of Alabama, No. 2:13-CV-20000-RDP ("MDL"), where claims against the named Defendants, as well as other licensees of the BCBS trademark, were alleged for violations of the Sherman Act.

**ANSWER:** BCBSM admits there is a multi-district class action litigation pending in the Northern District of Alabama titled *In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, No. 2:13-CV-20000-RDP (the "MDL") against the Blue Cross Blue Shield Association ("BCBSA"), BCBSM, and other licensees of the Blue Cross and Blue Shield trademarks alleging violations of the Sherman Act.  BCBSM further admits that Plaintiff was a class member for purposes of settlement in the MDL who exercised its right to opt out of the MDL settlement. BCBSM denies the remaining allegations in Paragraph 4.

5.     The MDL settled, in part, for approximately $2.7 billion dollars in

2020, and the settlement was approved by the MDL Court in 2022.

**ANSWER:** BCBSM admits the allegations in Paragraph 5.

6.      Designated a class-member for purposes of settlement in the MDL, Ford timely exercised its right to opt out of the MDL settlement and chose to independently pursue its claims in the instant Complaint against Defendants.

**ANSWER:** BCBSM admits the allegations in Paragraph 6.

7.      Ford purchased commercial insurance products offered by BCBS Entities, including Defendant BCBS MI. These products included, but were not limited to: (a) traditional insurance products in which Ford paid a premium in exchange for BCBS Entities insuring employee plan members against the cost of medical care, and (b) Administrative Services Only ("ASO") products, whereby Ford purchased administrative services from BCBS Entities and an account funded by Ford (that is, a self-funded account) paid for or reimbursed the costs of medical care.

**ANSWER:** BCBSM admits that Plaintiff purchased both fully insured products and administrative services products from BCBSM.  BCBSM is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the specific products Plaintiff purchased from other Blue Cross Blue Shield entities and therefore denies those allegations.

8.      BCBS Entities, including Defendant BCBS MI, are separate business

and legal entities and potential competitors with each other, and potential competitors with all other entities that use the Blue Cross and Blue Shield trademark and licenses ("BCBS Licensees") (not listed herein). As BCBS Licensees, BCBS Entities, including Defendant BCBS MI, agreed with each other and Defendant BCBSA to allocate customers and refrain from competing against each other and all other BCBS Licensees when providing insurance products and services. Defendants successfully conspired with BCBS Licensees to, among other things, create Exclusive Service Areas ("ESAs") — geographic boundaries in which all other BCBS Licensees would not compete — making each individual BCBS Licensee the exclusive provider of certain insurance products and services in that territory. This, in turn, restrained competition between BCBS Licensees and reduced the overall number of insurers in any one region.

**ANSWER:** BCBSM admits that it is an independent legal entity. BCBSM further admits that the Blue Cross Blue Shield Association ("BCBSA") licenses the Blue Cross and/or Blue Shield trademarks ("Blue Marks") to 33 independent, community-based and locally operated Blue Cross and Blue Shield plans (each a "Blue Plan") in the United States and Puerto Rico that collectively provide healthcare coverage in all 50 states, the District of Columbia, and Puerto Rico, and that those licensees are governing members of BCBSA.  BCBSM also admits that it has entered into license agreements (hereinafter "License Agreements") with

BCBSA, which require licensees to comply with certain Membership Standards and Guidelines. BCBSM refers to the License Agreements, Membership Standards and Guidelines for their contents and denies Plaintiff's characterization thereof. BCBSM also admits that it is an independent legal entity. BCBSM further responds that the fact that the Blue Plans are formally separate companies is no bar to the single-entity defense. BCBSM denies the remaining allegations in Paragraph 8.

9.     As a result of this conspiracy, Ford paid higher premiums for traditional insurance products and higher fees and costs for ASO services. Defendants' horizontal conspiracy to divide geographic territory is the exact type of harm that Congress intended the Sherman Act to protect against.

**ANSWER:** BCBSM denies the allegations in Paragraph 9.

10.     Ford seeks to recover treble the amount of actual damages as determined by the difference between the supra-competitive premiums and fees that Ford was charged as a result of the conspiracy, and what Ford would have paid absent Defendants' anticompetitive conspiracy in a free and competitive market. Finally, Ford seeks costs and attorney's fees as permitted by the Sherman Act and Clayton Act, and any other remedies (including injunctive relief) the court finds proper and just.

**ANSWER:** BCBSM admits that Plaintiff purports to bring a claim under the

Shearman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 15, but denies that Plaintiff can state a claim under the Shearman Act or the Clayton Act, or that Plaintiff is entitled to any of the requested relief.

## II.   JURISDICTION AND VENUE

11.   This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Ford brings its claims pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Ford from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:** BCBSM admits that Plaintiff purports to bring claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, to attempt to recover treble damages and costs of suit, including attorneys' fees, for injuries allegedly sustained by reason of violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, but denies that Plaintiff can state claims under the Clayton Act or Sherman Act, or that Plaintiff is entitled to any of the requested relief.  Whether the Court has subject matter jurisdiction over this action is a legal conclusion to which no response is required; if a response is deemed required, BCBSM denies the allegations. BCBSM denies any remaining allegations in Paragraph 11.

12.   This Court has personal jurisdiction over both Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the Michigan long-arm statute

(Mich. Stat. Ann. 600) under one or more of the following.

    a.  One of the named Defendants, BCBS MI, has a substantial presence within this District, including its principal place of business, corporate headquarters, and numerous employees.

    b.  Defendants BCBS MI and BCBSA transact substantial business within this District through contractual obligations within the state of Michigan, administration of claims, payment of premiums, and provision of insurance coverage.

    c.  Defendants BCBS MI and BCBSA conspired with each other and all other BCBS Licensees in a nationwide conspiracy which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

    d.  Upon information and belief, Defendants BCBS MI and BCBSA have minimum contacts within the state of Michigan due to an agreement made between the Defendants, which assigned an ESA to BCBS MI in the state of Michigan in furtherance of their willing and intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

    e.  Defendants BCBS MI and BCBSA have minimum contacts within the state of Michigan due to their willing and intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

    f.  Defendants BCBS MI and BCBSA have purposefully availed themselves of this court's jurisdiction due to their willing and

intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

g. Defendants BCBS MI's and BCBSA's contacts within the state of Michigan and within this District are of a substantial, continuous, and systematic nature due to their willing and intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

**ANSWER:** BCBSM admits the Court has personal jurisdiction over BCBSM.  BCBSM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 with respect to BCBSA and therefore denies those allegations. BCBSM denies the remaining allegations in Paragraph 12.

13.   Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and actions giving rise to the claim occurred within this District.

**ANSWER:** BCBSM admits venue is proper as to BCBSM.  BCBSM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 with respect to BCBSA and therefore denies those allegations. BCBSM denies the remaining allegations in Paragraph 13.

14.   Venue is proper in this district pursuant to Section 12 of the Clayton

Act, 15 U.S.C. § 22.

**ANSWER:** BCBSM admits venue is proper as to BCBSM.  BCBSM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14 with respect to BCBSA and therefore denies those allegations.

## III. THE PARTIES

15.    Plaintiff Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan. Ford is one of the largest automobile manufacturers in the United States and has over 170,000 employees worldwide.

**ANSWER:** BCBSM is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and therefore denies those allegations.

16.    BCBS MI is the exclusive health insurance plan operating under the BCBS trade names and trademarks in the state of Michigan. The principal headquarters for BCBS MI is located at 600 E. Lafayette Blvd., Detroit, MI 48226. BCBS MI does business in each county in Michigan.

**ANSWER:** BCBSM denies the allegations in the first sentence of Paragraph 16.  BCBSM admits the remaining allegations in Paragraph 16.

17.    BCBSA is an Illinois corporation owned and controlled by thirty-six health insurance plans that operate under the BCBS trade names and trademarks,

including Defendant BCBS MI. The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601. BCBSA was created and maintained by BCBS Licensees in furtherance of their unlawful conspiracy. Notwithstanding this ownership of BCBSA, Defendants are independent economic actors without common shareholders or ownership.

**ANSWER:** BCBSM admits that BCBSA is a not-for-profit organization incorporated in Illinois and headquartered in Chicago, Illinois. BCBSM further admits that BCBSA licenses the Blue Marks to 33 independent, community-based and locally operated Blue Cross and Blue Shield plans in the United States and Puerto Rico that collectively provide healthcare coverage in all 50 states, the District of Columbia, and Puerto Rico, and that those licensees are governing members of BCBSA. BCBSM denies the remaining allegations in Paragraph 17.

## IV. HISTORY OF THE BLUE CROSS BLUE SHIELD PLANS AND BCBSA

18. Historically, BCBS Licensees arose as independent non-profit insurance plans, but they jointly conceived of the Blue Cross Blue Shield trademarks ("Blue Brand") in a coordinated effort to create a national brand that each would operate within its local area. They quickly developed to dominate the market for health care coverage. Since the 1980s, the BCBS Licensees have increasingly operated as for-profit entities by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-

million dollar salaries and bonuses for their administrators.[1]

**ANSWER:** BCBSM admits that Blue Cross and Blue Shield Plans arose independently.  Defendant further admits that certain Blue Plans have converted to for profit status since the 1980s.  BCBSM also admits that Plaintiff purports to quote or summarize a Chicago Business article and an Axios article. BCBSM refers to those articles for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 18.

19.    In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota, using a poster featuring a nurse wearing a blue Geneva cross uniform as the symbol and the name "Blue Cross" for the plan. Soon, other prepaid hospital plans began independently using the Blue Cross symbol.[2]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected excerpts from BCBSA's website. BCBSM refers to BCBSA's website for its contents and denies any characterization thereof.  BCBSM denies the remaining allegations in Paragraph 19.

20.    In 1939, the Blue Cross mark was adopted as the official emblem of

---

[1]   Andrew L. Wang, *Blue Cross parent CEO's compensation rockets past $16 million,* CHICAGO BUSINESS (April 11, 2013),   http://www.chicagobusiness.com/article/20   13041   UNEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million; Bob Herman, *Big raises for CEOs of the big Blues plans,* AXIOS (Oct. 14, 2021), https://www.axios.com/2021/10/14/blue-cross-blue-shield-ceo-compensation-pay-pandemic.

[2]  BCBSA HISTORY FACT SHEET, Communications Division of the Blue Cross and Blue Shield Association (March, 1997).

those prepaid hospital plans that received the approval of the American Hospital Association ("AHA").

**ANSWER:** BCBSM admits that at least as of 1939, certain prepaid hospital plans were using a blue cross mark to advertise their services.  BCBSM denies the remaining allegations in Paragraph 20.

21.    The Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

**ANSWER:** BCBSM admits that the Blue Cross hospital plans were developed in conjunction with the AHA, while the Blue Shield medical society plans were developed in conjunction with the AMA.  BCBSM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21 and therefore denies those allegations.

22.    The Blue Shield plans closely followed the development of the Blue Cross plans. Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

**ANSWER:** BCBSM admits that in some respects, the development of the Blue Shield plans paralleled the development of the Blue Cross plans.  BCBSM further admits the Blue Shield symbol was developed by a local medical society

plan, and other Plans began using that symbol.  BCBSM denies the remaining allegations in Paragraph 22.

23.    In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans which would eventually become the Blue Shield Association.

**ANSWER:** BCBSM admits the Associated Medical Care Plans ("AMCP") was formed in 1946.  BCBSM denies the remaining allegations in Paragraph 23.

24.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. Early on, there were no restrictions on the ability of any plans to compete with, or offer coverage in, an area already covered by another plan.

**ANSWER:** BCBSM admits that certain Blue Plans have competed with each other in certain respects and at certain times. BCBSM denies the remaining allegations in Paragraph 24.

25.    By the late 1940s, however, the BCBS Licensees faced growing competition from both each other and third-party insurance companies.

**ANSWER:** BCBSM admits that by the late 1940s, the Blue Plans faced growing competition from commercial insurance companies. BCBSM denies the remaining allegations in Paragraph 25.

26.    To address the increasing competition, the various BCBS Licensees agreed to centralize the ownership of their trademarks and trade names. In 1954,

the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

**ANSWER:** BCBSM admits that Plaintiff purports to summarize a 1954 Agreement and a 1972 Agreement. BCBSM refers to those agreements for their contents and denies any characterization thereof.  This paragraph contains legal conclusion to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 26.

27.    Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the Blue Shield Association.

**ANSWER:** BCBSM admits that Plaintiff purports to summarize a 1952 Agreement. BCBSM refers to that agreement for its contents and denies any characterization thereof.  This paragraph contains legal conclusion to which no response is required; if a response is deemed required, BCBSM denies the allegations.

28.    In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross trade names and trademarks, and Blue Shield trade names and

16

trademarks previously owned by the local plans.

**ANSWER:** BCBSM admits that in 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA, and BCBSA acquired the interests of the Blue Cross Association and the Blue Shield Association in the Blue trademarks and trade names. BCBSM denies the remaining allegations in Paragraph 28.

29.     In November 1982, after heated debate, BCBSA's member plans, the BCBS Licensees, agreed to two "propositions" (Propositions Nos. 1.1 and 1.2): (a) by the end of 1984, all existing Blue Cross plans and Blue Shield plans would consolidate at a local level to form joint plans; and (b) by the end of 1985, all BCBS Licensees within a state would further consolidate, ensuring that each state would have only one BCBS Licensee. Proposition 1.2 was justified as "a concentration of power and resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively", including "decision-making" and "policy determination."[3]

**ANSWER:** BCBSM admits that there were 97 Blue Plan licensees in the United States and Puerto Rico as of year-end 1984, 75 Blue Plan licensees in the United States and Puerto Rico as of year-end 1989, and 33 Blue Plan licensees in the United States and Puerto Rico currently. BCBSM further admits that Plaintiff

---

[3] *See In Re Blue Cross Blue Shield Antitrust Litigation,* BCBSAL_0000022540-55 (N.D. Ala. 2020)

purports to quote or summarize selected excerpts from a document produced by Blue Cross and Blue Shield of Alabama in another litigation.  BCBSM refers to that document for its content and denies any characterization thereof.  BCBSM denies the remaining allegations in Paragraph 29.

## V.    EXCLUSIVE SERVICE AREAS AND OUTPUT RESTRICTIONS

30.    After the merger of Blue Cross and Blue Shield, a task force was created to advance the ability and willingness of the BCBS Licensees to work together. One suggestion was the creation of a common licensing agreement applicable to both the Blue Cross and Blue Shield marks. It was noted that this task was "complicated" by "antitrust matters." The United States Department of Justice ("DOJ") commenced an investigation into how the then-operative license agreements worked.[4]

**ANSWER:** BCBSM admits that the DOJ investigated the license agreements and did not take any further enforcement action, but denies any characterization thereof. BCBSM also admits that Plaintiff purports to quote or summarize selected excerpts from an unidentified document but denies that the source of Plaintiff's allegations is the case cited in footnote 4 to Paragraph 30 of Plaintiffs' complaint. BCBSM refers to the unidentified document for its content and denies any characterization thereof. BCBSM denies the remaining allegations

---

[4]    *See, e.g. United States and State of Michigan v. Blue Cross Blue Shield of Michigan,* Civil Action No. 2:10-cv-14155 (E.D. Mich. 2013).

in Paragraph 30.

31.     In order to provide "checks and balances" against "open competition,"
in April 1987, the BCBS Licensees, through the BCBSA, held an "Assembly of
Plans" — a series of meetings held for the purpose of determining how they would
and would not compete against each other. During these meetings, these
independent health insurers and competitors agreed to maintain Exclusive Service
Areas ("ESAs") when operating under the Blue Brand, thereby eliminating "Blue
on Blue" competition.[5]

**ANSWER:** BCBSM admits that the member Plans of BCBSA held an
"Assembly of Plans" beginning in 1987.  BCBSM further admits that Plaintiff
purports to quote or summarize selected excerpts from a book by Robert
Cunningham III and Robert Cunningham Jr. BCBSM refers to that book for its
contents and denies any characterization thereof. BCBSM denies the remaining
allegations in Paragraph 31.

32.     More than one BCBS Licensee has publicly admitted the existence of
these territorial market divisions. For example, a former BCBS Licensee in Ohio
alleged that BCBS Licensees, through the BCBSA, agreed to include these
restrictions in the Guidelines to Administer Membership Standards (the
"Guidelines") in 1996 in an effort to block the sale of one member plan to a non-

---

[5]     ROBERT CUNNINGHAM III AND ROBERT M. CUNNINGHAM JR., THE BLUES: A HISTORY OF THE BLUE CROSS AND
BLUE SHIELD SYSTEM (1997).

member that might present increased competition to another member plan.[6]

**ANSWER:** BCBSM admits that Plaintiff purports to describe allegations made in Blue Cross & Blue Shield Mutual of Ohio's complaint against BCBSA in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross & Blue Shield Association*, 110 F.3d 318 (6th Cir. 1997). BCBSM refers to that pleading for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 32.

33.     The Government Accounting Office ("GAO") Report notes:

> To use the Blue Cross and Blue Shield names and trademarks, each [BCBS Licensee] must sign a license agreement with the [BCBSA]. The agreement does not constitute a partnership or joint venture, and the [BCBSA] has no obligations for the debts of [BCBS Licensees].
> The license agreement restricts [BCBS Licensees] from using the trademark outside their prescribed service area to prevent competition among plans using the [Blue Brand].[7]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected excerpts from a 1994 Government Accountability Office report. BCBSM refers to that report for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 33.

34.     The "prescribed service area" is the ESA described above.

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize

---

6   *See Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n, 110* F.3d 318 (6th Cir. 1997).

7   Government Accountability Office, "Blue Cross and Blue Shield: Experiences of Weak Plans Underscore the Role of Effective State Oversight," Apr. 1994 ("GAO Report"), at 28.

selected excerpts from a 1994 Government Accountability Office report. BCBSM refers to that report for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 34.

35.    All BCBS Licensees must abide by the rules and regulations of the BCBSA.

**ANSWER:** BCBSM admits that the License Agreements require licensees to comply with certain Membership Standards and Guidelines, but refers to the License Agreements, Membership Standards and Guidelines for their contents and denies Plaintiff's characterization thereof. BCBSM denies the remaining allegations in Paragraph 35.

36.    The BCBS Licensees control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine-member plan CEOs and three independent members.

**ANSWER:** BCBSM denies the allegations in Paragraph 36.

37.    The BCBS Licensees also control the rules and regulations that all members of BCBSA must obey.

**ANSWER:** BCBSM denies the allegations in Paragraph 37.

38.    According a brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross

License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines.[8]

**ANSWER:** BCBSM admits that Plaintiff purports to paraphrase selected excerpts from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, 110 F.3d 318 (6th Cir. 1997), but denies that Plaintiff accurately paraphrases the selected excerpts. BCBSM refers to the brief for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 38.

39.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the [BCBS Licensees] and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, a BCBS Licensee "agrees . . . to comply with the Membership Standards." In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the BCBS Licensees "deliberately chose," "agreed to," and "revised."

**ANSWER:** BCBSM admits that Plaintiff purport to quote or summarize selected excerpts from the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM

---

[8]    *See Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318 (6th Cir. 1997).

further admits that Plaintiff purports to quote or summarize selected excerpts from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, 110 F.3d 318 (6th Cir. 1997), but denies that Plaintiff accurately quotes the selected excerpts. BCBSM refers to the brief for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 39.

40.     The License Agreement defines each BCBS Licensee's ESA as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."[9]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected portions of the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 40.

41.     The BCBS Licensees recognized the legal risk of such a market allocation strategy. A 1987 report on interviews of BCBS CEOs that was sent to John Thompsons, Chairman of the Ad Hoc Committee of the Assembly of Plans, observed that most regard the ESAs as necessary to avoid chaos in the Blue Brand system; the report recognized that this issue may implicate antitrust laws (given

---

[9]     *See* Blue Cross License Agreement,
https://www.sec.gov/Archives/edgar/data/1156039/000119312511039172/dex1014.htm (last visited March 10, 2023).

court cases pending in Ohio and elsewhere) and took a view that the right to control name and market may not extend to the ability/right to enforce exclusivity.[10]

**ANSWER:** BCBSM admits that Plaintiff purports to summarize selected excerpts from a document Bates-stamped BCBSA00083662-69. BCBSM refers to that document for its content and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 41.

42.     One internal memorandum from the CEO of the BCBS Licensee in Maryland frankly recognized the illegal and horizontal nature of the market allocation agreement, stating the feeling that the current licensing arrangements were illegal because BCBS Maryland was in the position of approving its own licenses as members of the association.[11]

**ANSWER:** BCBSM admits that Plaintiff purports to summarize selected excerpts from a document Bates-stamped BCBSA00083755-59. BCBSM refers to that document for its content and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 42.

43.     In 1996, the independent BCBS Licensees approved a "Local Best Efforts Rule." It reads as follows: "[a]t least 80% of the annual Combined Local Net Revenue of a controlled affiliate attributable to health care plans and related

---

[10]    *. See In Re Blue Cross Blue Shield Antitrust Litigation,* BCBSA00083662-69.

[11]    *See id.* at BCBSA00083755-59

services . . . offered within the designated Service Area must be sold, marketed, administered or underwritten under the Licensed Marks and Names."[12]

**ANSWER:** BCBSM admits that the Local Best Efforts rule was adopted in 1994. BCBSM further admits that Plaintiff purports to quote or summarize selected portions of the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 43.

44.    A "National Best Efforts Rule" was also approved by the independent BCBS Licensees. It is embodied in the following guideline: "[a]t least 66 2/3% of the annual Combined National Net Revenue of the Controlled Affiliate[] attributable to health care plans and related services . . . must be sold, marketed, administered or underwritten under the Licensed Marks and Names. The percentage set forth in this paragraph shall not be changed for at least 10 years from the date of adoption of this paragraph."[13]

**ANSWER:** BCBSM admits that the National Best Efforts rule was adopted in 2005. BCBSM further admits that Plaintiff purports to quote or summarize selected portions of the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM

---

[12]  Blue Shield Controlled Affiliate License Agreement, Standard 10, Guideline 2.1 (March 15, 2007) (hereinafter "2007 License Agreement").

[13]  *Id.* at Guideline 2.2.

denies the remaining allegations in Paragraph 44.

45.     The independent BCBS Licensees also limited transfer rights by requiring prior BCBSA review and approval of the establishment of a successor BCBS Licensee.

**ANSWER:** BCBSM denies the allegations in Paragraph 45.

46.     All of these additions to the BCBSA rules drastically limited the ability of the independent BCBS Licensees to compete with one another.

**ANSWER:** BCBSM denies the allegations in Paragraph 46.

47.     The independent BCBS Licensees monitor all members' compliance with the rules and regulations of BCBSA.

**ANSWER:** BCBSM admits that since at least 2008, BCBSA has enforced the terms of the License Agreements.  BCBSM denies the remaining allegations in Paragraph 47.

48.     The independent BCBS Licensees similarly control the termination of existing members. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may

only be terminated on a three-fourths or greater affirmative Plan weighted vote."[14]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected portions of the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 48.

49. The independent BCBS Licensees discipline members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply — "Immediate Termination," "Mediation and Arbitration," or "Sanctions" — each of which could result in the termination of a member plan's license.[15]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected portions of the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 49.

50. A terminated BCBS Licensee would lose the right to use the Blue Brand through which it derived the majority of its revenue and would be required to fund the establishment of a competing Blue Brand health insurer in its ESA. This amounted to a powerful incentive to remain in the association, and a threat by

---

14  *Id.* At Guideline 9(b).

15  *See, e.g.* 2007 License Agreement at Standard 1(1): Guidelines Subject to Immediate Termination; *id.* at Standard 1(2): Guidelines Subject to Mediation/Arbitration; *id.* at Standard 1(3): Guidelines Subject to Sanctions.

the BCBSA and the other independent BCBS Licensees to put any entity that breached the territorial restrictions out of business.

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected portions of the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM denies the allegations in Paragraph 50.

51.    The independent BCBS Licensees are potential competitors that use BCBSA to coordinate their activities. As a result, the rules and regulations imposed by the BCBSA on the member plans are in truth imposed by the member plans on themselves and each other.

**ANSWER:** BCBSM denies the allegations in Paragraph 51.

52.    Each BCBS Licensee is an independent legal organization. In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that the formation of BCBSA did not change each plan's fundamental independence. The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."[16]

**ANSWER:** BCBSM admits that each Blue Plan is an independent legal entity. BCBSM further responds that the fact that the Blue Plans are formally

---

[16]    *Id.* at § 10: Joint Venture (June 16, 2006).

separate companies is no bar to the single-entity defense. BCBSM also admits that Plaintiff purports to summarize selected excerpts from BCBSA's Joint Opposition to Plaintiffs' Re-Filed Motion for Class Certification filed in *Thomas v. Blue Cross and Blue Shield Association*. BCBSM refers to this pleading for its contents and denies any characterization thereof. BCBSM further admits that Plaintiff purports to quote or summarize selected excerpts from the License Agreements. BCBSM refers to the License Agreements for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 52.

53. The independent BCBS Licensees include many of the largest commercial health benefit product companies in the United States.

**ANSWER:** BCBSM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and therefore denies those allegations.

54. By some measures, Anthem is the largest commercial health benefit product company in the nation. Similarly, fifteen of the twenty-five largest commercial health benefit product companies in the country are BCBS Licensees. On its website, BCBSA states that its members together provide "coverage for nearly 100 million people — one-third of all Americans" and that, nationwide, "more than 96% of hospitals and 91% of professional providers contract with Blue

Cross and Blue Shield companies — more than any other insurers."[17] Absent the restrictions that the independent BCBS Licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health benefit products.

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected excerpts from BCBSA's website. BCBSM refers to that website for its contents and denies any characterization thereof. BCBSM is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 regarding unspecified measures of health insurance companies in the nation and therefore denies them. BCBSM denies the remaining allegations in Paragraph 54.

55.    In its Sixth Circuit brief, BCBSA admitted that the member plans formed the precursor to BCBSA when they "recognized the necessity of national coordination."[18]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize a selected excerpt from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, No. 1:96-cv-1275 (N.D. Ohio Nov. 4, 1996) but denies that Plaintiff accurately quotes the selected excerpt. BCBSM refers to this brief for its contents and denies any characterization thereof. BCBSM denies the remaining allegations

---

[17]    BLUE CROSS BLUE SHIELD, ABOUT US, https://www.bcbs.com/about-us (last visited March 1, 2023).
[18] *Blue Cross & Blue Shield Mut.,* 110 F.3d at 318.

in Paragraph 55.

56.    One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."[19]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected excerpts from WellPoint Inc.'s February 17, 2011 Form 10-K filing, but denies that Plaintiff accurately quotes the selected excerpts. BCBSM refers to that filing for its contents and denies any characterization thereof. BCBSM denies any remaining allegations in Paragraph 56.

57.    No Defendant has or had any franchise agreement with another independent BCBS Licensee or the BCBSA during the relevant period.

**ANSWER:** BCBSM admits that since at least 2008, it does not and has not had any franchise agreement with BCBSA.  BCBSM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57 and therefore denies those allegations.

58.    As the foregoing demonstrates, BCBSA is a vehicle used by independent commercial health benefit product companies to enter into agreements that restrain competition.

**ANSWER:** BCBSM denies the allegations in Paragraph 58.

---

[19] Wellpoint, Inc. 10-K Annual report pursuant to section 13 and 15(d), 8 (Feb. 27, 2011).

59.     Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves. As two economists stated to the FTC in 1978, "[t]he Blues collude almost perfectly. BCBS plans agree upon geographical market areas with the assistance of their national associations."[20]

**ANSWER:** BCBSM admits that the CEO of each Blue Plan is eligible to serve on the Board of Directors of BCBSA.  Defendant further admits that the BCBSA Board of Directors is comprised of the Blue Plans' CEOs and BCBSA's CEO acting in their fiduciary capacity to BCBSA.  BCBSM also admits that Plaintiff purports to quote or summarize selected excerpts from an FTC publication. BCBSM refers to that publication for its contents and denies any characterization thereof. The remaining allegations in Paragraph 59 are legal conclusions to which no response is required; to the extent a response is deemed required, BCBSM denies the remaining allegations in Paragraph 59.

## VI. RESTRAINT OF TRADE

60.     Defendant BCBS MI entered into a License Agreement with Defendant BCBSA. All BCBS Entities, including Defendant BCBS MI, complied with and enforced the ESA restrictions required by the License Agreement from at

---

[20]   Federal Trade Commission, "Competition in the Health Care Sector: Past, Present, and Future," Mar. 1978, at 212, at https://www.ftc.govisites/default/files/documents/reports/competition-health-care-sector-past-present-and-future-proceedings-conference/197803healthcare.pdf

least 2008 to the present.

**ANSWER:** BCBSM admits that since at least 2008, it has entered into License Agreements with BCBSA, which require licensees to comply with certain Membership Standards and Guidelines.  BCBSM refers to those License Agreements, Membership Standards and Guidelines for their contents and denies any characterization thereof.  BCBSM denies the remaining allegations in Paragraph 60.

61.    Defendants have allocated U.S. markets for commercial health benefit products by agreeing to limit their competition against one another when not using the Blue Brand. The Guidelines and Membership Standards, which the independent BCBS Licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, establish two key restrictions on BCBS Licensees.[21]

**ANSWER:** BCBSM admits that the License Agreements require licensees to comply with certain Membership Standards, but refers to the License Agreements, Membership Standards and Guidelines for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 61.

---

[21] *See ¶¶ 31 and 32, supra.*

33

62.     First, the Local Best Efforts Rule directly limits the ability of each BCBS Licensee to generate revenue from non-Blue Brand business within its ESA. This provision thereby limits the ability of each BCBS Licensee to develop non-Blue Brands that could and would compete within the ESA. It discourages and disincentivizes each BCBS Licensee from developing any non-Blue Brand businesses.

**ANSWER:** BCBSM admits that the License Agreements require licensees to comply with certain Membership Standards, but refers to the License Agreements, Membership Standards and Guidelines for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 62.

63.     Second, the National Best Efforts Rule dictates that no BCBS Licensee may generate more than one-third of its total revenue from non-Blue Brand business outside of its ESA anywhere in the U.S., thereby further discouraging and disincentivizing each BCBS Licensee from developing substantial non-Blue Brand business outside of its ESA.

**ANSWER:** BCBSM admits that the License Agreements require licensees to comply with certain Membership Standards, but refers to the License Agreements, Membership Standards and Guidelines for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in

34

Paragraph 63.

64.    The one-third cap on non-Blue Brand revenue arising from the National Best Efforts Rule provides a BCBS Licensee with minimal, if any, incentive to compete outside its ESA.

**ANSWER:** BCBSM admits that the License Agreements require licensees to comply with certain Membership Standards, but refers to the License Agreements, Membership Standards and Guidelines for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 64.

65.    In sum, each BCBS Licensees, including BCBS Entities, agreed with its potential competitors that it will exercise the exclusive right to use the Blue Brand within its designated geographic areas, derive *none* of its revenue from products and services offered under the Blue Brand outside of that area, and derive no more than one-third of its revenue from outside of its exclusive area, by offering products and services under a non-Blue Brand. The latter amount will be further reduced if the BCBS Licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue Brand.

**ANSWER:** BCBSM denies the allegations in Paragraph 65.

66.    The foregoing restrictions on the ability of BCBS Licensees to generate revenue outside of their ESAs constitute agreements between competitors

to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act. Each Defendant abided by the foregoing restrictions from 2008 to the present.[22]

**ANSWER:** The allegations in the first and second sentences in Paragraph 66 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM admits that the License Agreements require licensees to comply with certain Guidelines and Membership Standards, but refers to the License Agreements, Membership Standards, and Guidelines for their contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 66.

67.    Since entering the License Agreement, no BCBS Licensee competed under the Blue Brand outside of its designated ESA. Thus, while there are numerous BCBS Licensees, and non-Blue Brand businesses owned by such plans, that could and would compete effectively in each other's ESAs but for the territorial restrictions, almost none compete outside their ESAs under a non-Blue Brand.

**ANSWER:** BCBSM admits that since at least 2008, it has operated its Blue-branded business as permitted by the License Agreement, Membership Standards and/or Guidelines.  BCBSM lacks knowledge or information sufficient to form a

---

[22]    The National Best Efforts rule was repealed in 2022 as part of the Subscriber Settlement in the Blue Cross Blue Shield Antitrust Litigation; however, the remaining restrictions are still in place. *See In re Blue Cross Blue Shield.*

belief as to the truth of the allegations regarding other licensees in Paragraph 67 and therefore denies those allegations.  BCBSM denies the remaining allegations in Paragraph 67.

## VII. MARKET DEFINITIONS

68.    The BCBS Licensees offer a range of health insurance products to their customers. These customers, depending on their size, generally use one of two types of health insurance for their employees and plan participants: fully insured or self-insured. The BCBS Licensees sell insurance products to both fully insured plans and self-insured plans (typically offered by larger employers and plans).

**ANSWER:** BCBSM admits that it and/or its affiliates offer and sell various commercial health insurance and/or administrative service products to customers, including employers.  BCBSM lacks knowledge or information sufficient to form a belief as to as to the truth of the remaining allegations in Paragraph 68 and therefore denies those allegations.

69.    BCBS Licensees, other health insurers, and other third-party administrators generally classify customers as "small group" or "large group" employers. Within the "large group" category, BCBS Licensees and other insurance industry participants recognize large, multi-site employers or plans typically covering 5,000 or more employees as a distinct group that are referred to

as "National Accounts." The sale of commercial health insurance services, including ASO services, to National Accounts is recognized as a distinct economic market by the BCBS Licensees and other health insurers, many of which have separate business units dedicated to National Accounts. National Accounts are also recognized as a separate economic market by the consuming public, including by the National Accounts themselves. Sales of insurance services to National Accounts are not reasonably interchangeable with the sales of insurance services to smaller accounts, or do not exhibit a high degree of cross-elasticity of demand with such accounts. This market is referred to herein as the "National Account Health Insurance Services" market.

**ANSWER:** BCBSM is without knowledge or information sufficient to form a belief at this time as to the truth of the allegations in Paragraph 69 concerning other Blue Plans and other health insurers and therefore denies those allegations. Paragraph 69 also contains legal conclusions to which no response is required; if a response is required, BCBSM denies those allegations. BCBSM denies the remaining allegations in Paragraph 69.

70. The package of ASO services is considered a distinct line of commerce and its inclusion in the National Account Health Insurance Services market is proper. *See United States v. Grinnell Corp.,* 384 U.S. 563, 572-73 (1966); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 201 (D.D.C. 2017)

(holding that traditional insurance for national accounts and ASO services for national accounts are part of the same market for evaluation under Clayton Act § 7).

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected excerpts from *United States v. Grinnell Corp.*, 384 U.S. 563, 572-73 (1966) and *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 201 (D.D.C. 2017). BCBSM refers to those opinions for their contents and denies any characterizations thereof.  The remaining allegations in Paragraph 70 are legal conclusions to which no response is required; if a response is required, BCBSM denies the remaining allegations in Paragraph 70.

71.    By virtue of their size and geographic dispersion, National Accounts have unique needs and characteristics that have led the health insurance industry to treat them as a separate product with distinct services and pricing. Insurers identify and target National Accounts based on these attributes, and many other participants in the insurance industry generally do not and cannot target National Accounts because of these attributes. Accordingly, only the BCBS Licensees, United HealthCare, Cigna, and Aetna are generally able to service the business of National Accounts. BCBS Licensees have a share of at least 50 percent of the National Account market.

**ANSWER:** BCBSM admits that certain large employers that self-fund

employer-sponsored health plans have certain characteristics that may differ from other employers and customers. To the extent Paragraph 71 contains legal conclusions, no response is required; if a response is deemed required, BCBSM denies the allegations. BCBSM is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 71 and therefore denies those allegations.

72. Many National Accounts self-insure. A majority of Ford's insurance has been self-insured since 2015. Self-insurance means Ford assumes the risk and cost of covered medical services used by their covered individuals. National Accounts facilitate this self-insurance coverage by purchasing ASO services pursuant to which third parties (such as BCBS Licensees) manage the day-to-day administration of customers' health plans and grant the covered individuals access to their medical provider network(s).

**ANSWER:** BCBSM admits that a majority of the products that Plaintiff has purchased from BCBSM since 2015 have been self-insured products. To the extent Paragraph 72 contains legal conclusions, no response is required; if a response is deemed required, BCBSM denies the allegations. BCBSM further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72 and therefore denies those allegations.

73.     Payments for services from self-insured National Accounts to insurers (such as BCBS Licensees) under ASO contracts are known as "ASO fees." ASO fees are a significant part of the negotiations between ASO service providers and National Accounts.

**ANSWER:** The allegations in Paragraph 73 are too vague and ambiguous to permit a response and therefore BCBSM denies the allegations.

74.     Alternatively, some National Accounts continue to rely on traditional insurance plans. Traditional insurance plans rely on the insurance provider to pool the fund and administer premiums. Both the employer and the employee pay premiums to the insurance provider to contribute toward the pooled fund. These premiums are a significant factor in the negotiations between insurance providers and National Accounts. Ford continues to rely on traditional plans for some plants and regions.

**ANSWER:** The allegations in Paragraph 74 are too vague and ambiguous to permit a response and therefore BCBSM denies the allegations.

75.     There is a relevant product market for the sale of commercial health insurance services to National Accounts.

**ANSWER:** The allegations in Paragraph 75 are legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations in Paragraph 75.

76.     The relevant geographic market is the entire United States. *Anthem Inc.*, 236 F. Supp. 3d at 193-202 (finding that the relevant product market for consideration of the proposed Anthem/Cigna merger was the sale of commercial health insurance to National Accounts with 5,000 employees or more spread across two or more states).

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize portions of *United States v. Anthem*, 236 F. Supp. 3d 171 (D.D.C. 2017). BCBSM refers to that opinion for its contents and denies any characterization thereof. The remainder of the paragraph contains legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the remaining allegations in Paragraph 76.

77.     Defendants' unlawful conduct has also unreasonably restrained competition in the National Account market.

**ANSWER:** The allegations in Paragraph 77 contain legal conclusions to which no response is required; to the extent a response is deemed required, BCBSM denies the allegations in Paragraph 77.  BCBSM denies the remaining allegations in Paragraph 77.

78.     Ford is a National Account as that term has been defined by the case law and as it is commonly used in the insurance industry and by Defendants.

**ANSWER:** BCBSM admits that Ford is a "National Account" as that term

42

is used by BCBSM in its internal business operations.  The remaining allegations in Paragraph 78 are legal conclusions to which no response is required; to the extent a response is deemed required, BCBSM denies the allegations in Paragraph 78.

79.    As owners of the BCBSA, BCBS MI and the other BCBS Licensees, agreed to allocate customers and markets, restrict output, and eliminate the ability of Defendants to compete against each other for the business of National Accounts.

**ANSWER:** BCBSM admits that BCBSA licenses the Blue Marks to 33 independent, community-based and locally operated Blue Cross and Blue Shield plans in the United States and Puerto Rico that collectively provide healthcare coverage in all 50 states, the District of Columbia, and Puerto Rico, and that those licensees are governing members of BCBSA.  BCBSM further admits that it has entered into License Agreements with BCBSA, which require licensees to comply with certain Membership Standards and Guidelines. BCBSM refers to those License Agreements, Membership Standards and Guidelines for their contents and denies any characterization thereof.  The remaining allegations in Paragraph 79 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the remaining allegations in Paragraph 79.

## VIII. BCBS LICENSEES' COLLECTIVE MARKET POWER

80.    The BCBS Licensees wield collective nationwide economic power.

BCBSA's own factsheet admits this.[23]

**ANSWER:** BCBSM admits that Plaintiff purports to summarize selected excerpts from BCBSA's website. BCBSM refers to BCBSA's website for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 80.

81.    The 36 BCBS Licensees serve 106 million people — one out of every three Americans. The various BCBS Licensees service 88 of the Fortune 100 companies. They also service over seven million people who work for small employers. They are the number one choice for organized labor, serving 17 million organized workers, retirees, and their families. They offer coverage through Affordable Care Act insurance exchanges and service millions of Americans through government-supported healthcare programs. The BCBS provider network includes more than 90% of doctors and hospitals nationwide. More than 62 million BCBS enrollees across all 50 states have access to care from more than 342,000 providers.[24] As just described, the market shares of individual BCBS Licensees in various states are indicative of market power.

**ANSWER:** BCBSM admits that Plaintiff purports to summarize selected excerpts from BCBSA's website. BCBSM refers to BCBSA's website for its

---

[23]    BLUE FACTS, Blue Cross Blue Shield Association, https://wvvw.bcbs.com/sites/default/files/file-attachments/page/BCBS.Facts__0.pdf (May, 2018).

[24]    *Id.*

contents and denies any characterization thereof. BCBSM further admits that BCBSA licenses the Blue Marks to 33 independent, community-based and locally operated Blue Cross and Blue Shield plans in the United States and Puerto Rico that collectively provide healthcare coverage in all 50 states, the District of Columbia, and Puerto Rico.  The remaining allegations in Paragraph 81 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the remaining allegations in Paragraph 81.

82.   In a letter written in February of 2016, the AHA summarized the market dominance of the BCBS Licensees (footnotes omitted) as follows:

a.  [BCBS Licensees] have the largest membership of any insurer. The Blues cover more than 105 million Americans. That is "nearly one in three Americans." Collectively, the [BCBS Licensees] are three times bigger than any other health plan.

b.  [BCBS Licensees] command the largest share of the commercial fully insured (FI) segment in at least 45 states and the District of Columbia (D.C.); in 35 states, a [BCBS Licensee] holds 50 percent or more FI market share; in some states, 85 percent of all FI members belong to a [BCBS Licensee].

c.  [BCBS Licensees] rank first in total membership in at least 43 states and D.C., with a high market share of 97 percent.

d.  In the Federal Employees Health Benefits Program, the [BCBS Licensees] command 66 percent of total membership, and control 50 to 90 percent of the membership in 48 states and D.C.

e.  In the public exchanges, [BCBS Licensees] dominate. In at least one state, the [BCBS Licensee] enrolled 100 percent of the exchange membership in 2015, and other [BCBS Licensees] acquired membership shares in the forties through nineties in many states.

f.  [BCBS Licensees] collectively are significantly larger than any of their rivals on a consolidated basis. Indeed, collectively [BCBS Licensees] had $244 billion in revenue in 2013, making them larger than all companies on the Fortune 500 except for Walmart and Exxon Mobil.

g.  The [BCBS Licensees] of Alabama, Florida, Illinois, Kansas, Minnesota, Montana, Nebraska, New Mexico, North Dakota, North Carolina, Oklahoma, Texas and Wyoming through their jointly owned pharmacy benefit manager acknowledge their "market dominance."

h.  [BCBS Licensees] dominate provider networks. In 32 states and D.C., [BCBS Licensees] have the largest provider networks and, in seven more states, [BCBS Licensees] have the second-largest provider networks.

i.  [BCBS Licensees] contract with 96 percent (more than 5,100) of U.S. hospitals and 92 percent of professional providers, which is more than any other insurer.[25]

**ANSWER:** BCBSM admits that Plaintiff purports to quote and/or summarize selected excerpts from a February 29, 2016 letter from the AHA. BCBSM refers to that letter for its contents and denies any characterization thereof. The remaining allegations in Paragraph 82 contain legal conclusions to which no

---

[25]  American Hospital Association Letter to Hon. William Baer, Antitrust Division, U.S. Department of Justice (Feb. 29, 2016) ("AHA Letter"), at 7-9.

response is required; if a response is deemed required, BCBSM denies the remaining allegations in Paragraph 82.

83. Moreover, the BCBS Licensees exercise market power in the market for National Accounts. As of September 2015, the BCBS Licensees served 85% of the Fortune 100 companies and 76% of Fortune 500 companies; a key indicator of the market share and market power the BCBS Licensees have in the market for National Accounts.[26]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize a Healthcare Business Strategy article. BCBSM refers to that article for its contents and denies any characterization thereof. BCBSM further states that the allegations in Paragraph 83 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations. BCBSM denies any remaining allegations in Paragraph 83.

84. In litigation involving a prospective merger between Anthem and Cigna, a United States District Court held that market share and market power at the levels maintained by BCBS Licensees is anticompetitive. To this end, the court held that if Anthem were to increase its share of the market for National Accounts within its fourteen-state area from 40 to 48 percent, the merger would presumably

---

[26] Mark Farrah Associates, *Blue Cross and Blue Shield Share Snapshot 2015,* Healthcare Business Strategy (Jan =. 26, 2016), https://www.markfarrah.com/uploaded/mfa-briefs/Blue-Cross-and-Blue-Shield-Market-Share-Snapshot-2015 .pdf.

lessen competition because the market would be too concentrated. Specifically, a market share increase from 40 to 48 percent would lead to a Herfindahl-Hirschman Index ("HHI") concentration increase from 641 to 3124, a number well above the HHI of 2500 used as a baseline to determine a highly concentrated market. *Anthem, Inc.,* 236 F. Supp. 3d at 208-10. The court ultimately held that the proposed merger was impermissible under the antitrust laws. *Id.* at 259.

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize an opinion from *United States v. Anthem*, 236 F. Supp. 3d 171 (D.D.C. 2017). BCBSM refers to that opinion for its contents and denies any characterization thereof. The remainder of Paragraph 84 contains legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.

85.    The BCBS Licensees' collective abuse of their market power in the market for National Accounts is also demonstrated by their ability to limit consumer choice, raise prices, and impose onerous terms without losing market share.

**ANSWER:** BCBSM denies the allegations in Paragraph 85.

86.    The BCBS Licensees, collectively, demonstrate a dominant share in the market; whether viewed on a state-by-state basis, or through the entire United States, the BCBS Licensees dominate the insurance industry.

48

**ANSWER:** The allegations in Paragraph 86 are legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.

87.   As noted in the AHA summary, the BCBS Licensees are the largest insurer by revenue, and all together control 50 to 90 percent of the market in 48 states. This enormous and wide-ranging market influence granted the BCBS Licensees an almost-certain probability of succeeding in any conspiratorial undertaking to inflate prices and reduce competition, such as the ESAs.

**ANSWER:** BCBSM admits that Plaintiff purports to quote and/or summarize selected excerpts from a February 29, 2016 letter from the AHA. BCBSM refers to that letter for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 87.

88.   At a minimum, the BCBS Licensees have exercised their collective market power to maintain and increase their market share even as their illegal and anticompetitive restraints limit the choice of Ford to just one of the BCBS Licensees in each ESA.

**ANSWER:** The allegations in Paragraph 88 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 88.

## IX. DEFENDANTS' CONDUCT WAS NOT BENEFICIAL TO THE MARKET

89.    But for the *per se* illegal territorial restrictions, all BCBS Licensees, including BCBS MI, would be free to sell their Blue Brand products and compete for National Accounts throughout the United States irrespective of their ESAs. The market competition generated by BCBS MI, together with all other BCBS Licensees, would result in lower costs and thus lower premiums and ASO fees paid by their enrollees.

**ANSWER**: The allegations in Paragraph 89 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 89.

90.    The market allocation agreement eliminates competition between BCBS Licensees and evades free market competition between BCBS Licensees. If each BCBS Licensee's right to its exclusive service territory were lost or materially changed, such entities would experience increased competition from other BCBS Licensees.

**ANSWER**: The allegations in Paragraph 90 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 90.

91.    BCBS MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its ESA of Michigan. But for the ESAs, BCBS MI would likely offer its commercial health

benefit services and products in more regions across the United States in competition with the individual BCBS plans in those regions. Likewise, other BCBS Licensees would likely offer their commercial health benefit services and products in Michigan in competition with BCBS MI. Such competition would result in lower health care costs paid by the other BCBS Licensees' enrollees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

**ANSWER:** BCBSM admits that it is the largest commercial health insurer in the state of Michigan, as measured by the number of subscribers. To the extent the first sentence in Paragraph 91 contains an allegation about the size of other commercial health insurers, BCBSM is without knowledge or information sufficient to form a belief as to the truth of that allegation, and therefore denies the allegation. BCBSM denies the remaining allegations in Paragraph 91.

92.     Anthem is the largest health insurer in the country by total medical enrollment with approximately 38.5 million enrollees. It has been allocated the geographic area of all or part of 14 states, and it also serves customers throughout the country (including outside its 14 allocated states) through its non-Blue Brand subsidiary, UniCare. Anthem is already operating outside of its allocated area via UniCare. But for the illegal territorial restrictions and output limitations alleged herein, Anthem would compete for National Accounts outside of its ESA.

**ANSWER:** BCBSM is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92 concerning Anthem's size, customer dispersion, non-Blue branded business, and acquisitions, and therefore denies those allegations. BCBSM denies the remaining allegations in Paragraph 92.

93.    BCBS Entities' anticompetitive conduct had no procompetitive justifications. More competitive insurance markets in each geographical area would exist without the horizontal allocation agreement. The anticompetitive agreement was not necessary to protect the Blue Brand, nor did it create productive cooperation in a free market or serve any other legitimate business need. To the contrary, the BCBS Entities' anticompetitive scheme was the direct cause of the reduction of competition within the ESAs, the realization of exorbitant profits, and an increase in market share for its participants.

**ANSWER:** BCBSM denies the allegations in Paragraph 93.

94.    The MDL Court found as much when it stated: "Defendants cannot claim they produce a unique product. The market allocations at issue are not necessary to market, sell or produce health insurance[.]" *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1269-70.

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize selected excerpts from *In re Blue Cross Blue Shield Antitrust Litigation*, 308 F.

Supp. 3d 1241 (N.D. Ala. Apr. 5, 2018). BCBSM refers to that opinion for its

contents and denies the characterizations thereof. BCBSM denies any remaining

allegations in Paragraph 94.

95.    The ESAs eliminated competition among BCBS Licensees and,

therefore, eliminated that downward pressure on premium and ASO contract price

levels.

**ANSWER:** BCBSM denies the allegations in Paragraph 95.

96.    As the AHA explained in the aforementioned 2016 AHA Letter

(footnotes omitted):

> A recent study looking at pricing changes on 34 state exchanges
> found that the "largest insurance company in each state on average
> increased their rates 75 percent more than smaller insurers in the
> same state," and increases did not appear to be related to higher
> medical costs. "In most states insurers with large market share
> [overwhelmingly BCBS Licensees] have proposed rate increases in
> excess of 20 percent for next year." These studies seem to suggest
> that [BCBS] premiums are higher in states where they are dominant
> and any network efficiencies they enjoy as a result do not translate
> into lower premiums for consumers.
>
> - Illinois - the [BCBS Licensee] asked for an average increase of 29
>   percent for its HMO plan and 38 percent for its PPO plans.
>
> - Kansas - the [BCBS Licensee] asked for average increases of 38
>   percent.
>
> - Anthem requested exchange premium increases of more than 10
>   percent in California, Connecticut, Georgia, Kentucky, New York,
>   and Virginia. Despite its higher premiums in the individual market

and despite losing some share to lower-priced competitors, Anthem declared that "we will not chase price to buy membership."[27]

**ANSWER:** BCBSM admits that Plaintiff purports to quote and/or summarize selected excerpts from a February 29, 2016 letter from the AHA. BCBSM refers to that letter for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 96.

97.     In addition, despite claiming to be "not-for-profit," many of the BCBS Licensees hold massive excess surplus levels built off the net income derived from high premiums they charge customers and sub-competitive payments to health care providers. Those excessive surplus levels have come at the expense of higher premiums to consumers.

**ANSWER:** BCBSM is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the surplus levels of other Blue Plans and therefore denies those allegations. BCBSM denies the remaining allegations in Paragraph 97.

98.     As of September 30, 2010, 33 "not-for-profit" BCBS Licensees held more than $27 billion in capital in excess of the minimum threshold reserves required by the BCBSA.[28]

---

27   AHA Letter at 18-19.

28   *In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406), Provider Plaintiff's Executive Summary of Expert Report of Thomas D. Gober, 6 (N.D. Ala. 2019).

**ANSWER:** BCBSM admits that Plaintiff purports to quote and/or summarize selected excerpts from a pleading filed by Provider Plaintiffs in *In re Blue Cross Blue Shield Antitrust Litigation*, 2:13-cv-20000 (N.D. Ala.). BCBSM refers to that pleading for its contents and denies any characterization thereof. BCBSM denies the remaining allegations in Paragraph 98.

99.    Many of the BCBS Licensees understate their actual surplus by citing only the surplus from their BCBSA licensed line of business, but not the general surplus on the BCBS Licensees' combined reporting statements accounting for all lines of business.

**ANSWER:** BCBSM is without knowledge or information to form a belief as to the truth of the allegations concerning the accounting practices of other Blue Plans and therefore denies those allegations.   BCBSM denies the remaining allegations in Paragraph 99.

100.   BCBS IL posted over one billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011, and 2012. This net income does not even account for large blocks of plans it administers for the self-insured plans.

**ANSWER:** BCBSM is without knowledge or information to form a belief as to the truth of the allegations in Paragraph 100 and therefore denies those allegations.

101.   The BCBS Licensees often claim these surpluses are designed as insurance reserves for future payments, but they are more often used as strategic monies allowing acquisitions of competitors, or market share.

**ANSWER:** The allegations in Paragraph 101 are too vague and ambiguous to permit a response and therefore BCBSM denies the allegations.

102.   Further, many of the executives at the BCBS Licensees take exorbitant bonuses at the cost of higher premiums and ASO fees. "CEO Patricia Hemingway Hall's base salary was just $1.1 million, but the executive garnered a $14.9 million bonus." "The CEO of [BCBS IL] received $12.9 million in 2011."[29]

**ANSWER:** BCBSM admits that Plaintiff purports to quote or summarize a Chicago Business article. BCBSM refers to that article for its contents and denies any characterization thereof.   BCBSM denies the remaining allegations in Paragraph 102.

103.   Ford was damaged by paying non-competitive premiums and ASO fees to BCBS Entities, including Defendant BCBS MI, in their exclusive service areas.

**ANSWER:** BCBSM denies the allegations in Paragraph 103.

104.   Ford's damages are the difference between the price Ford actually paid in non-competitive premiums and ASO fees, reduced by the price that would

---

[29]   Wang, *Blue Cross parent CEO's compensation rockets past $16 million, supra* n. 1.

have been available to Ford but for BCBS Entities' antitrust violations.

**ANSWER:** BCBSM denies the allegations in Paragraph 104.

## X.    PRODUCTS PURCHASED BY FORD

105.  From as early as 2009 through the present Ford has purchased insurance products and services including fully insured plans and ASO services from BCBS Entities, including Defendant BCBS MI.

**ANSWER:** BCBSM admits that Plaintiff has purchased commercial health insurance products, including both fully insured products and administrative services products, from BCBSM as early as 2009. BCBSM is without knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 105 and therefore denies those allegations.

106.  Ford has contracted with Defendant BCBS MI since at least 2009 through on or about 2013, to provide "fully-insured" products for its employees in designated service areas in Michigan, spending more than $500,000,000 in premiums.

**ANSWER:** BCBSM admits that Plaintiff purchased fully-insured products from BCBSM since at least 2009 until approximately 2013. The remaining allegations in Paragraph 106 are too vague and ambiguous to permit a response and therefore BCBSM denies the allegations.

107.  Ford has contracted with Defendant BCBS MI since on or about 2013

to provide ASO services, and continues to contract with BCBS MI, spending more than $150,000,000 in fees, and additional monies for claims paid.

**ANSWER:** BCBSM admits that Plaintiff has purchased administrative services products from BCBSM since 2013. The remaining allegations in Paragraph 107 are too vague and ambiguous to permit a response and therefore BCBSM denies the allegations.

108. Ford has contracted with BCBS KC since at least 2009, and continues to contract with BCBS KC, to provide "fully-insured" products for its employees in designated service areas in Missouri, spending more than $500,000,000 in premiums.

**ANSWER:** BCBSM is without knowledge or information to form a belief as to the truth of the allegations in Paragraph 108 and therefore denies those allegations.

109. Ford has contracted with Anthem since at least 2009 through on or about 2011, to provide "fully-insured" products for its employees in designated service areas in Ohio and Missouri, spending more than $10,000,000 in premiums.

**ANSWER:** BCBSM is without knowledge or information to form a belief as to the truth of the allegations in Paragraph 109 and therefore denies those allegations.

110. Ford has contracted with Anthem since 2015, and continues to

contract with Anthem, to provide ASO services in Ohio and Missouri, spending more than $3,000,000 in fees, and additional monies for claims paid.

**ANSWER:** BCBSM is without knowledge or information to form a belief as to the truth of the allegations in Paragraph 110 and therefore denies those allegations.

111.  Ford has contracted with BCBS IL since 2009, and continues to contract with BCBS IL, to provide "fully-insured" products for its employees in designated service areas in Illinois, spending more than $100,000,000 in premiums, and additional monies in claims paid.

**ANSWER:** BCBSM is without knowledge or information to form a belief as to the truth of the allegations in Paragraph 111 and therefore denies those allegations.

112.  Ford has contracted with BCBS TN since at least 2009 through 2012, to provide "fully-insured" products for its employees in designated areas in Tennessee, spending more than $25,000,000 in premiums.

**ANSWER:** BCBSM is without knowledge or information to form a belief as to the truth of the allegations in Paragraph 112 and therefore denies those allegations.

113.  Ford has suffered actual damages because it paid Defendant BCBS MI and the above-named BCBS Entities more for these insurance products and

services than it otherwise would have paid in a competitive market free from Defendants' anticompetitive contractual agreement not to compete.

**ANSWER:** BCBSM denies the allegations in Paragraph 113.

## XI. TOLLING OF THE STATUTE OF LIMITATIONS

114. The statute of limitations as to the BCBS Entities' continuing antitrust violations alleged in this Complaint was tolled by the pendency of one or more class action complaints, including the original *Cerven* complaint,[30] and any amendments thereto.

**ANSWER:** BCBSM denies the allegations in Paragraph 114.

115. The statute of limitation as to Defendant BCBS MI is tolled because Ford suffered continuing violations, including new, independent, and separately negotiated and executed yearly contracts and amendments executed with Defendant BCBS MI.

**ANSWER:** BCBSM denies the allegations in Paragraph 115.

116. The statute of limitation as to Defendant BCBS MI was additionally tolled because Ford entered into a tolling agreement with BCBS MI related to Ford's claims extending the statute of limitation for an additional year.

**ANSWER:** BCBSM admits that it entered into tolling agreement with Plaintiff that extended any applicable statute of limitation to Plaintiff's claims for

---

30   Complaint, *Cerven et al v. Blue Cross and Blue Shield of North Carolina et al,* 2:12-ov-04169, Dkt, 1.

one additional year.  BCBSM denies the remaining allegations in Paragraph 116.

## XII. SHERMAN ACT § 1 VIOLATIONS

117. Ford repeats, realleges, and incorporates the allegations in all numerical paragraphs above.

**ANSWER:** BCBSM repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

118. The agreements entered into, amongst and between Defendant BCBSA and BCBS Entities, including Defendant BCBS MI, represent horizontal agreements between competitors or potential competitors in the market for commercial health insurance products and services.

**ANSWER:** The allegations in Paragraph 118 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 118.

119. The agreements entered into and restraints imposed by BCBS Entities created an unreasonable contract, combination, and/or conspiracy in restraint of trade within the meaning of Section 1 of the Sherman Act.

**ANSWER:** The allegations in Paragraph 119 are legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.

120. Through these agreements and restraints, BCBS Entities allocated

geographic territories for the exclusive sale of commercial health insurance products and services with the specific intent to restrain interstate trade in violation of Section 1 of the Sherman Act. This geographic allocation of markets is *per se* illegal under Section 1 of the Sherman Act and had unreasonable anticompetitive effects including but not limited to (a) reducing the number of BCBS Licensees competing with each other; (b) reducing the number of non-Blue Brand insurance providers competing with BCBS Licensees; (c) limiting the entry of competitor health insurance companies into the market; (d) allowing BCBS Entities, including BCBS MI, to maintain their market dominance; (e) allowing BCBS Entities, including BCBS MI, to charge supra-competitive prices; and (f) all other effects flowing from the lack of a free and open competitive market.

**ANSWER:** The allegations in Paragraph 120 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 120.

121.   As a direct and proximate result of this conspiracy to allocate markets and restrain trade, Ford was deprived of, among other things, the opportunity to purchase health insurance products and services from a lower cost competitor and/or at a price set by the free market. Additionally, but for BCBS Entities' illegal conspiracy, Ford could and would have accessed a wider choice of insurance products and services.

62

**ANSWER:** The allegations in Paragraph 121 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 121.

122.   Ford has suffered and continues to be threatened with suffering injury and damages in an amount to be proven at trial. These actual damages consist of (a) having paid artificially inflated, unreasonable, and supra-competitive prices to BCBS Entities, including BCBS MI, that were higher than Ford would have paid but for the Sherman Act violations; and (b) being deprived of the opportunity to purchase health insurance products and services from other BCBS Licensees and/or non-Blue Brand insurance providers. Ford's damages consist of the difference between the artificially inflated prices and those that would have been available in a competitive market. These payments have occurred on a continuing basis (and no less than a monthly basis), and each payment to a BCBS Entity has caused injury to Ford.

**ANSWER:** The allegations in Paragraph 122 contain legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.  BCBSM denies the remaining allegations in Paragraph 122.

123.   Defendants are jointly and severally liable to Plaintiff in treble the amount of actual damages suffered by Plaintiff plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by

Section 4 of the Clayton Act. Plaintiff also seeks and is entitled to recover divisible and individualized injunctive relief that does not infringe on the indivisible injunctive relief previously awarded in the putative subscriber class action settlement in the MDL.

**ANSWER:** The allegations in Paragraph 123 are legal conclusions to which no response is required; if a response is deemed required, BCBSM denies the allegations.

## XIII. RELIEF REQUESTED

The remainder of the Complaint consists of Plaintiff's prayer for relief, to which no response is required.  To the extent a response is required, BCBSM denies that Plaintiff is entitled to the relief sought in the Complaint or to any relief whatsoever.  BCBSM denies each and every allegation in the Complaint except as expressly admitted and qualified above.  BCBSM requests that the Complaint be dismissed with prejudice, that the Court find that Plaintiff is not entitled to any judgment or relief, that the Court enter judgment in favor of BCBSM and BCBSA, and that the Court award BCBSM and BCBSA their attorneys' fees, costs and expenses, pre-judgment interest and such other and further relief as the Court deems just and proper.

## **AFFIRMATIVE AND OTHER DEFENSES**

Pursuant to Federal Rule of Civil Procedure 8(c), BCBSM, without waiver, limitation, or prejudice, sets forth below its affirmative and other defenses. By setting forth these defenses, BCBSM does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to the Plaintiff. Nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to Plaintiff's allegations. BCBSM reserves the right to rely on any defense or claim that may subsequently come to light and expressly reserves the right to amend its answer to assert such additional defenses or claims.

As separate and distinct defenses, BCBSM alleges as follows:

## First Defense

### (Statute of Limitations)

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

## Second Defense

### (Laches)

Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of laches.

## Third Defense

### (Res Judicata/Collateral Estoppel)

Plaintiff's claims are barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

## Fourth Defense

### (Release)

Plaintiff's claims are barred, in whole or in part, because they have been released. Plaintiff is a member of the mandatory Rule 23(b)(2) injunctive class of the Subscriber Track settlement in the MDL and has therefore released its claims for indivisible equitable relief against Defendants in their capacity as purchaser of Blue-branded health insurance and/or administrative services products.

## Fifth Defense

### (Waiver)

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver due to Plaintiff's own acts and omissions, including because Plaintiff continues to enjoy the benefits of the agreements with BCBSM.

## Sixth Defense

### (Estoppel)

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

**Seventh Defense**

**(Single Entity)**

Plaintiff's claims are barred, in whole or in part, because Defendants constitute a single entity with respect to the licensing and use of the nationwide Blue Cross and Blue Shield trademarks and trade names and are therefore incapable of conspiring under § 1 of the Sherman Act.

**Eighth Defense**

**(Lack of Antitrust Injury)**

Plaintiff's claims are barred, in whole or in part, because it has sustained no injury of the type that the antitrust laws were intended to prevent.

**Nineth Defense**

**(Legitimate Business Justifications)**

BCBSM alleges that, without admitting any liability whatsoever, at all times its conduct was reasonable and that its actions were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging, and increasing competition and/or were ancillary to pro-competitive conduct.

**Tenth Defense**

**(Protected Common-Law and Statutory Intellectual Property Rights)**

Plaintiff's claims are barred, in whole or in part, because the challenged conduct is ancillary to protecting the value of lawfully-acquired intellectual

property rights and to licensure of those rights, and conflicts with Defendants' lawfully-acquired common-law and statutory intellectual property rights.  Even if the challenged license agreements were struck down, the common law rights (including the right to exclude) would revert to their original owners, which could lawfully continue to assert them, which is precisely what BCBSM, the owner of the common-law marks in the state of Michigan, would continue to do.

## Eleventh Defense

## (Relief Contrary to Public Interest, Inequitable, Impractical, and/or Unworkable)

The relief sought by Plaintiff would be contrary to the public interest and harm consumers.  Plaintiff seeks a declaration that the Blue System is unlawful under the Shearman Act.  Such a declaration would render it impossible for the System to function, removing one of only a few national competitors in the market for large national accounts, and would therefore harm competition as well as Blue consumers throughout the nation.

## Twelfth Defense

## (No Unreasonable Restraint of Trade)

Plaintiff has failed to define an appropriate, relevant market; demonstrate the existence of market power in that market; demonstrate that any anticompetitive effects exist; and/or, if they carry their burden of demonstrating that any

anticompetitive effects exist, that such anticompetitive effects outweigh the pro-competitive benefits.

**<u>Thirteenth Defense</u>**

**(No Entitlement to Attorney's Fees or Costs)**

Plaintiff is not entitled to attorney's fees or costs in connection with this action because Plaintiff will be unable to prove necessary elements of its claims and attorney's fees and/or costs are not recoverable by a non-prevailing party.

**<u>Fourteenth Defense</u>**

**(Filed Rate/State Action Doctrine)**

Plaintiff's claims to recover for alleged overpayment of health insurance services are barred, in whole or in part, because they are preempted by the filed-rate doctrine at both the federal and state levels.

**<u>Fifteenth Defense</u>**

**(McCarran-Ferguson Act)**

Plaintiff's claims are barred, in whole or in part, by the McCarran-Ferguson Act. *See* 15 U.S.C. §§ 1011-1015.

## Sixteenth Defense

## (Implied/Express Immunity)

Plaintiff's claims are preempted and barred, in whole or in part, because Defendants' alleged conduct has implied or express immunity from the antitrust laws.

## Seventeenth Defense

## (Lack of Standing)

Plaintiff's claims are barred, in whole or in part, as Plaintiff lacks standing to bring its claims.

## Eighteenth Defense

## (Failure to State a Claim)

Plaintiff fails to state a claim on which relief can be granted.

## Nineteenth Defense

## (Lack of Injury-in-Fact)

Plaintiff's claims are barred, in whole or in part, because it has sustained no injury in fact by any act or omission of BCBSM.

## Twentieth Defense

## (Lack of Causation)

Plaintiff's claims are barred, in whole or in part, because of a lack of causation, including, without limitation, because any injuries or damages that may

have been suffered were not caused solely or proximately by any act or omission of BCBSM.

## **Twenty-First Defense**

### **(Duplicative)**

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff seeks damages that would constitute duplicative recovery and/or offset.

## **Twenty-Second Defense**

### **(Unjust Enrichment)**

Plaintiff's claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Plaintiff.

## **Twenty-Third Defense**

### **(Failure to Mitigate)**

Plaintiff's claims are barred, in whole or in part, by its failure to mitigate, prevent, or avoid their alleged damages, if any, and therefore Plaintiff's recovery, if any, should be reduced to the extent such damages could and should have been mitigated, prevented, or avoided.

## **Twenty-Fourth Defense**

### **(Speculative Damages)**

Plaintiff's claims are barred, in whole or in part, because any damages that Plaintiff purports to have suffered are too remote or speculative to allow recovery,

and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

**Twenty-Fifth Defense**

**(Adequate Remedy at Law)**

Plaintiff is not entitled to injunctive relief because any alleged injury to Plaintiff is not immediate or irreparable, is entirely self-inflicted, and Plaintiff has an adequate remedy at law.

**Twenty-Six Defense**

**(Prior Litigation)**

Plaintiff's claims are barred, in whole or in part, because those claims have been settled and/or dismissed with prejudice in prior litigation, including *The Shane Group, Inc., et al. v. Blue Cross Blue Shield of Michigan*, No. 2:10-cv-14360 (E.D. Mich.), as well as any other matters BCBSM uncovers in discovery.

**Twenty-Seventh Defense**

**(Ratification/Agreement/Acquiescence/Consent)**

Plaintiff's claims are barred, in whole or in part, because of Plaintiff's ratification, agreement, acquiescence, authorization, or consent to BCBSM's alleged conduct, including because Plaintiff continues to reap the benefits of its respective agreement with BCBSM.

**Twenty-Eighth Defense**

**(Adoption of Other Defenses)**

BCBSM adopts by reference any defense not otherwise expressly set forth herein that is or will be pleaded by BCBSA in this action.

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL DEFENSES

BCBSM presently has insufficient knowledge or information to determine whether it may have additional, as yet unstated defenses.  BCBSM has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other applicable defenses that may become available or apparent during discovery in this matter. BCBSM reserves the right to amend or seek to amend its answer and/or affirmative defenses.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), BCBSM demands a trial by jury of all claims and defenses upon which it is entitled to a jury trial.

## PRAYER FOR RELIEF

BCBSM requests that the Complaint be dismissed with prejudice, that the Court find that Plaintiff is not entitled to any judgment or relief, that the Court enter judgment in favor of BCBSM and BCBSA, and that the Court award BCBSM and BCBSA their attorneys' fees, costs and expenses, pre-judgment interest and such other and further relief as the Court deems just and proper.

Dated: April 15, 2024

Respectfully submitted,

SHEARMAN & STERLING LLP

By: */s/ Todd M. Stenerson*
Todd M. Stenerson (P51953)
Brian Hauser (*application for admission forthcoming*)
401 9th Street, Suite 800
Washington, DC 20004
(202) 508-8000
todd.stenerson@shearman.com
brian.hauser@shearman.com

Rachel Mossman Zieminski
(*admitted in E.D. Mich.*, Texas Bar 24131967)
2601 Olive Street, Suite 1700
Dallas, TX 75201
(214) 271-5777
rachel.zieminski@shearman.com

Susan Loeb (*admitted in E.D. Mich.*, New York Bar 5570940)
Sophie Copenhaver (*admitted in E.D. Mich.*, New York Bar 6004766)
599 Lexington Avenue
New York, NY 10022
(212) 848-4000
susan.loeb@shearman.com
sophie.copenhaver@shearman.com

Sarah L. Cylkowski (P75952)
Alexandra C. Markel (P81705)
BODMAN PLC
6th Floor at Ford Field
1901 Saint Antoine Street
Detroit, Michigan 48226

(313) 392-1077
scylkowski@bodmanlaw.com
amarkel@bodmanlaw.com

*Attorneys for Defendant Blue Cross*
*Blue Shield of Michigan Mutal*
*Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I caused the foregoing document to be served via ECF on all attorneys of record. I declare under penalty of perjury that the foregoing statements are true and correct.

By: */s/ Todd M. Stenerson*
Todd M. Stenerson (P51953)
401 9th Street, Suite 800
Washington, DC 20004
(202) 508-8000
todd.stenerson@shearman.com

*Attorney for Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company*