IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| FORD MOTOR COMPANY ) | CASE NO: 2.23-CV-11286 |
| PLAINTIFF ) | JUDGE: Hon. Linda V. Parker |
| ) | MAGISTRATE JUDGE: Hon. Elizabeth A. Stafford |
| v. ) | **ORAL ARGUMENT REQUESTED** |
| BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE CO, et al., ) | |
| DEFENDANTS ) | |

**PLAINTIFF FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Eastern District of Michigan Local Rule 7.1, Plaintiff Ford Motor Company ("Ford") moves this Court for an order granting summary judgment against Defendants Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSM") and the Blue Cross Blue Shield Association ("BCBSA" or the "Association") (collectively, "Defendants"). As detailed in Ford's Brief in Support of this Motion, there is no genuine dispute as to any material fact, and Ford is entitled to judgment as a matter of law on the question of Defendants' liability under Section 1 of the Sherman Act, 15 U.S.C. § 1.

As an initial matter, the per se standard of review applies to Defendants' market restraints. It is undisputed that Defendants engaged in precisely the type of horizontal agreement that courts have repeatedly held to require per se treatment. Moreover, applying the per se standard, the undisputed record establishes a violation as to each of Defendants' market restraints— BCBSA's Exclusive Service Areas, National Account Program, and NBE Rule. Finally, even if the Rule of Reason applied (it does not), the undisputed record would still compel judgment for Ford because, as held in related litigation, the market restraints lack procompetitive justification.

In accordance with E.D. Mich. LR 7.1 (a), counsel for the Parties met and conferred seeking concurrence on the issues to be presented in their respective motions seeking common ground on the issues and in an attempt to narrow any issues where possible. There are issues remaining upon which the Parties do not concur and as such Plaintiff Ford Motor Company files this Motion for Summary Judgment.

Further, pursuant to the terms of the Qualified Protective Order in the case, ECF No 52, material submitted in support of this motion has been designated "Confidential" by the producing party. As contemplated in ¶ 12 of the Qualified Protective Order, ECF No. 52, PageID.3698, Plaintiffs file this motion, the associated brief, and exhibits under seal and will concurrently file a public version

of the motion and brief redacting only those portions of the motion, brief and exhibits that have been designated as "Confidential" within five business days of this filing, including the obligation that such party must file a motion to maintain seal pursuant to the Federal Rules of Civil Procedure and Local Rule 5.3 and 26.4, within fourteen days of receipt of such notice. Defendants shall re-file any material over which no such motion is filed thereafter.

In accordance with the Court's Practice Guidelines, Plaintiffs have not submitted a proposed order with this motion but will provide one should the Court makes such request.

Therefore, Ford respectfully requests that this Court grant summary judgment in its favor on the question of Defendants' liability under Section 1 of the Sherman Act.

Dated: October 23, 2026

Respectfully submitted,

DINSMORE & SHOHL LLP

*/s/William A. Sherman, II*

William A. Sherman, II
Dinsmore & Shohl LLP
801 Pennsylvania Ave, NW
Suite 610
Washington, D.C. 20004
(202) 372-9100
william.sherman@dinsmore.com

Alan H. Abes
Dinsmore & Shohl LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 977-8200
alan.abes@dinsmore.com

J. Travis Mihelick (P73050)
900 Wilshire Drive, Suite 300
Troy, MI 48084
(248) 203-1655
*travis.mihelick@dinsmore.com*

Brandon Pelligrino (P79112)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
brandon.pelligrino@bowmandandbrooke.com

*Attorneys for Plaintiff Ford Motor Company*

# **BRIEF IN SUPPORT OF PLAINTIFF FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iv

STATEMENT OF ISSUES PRESENTED ..... vii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..... viii

INTRODUCTION ..... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ..... 3

I. The Parties ..... 3

II. The Plans Govern the Association ..... 5

III. Compliance with the Association's Rules is Mandatory ..... 7

IV. The License Agreements and Exclusive Service Areas ..... 8

V. The Best Efforts Rules ..... 12

VI. The National Account Rules ..... 13

VII. BlueCard and the National Programs ..... 15

VIII. The Blue Entities' Licenses During the Relevant Period ..... 16

IX. Ford's Purchase of Insurance from BCBSM ..... 17

X. Ford's Purchases of HMO Coverage From Blue Entities ..... 18

XI. Ford Could Only Obtain a Blue-Brand Proposal For Its National Account From BCBSM ..... 20

STATEMENT OF LAW AND ARGUMENT ..... 20

Summary Judgment Standard ..... 20

ARGUMENT ..... 21

I. Defendants Entered Into an Agreement Affecting Interstate Commerce ..... 21

II. Per Se Review is the Appropriate Standard ..... 23

A. Per Se Review Applies to Agreements Between Actual or Potential Horizontal Competitors to Allocate Markets or Restrict Output ..... 24

B. Defendants' Restraints Are Horizontal Agreements Among Actual and Potential Competitors ..... 25

1. The Blue Plans are actual and potential competitors. ..... 25

2. The Blue Plans govern the Association that licenses them. ................26

3. Under *Sealy* and *Topco*, restraints imposed through an association controlled by potential competitors are horizontal. ..................................27

C. Defendants' Agreements to Allocate Markets Are Per Se Violations of the Sherman Act. ....................................................................................29

1. The Exclusive Service Areas allocate territories. ...............................29

2. The National Account Program allocates customers. .........................30

D. Defendants' Agreements to Restrict Output Are Per Se Violations of the Sherman Act. ....................................................................................31

E. The Aggregation of the ESAs, National Account Program, and NBE Rule is Per Se Unlawful. ..................................................................32

III. Even if the Rule of Reason Applies, Defendants' Restraints Violate the Sherman Act. ....................................................................................33

CONCLUSION ....................................................................................34

# TABLE OF AUTHORITIES

## *US SUPREME COURT CASES*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................. 20

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999) .................................................. 21

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010) .................................................. 22

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) .................................................. 23

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) .................................................. 23

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958) .................................................. 23

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990) .................................................. 24, 24, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................. 25

*United States v. Sealy, Inc.*,
388 U.S. 350 (1967) .................................................. *passim*

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .................................................. 24, 34

*NCAA v. Alston*,
594 U.S. 69 (2021) .................................................. 34

*Timken Roller Bearing Co. v. United States*,
341 U.S. 593 (1951) .................................................. 33, 34

## *FEDERAL CASES*

*Cason-Merenda v. Detroit Med. Ctr.*,
862 F. Supp. 2d 603 (E.D. Mich. 2012) .......... 20

*Hyland v. HomeServices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014) .......... 21

*White & White, Inc. v. Am. Hosp. Supply Corp.*,
723 F.2d 495 (6th Cir. 1983) .......... 21

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
48 F.4th 656 (6th Cir. 2022) .......... 21

*United Ruggles*,
U.S. App. LEXIS 25692 .......... 22

*Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitrust Litig.)*,
739 F.3d 262 (6th Cir. 2014) .......... 23

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) .......... 23

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 682 (E.D. Mich. 2000) .......... 24

*United States v. Cooperative Theatres of Ohio, Inc.*,
845 F.2d 1367 (6th Cir. 1988) .......... 25, 31

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
263 F.3d 239 (3d Cir. 2001) .......... 25

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
373 F.3d 57 (1st Cir. 2004) .......... 25

*Chesapeake & Ohio Fuel Co. v. United States*,
115 F. 610 (6th Cir. 1902) .......... 25

*In re Blue Cross Blue Shield Antitrust Litigation*,
308 F. Supp. 3d 1241 (N.D. Ala. 2018) .......... 2, 23, 28, 32, 33

*United States v. Alston*,
974 F.2d 1206 (9th Cir. 1992)........................................................................ 29

*United States v. Addyston Pipe & Steel Co.*,
85 F. 271; 175 U.S. 211; 175 U.S. 211 (6th Cir. 1898) .................................... 30

*United States v. Cadillac Overall Supply Co.*,
568 F.2d 1078 (5th Cir. 1978)........................................................................ 31

*United States v. Suntar Roofing, Inc.*,
897 F.2d 469 (10th Cir. 1990)........................................................................ 31

*United States v. Topco Assocs., Inc.*,
319 F. Supp. 1031; 405 U.S. 596; 405 U.S. 596 (N.D. Ill. 1970) .. 24, 24, 26, 28, 32

***US CONSTITUTIONAL PROVISIONS***

U.S. Const. art. V § 5.............................................................................................. 5

U.S. Const. art. IV § 8 ............................................................................................ 5

U.S. Const. art. I § 3 ................................................................................................ 6

U.S. Const. art. VII § 2 ............................................................................................ 6

***FEDERAL STATUTES***

Title 15 U.S.C. § 1 ........................................................................................ 1, 21

***FEDERAL RULES***

Fed. R. Civ. P. 30 (b)(6)........................................................................................ 5

Fed. R. Civ. P. 56 ........................................................................................ 1, 20, 28

***STATE RULES***

Mich. Local R. 7.1 ................................................................................................... 1

# STATEMENT OF ISSUES PRESENTED

1. Where Defendants' License Agreements, Membership Standards, and Guidelines impose Exclusive Service Areas, a National Account Program, and a National Best Efforts Rule on Member Plans that are actual or potential horizontal competitors and that themselves control the Association through its Board, is per se review the appropriate standard for evaluating these restraints under Section 1 of the Sherman Act?

   Ford answers: **Yes.**

2. Applying the per se standard, does the undisputed record establish that Defendants' Exclusive Service Areas, National Account Program, and National Best Efforts Rule each constitute an unlawful horizontal agreement to allocate markets or restrict output in violation of Section 1 of the Sherman Act, and does their aggregation independently compel the same conclusion?

   Ford answers: **Yes.**

3. Even if the Rule of Reason applied instead of the per se standard, does the undisputed record – including the absence of any valid procompetitive justification for the restraints – compel summary judgment for Ford on Defendants' liability under Section 1 of the Sherman Act?

   Ford answers: **Yes.**

**CONTROLLING OR MOST APPROPRIATE AUTHORITY**

In re Blue Cross Blue Shield Antitrust Litigation, 308 F. Supp. 3d 1241 (N.D. Ala. 2018)

United States v. Sealy, Inc., 388 U.S. 350 (1967)

United States v. Topco Associates, Inc., 405 U.S. 596 (1972)

Timken Roller Bearing Co. v. United States, 341 U.S. 593 (1951)

Hyland v. HomeServices of Am., Inc., 771 F.3d 310 (6th Cir. 2014)

Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85 (1984)

N. Pac. Ry. Co. v. United States, 356 U.S. 1 (1958)

Palmer v. BRG of Ga., Inc., 498 U.S. 46 (1990) (per curiam)

In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 682 (E.D. Mich. 2000)

A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239 (3d Cir. 2001)

United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898) aff'd, 175 U.S. 211 (1899)

United States v. Cooperative Theatres of Ohio, Inc., 845 F.2d 1367 (6th Cir. 1988)

Ohio v. Am. Express, 585 U.S. at 541; NCAA v. Alston, 594 U.S. 69 (2021)

## INTRODUCTION

This is a clear case of horizontal market restraints that are unlawful per se. Blue Cross Blue Shield Association and its Licensed Member Plans[1] agreed in writing not to compete in designated geographic areas. The Association's License Agreements, Membership Standards, and Membership Guidelines divide the country into Exclusive Service Areas ("ESAs"), in which a single Blue Plan is licensed to market, sell, and advertise Blue Brand commercial health insurance products and services. The Association's National Account Program allocates national customers like Ford to the Blue Plan licensed to operate in the ESA where the customer is headquartered. The Association's National Best Efforts Rule restricts the amount of non-Blue Brand competing products a Member Plan may sell. These horizontal restraints unlawfully restricted competition for Ford's business.

The court overseeing the multidistrict litigation filed against the Association and its Member Plans (the "MDL Court") considered the same restrictions at issue here. On a full summary judgment record, the MDL Court held that "Defendants' aggregation of a market allocation scheme together with certain other output

[1] The "Association" refers to Defendant Blue Cross Blue Shield Association; the "Blue Marks" are the Blue Cross and Blue Shield names and service marks the Association owns and licenses; the "Member Plans" or "Blue Plans" are the independent companies licensed to use the Blue Marks; and "Blue-brand" describes products and services sold under the Blue Marks. (SOF ¶¶ 3-4, 8, 10.) Other capitalized terms are defined in the Statement of Undisputed Material Facts.

restrictions is due to be analyzed under the per se standard of review." *In re Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d 1241, 1279-80 (N.D. Ala. 2018). Similarly, this Court, on the pleadings alone, held that Ford adequately alleged a horizontal agreement, the kind of restraint courts have characterized as "naked restraints of trade with no purpose except stifling competition." (ECF No. 30, PageID.942, 944–46) Discovery here has only confirmed what both courts already found, making both the application of the per se standard of review and summary judgment appropriate.

Specifically, Ford is entitled to summary judgment for three reasons. First, the Association's ESAs, National Account Program, and National Best Efforts Rule are horizontal market-allocation restraints and output restrictions that warrant per se review under Section 1 of the Sherman Act. Second, the undisputed record establishes a per se violation as to each of Defendants' restraints. Third, and in the alternative, even if the Rule of Reason applied, the undisputed record compels judgment for Ford because the restraints are anticompetitive as a matter of law. As there is no genuine dispute of material fact disputing that Defendants imposed the subject market restraints, and the restraints violate Section 1 of the Sherman Act, the Court should grant Ford's Motion for Summary Judgment.

# STATEMENT OF UNDISPUTED MATERIAL FACTS

## I. The Parties

1. BCBS acknowledges that Ford is headquartered in Michigan, as confirmed by Ford. (Ex. A, Hedges Dep. 35:19–24; Ex. AG, Lawrence Dep. 49:24-50:2.)

2. Ford has employees in all fifty states, with the largest concentrations in Michigan, Kansas City, Louisville, and the Chicago area. (Ex. B, De Haan Dep. 56:20–25, 57:20–58:25.)

3. The Association is an Illinois not-for-profit corporation, incorporated in 1948, with its principal office in Illinois. (Ex. C, BCBSA Bylaws, Arts. of Inc. ¶¶ 1–3 (BCBSA_ASO_00820754); Ex. C, Bylaws Art. XV § 1 (BCBSA_ASO_00820777).)

4. The Association owns the Blue Marks and licenses their exclusive use to individual Blue Plans. (Ex. D, Hedges VHS Dep. Jan. 14, 2026, 47:14, 48:1-9) (BCBSA_Ford00003982)).

5. The Plans collectively cover approximately 117 million people, about one in three Americans. (Ex. D, VHS Dep. Jan 14, 2026, 48:21-49:4 (BCBSA_Ford00003982).)

6. [redacted] (Ex. D, Hedges VHS Dep. Jan. 14, 2026, 47:7-13, 121:6-122:4 (BCBSA_Ford00003982, BCBSA_Ford00004000–004001).)

7. During February 2008 through April 2021 (the "Relevant Period"), the Association maintained its own corporate headquarters, business offices, and Board of Directors separate from each Plan; the Association did not run daily operations at any Plan; no Plan is a wholly owned subsidiary of the Association; and the Association is not a wholly owned subsidiary of any Plan. (Ex. F, BCBSA 1st RFA Resp. Nos. 12–14, 16–18.)

8. [redacted] (Ex. G, Gavin Dep. 22:18–21.)

9. [redacted]. (Ex. G, Gavin Dep. 22:22–23:7, 31:15–22.)

10. Blue Cross and Blue Shield of Kansas City ("BCBS KC"), Blue Cross Blue Shield of Tennessee ("BCBS TN"), Health Care Service Corporation ("HCSC," which operates Blue Cross and Blue Shield of Illinois), and Anthem, Inc. (now Elevance Health, Inc.) ("Anthem") and their licensed affiliates [redacted] (Ex. A, Hedges Dep. 12:25–13:21.)

11. Kari Hedges ("Hedges"), the Association's Senior Vice President of Market Solutions, testified as the Association's Rule 30(b)(6) designee and in her individual capacity. (Ex. A, Hedges Dep. 8:24-25, 9:1-3,25, 11:7–15.)

12. Gary Gavin ("Gavin"), BCBSM's Vice President responsible for autos, key accounts, trust funds, and national accounts, testified as BCBSM's Rule 30(b)(6) designee and in his individual capacity. (Ex. G, Gavin Dep. 9:11–23, 11:18–22.)

13. Hedges describes the Association and Plans as working [redacted] (the "Blue System"). (Ex. D, Hedges VHS Dep. Jan. 14, 2026, 48:14-20 (BCBSA_Ford00003982).)

## II. The Plans Govern the Association

14. The Association's Board of Directors consists of the [redacted]. (Ex. A, Hedges Dep. 87:7–12.)

15. [redacted] (Ex. C, BCBSA Bylaws Art. V § 5 (BCBSA_ASO_00820763).) [redacted] (Ex. C, BCBSA Bylaws Art. IV § 8 (BCBSA_ASO_00820762).)

16. [redacted]. (Ex. H, BCBSA Interrog. Resp. No. 14.) [redacted]

[redacted] (Ex. C, BCBSA Bylaws Art. I § 3 (BCBSA_ASO_00820757).)

17. [redacted] (Ex. E, Hedges VHS Dep., 352:9-353:4 (BCBSA_Ford00003827 Jan. 15, 2026).)

18. [redacted] (Ex. I, 2013 License Agmt. ¶¶ 9(c), 16 (BCBSA_ASO_01059448, BCBSA_ASO_01059461).)

19. [redacted] (Ex. I, 2013 License Agmt. Ex. 2, Membership Standards Preamble (BCBSA_ASO_01059557).)

20. [redacted] (Ex. C, BCBSA Bylaws Art. VII § 2(a)–(b) (BCBSA_ASO_00820767).)

## III. Compliance with the Association's Rules is Mandatory

21. The Association enforces the License Agreements. (BCBSA Answer ¶ 47, ECF No. 33, PageID.1046.)

22. In its License Agreement, [redacted] (Ex. I, 2013 License Agmt. ¶ 4 (BCBSA_ASO_01059445).)

23. [redacted] (Ex. E, Hedges VHS Dep Jan. 15, 2026, 428:21-429:17 (BCBSA_Ford00003863, BCBSA_Ford00003846).) [redacted] (Ex. D, Hedges VHS Dep. Jan. 14, 2026, 430:3-21 (BCBSA_Ford00003846, BCBSA_Ford00004012, BCBSA_Ford00003840).)

24. [redacted] Ex. I, 2013 License Agmt. ¶ 6 (BCBSA_ASO_01059446).)

25. [redacted] (Ex. I, 2013 License Agmt. ¶ 9(a) (BCBSA_ASO_01059447).)

26. The Association has enforced the License Agreements at least since 2008. (BCBSA Answer ¶¶ 47, 60, ECF No. 33, PageID.1046, 1049.)

27. BCBSM complies with the [redacted] (Ex. G, Gavin Dep. 32:13–23, 49:14–50:7.)

## IV. The License Agreements and Exclusive Service Areas

28. [redacted] (Ex. A, Hedges Dep. 34:23–35:18, 41:25–42:15, 63:9–18.)

29. The Association [redacted]. (Ex. A, Hedges Dep. 17:9–14 (Ex. J, Hedges Dep. Ex. A3 (BCBSA_ASO_00717044) and 39:25–40:15, Ex. K, Hedges Dep. Ex. A4, (BCBSA_ASO_04055980).)

30. Apart from the identity of the [redacted]. (Ex. A, Hedges Dep. 19:8–15.)

31. Each Plan's [redacted]. (Ex. A, Hedges Dep. 19:8–15, 35:11–18, 41:25–42:15.)

32. [redacted] (Ex. I, 2013 License Agmt. ¶ 5 (BCBSA_ASO_01059446).)

33. A Plan's [redacted] (Ex. A, Hedges Dep. 18:4–8, 18:19–22.)

34. Except as expressly provided by the [redacted] (Ex. I, 2013 License Agmt. ¶ 6 (BCBSA_ASO_01059446).)

35. BCBSM cannot s[redacted]. (Ex. G, Gavin Dep. 27:19–28:10.) A Plan may not [redacted] (Ex. D, Hedges VHS Dep. Jan. 14, 2026, 60: 18-61:11 (BCBSA_FORD_00003985, BCBSA_FORD_00003992).)

36. [redacted] State of Michigan. (Ex. A, Hedges Dep. 27:3–8.)

37. [redacted] does not serve. (Ex. A, Hedges Dep. 25:2–12, 28:17–29:1, 33:11–34:22; Exs. L, M, Hedges Dep. Exs. A13, A14.) [redacted]. (Ex. A, Hedges Dep. 27:9–28:16, 30:4–32:24 (Exs. L, M, Hedges Dep. Exs. A13, A14.)

38. Melissa Rotunno, the Association's corporate designee in *VHS Liquidating Trust v. Blue Cross of California*, testified [redacted] Outside the historical overlapping areas, a service area has one Plan and "no competition" among Blue Plans. (Exs. N, O, Rotunno VHS Dep. 64:4–8, 251:8–15, 291:17–18.)

39. Where two Plans hold [redacted] for the same business. (Ex. A, Hedges Dep. 28:11–16, 30:17–24; Ex. D, Hedges VHS Dep., (BCBSA_FORD_00003989, BCBSA_FORD_00004020).)

40. Any Plan may [redacted] does not govern what [redacted] (Ex. A, Hedges Dep. 38:21–39:4, 65:13–17.)

41. Blue Plan CEOs describe [redacted]

- [redacted] (Ex. E, Hedges VHS Dep. Jan. 15, 2026, BCBSA_FORD_00003808 (Ex. P, Hedges VHS Dep. Ex. 302, BCBSA 00115429 at 115431).)

- ESAs are [redacted] (Ex. E, Hedges VHS Dep Jan. 15, 2026, BCBSA_FORD_00003815 (Ex. Q, Hedges VHS Dep. Ex. 299, BCBSA 00115497).)

- [redacted] (Ex. E, Hedges VHS Dep. Jan. 15, 2026, BCBSA_FORD_00003815–003816 (Ex. R, Hedges VHS Dep. Ex. 634, BCBSA 00115424).)

**V. The Best Efforts Rules**

42. [redacted] (Ex. I, 2013 License Agmt. Ex. 2, Standard 10 (BCBSA_ASO_01059560); Ex. S, 2012 Guidelines at BCBSM_Ford_0000000036; Ex. T, 2014 Guidelines at BCBSM_Ford_0000002144).)

43. In June 2005, the member Plans [redacted]. (Ex. A, Hedges Dep. 69:16–18 (Ex. U, Hedges Dep. Ex. A5 (BCBSA_ASO_02411626 at 411677).)

44. The [redacted] (Ex. F, BCBSA 1st RFA Resp. No. 3; Ex. S, 2012 Guidelines, Standard 10, Guideline 2.2 (BCBSM_Ford_0000000036); Ex. T, 2014 Guidelines, Standard 10, Guideline 2.2 (BCBSM_Ford_0000002144).)

45. Compliance with the [redacted] (Ex. A, Hedges Dep. 72:11–16.) A Plan fell [redacted]

[redacted] (Ex. E, Hedges VHS Dep. Jan. 15, 2026, 397:20-398:11 (BCBSM_Ford_00003838–003839).)

46. A Plan not [redacted] was required to s[redacted] (Ex. A, Hedges Dep. 72:17–73:14.)

47. [redacted] (Ex. G, Gavin Dep. 80:14–24.)

48. [redacted]e was in effect from June 16, 2005 [redacted] as of April 27, 2021, [redacted] (Ex. F, BCBSA 1st RFA Resp. No. 3; Ex. E, Hedges VHS Dep Jan. 15, 2026, (BCBSA_FORD_0003839–003840).)

## VI. The National Account Rules

49. The License Agreement defines a national account as [redacted] and provides that, [redacted] (Ex. I, 2013 License Agmt. Ex. 3 ¶ 2 (BCBSA_ASO_01059562).)

50. [redacted] (Ex. A, Hedges Dep. 36:1–8; Ex. G, Gavin Dep. 15:15–21.)

51. The [redacted] is the licensee in whose service area the national account is headquartered. (Ex. A, Hedges Dep. 54:8–14.)

52. Only the [redacted] (Ex. A, Hedges Dep. 35:6–18, 54:1–7 (Ex. V, Hedges Dep. Ex. A7 (BCBSA_ASO_05137371).)

53. Because Ford is headquartered in Michigan, BCBSM is the [redacted] products and services to Ford. (Ex. A, Hedges Dep. 36:9–18, 38:21–24.)

54. Outside of overlapping service areas and the settlement relief described in Paragraph 82, [redacted] (Ex. A, Hedges Dep. 54:5–7.)

55. [redacted] (Ex. G, Gavin Dep. 68:3–70:5; Ex. W, Gavin Dep. Ex. M6 (BCBSM_Ford_0000009825 at 009831).)

56. A Plan may serve a [redacted] in another [redacted] only if the [redacted]

[redacted] (Ex. G, Gavin Dep. 61:4–25, 62:6–11, 64:23–65:21.) A Plan can never [redacted]. (Ex. G, Gavin Dep. 71:22–73:2; Ex. W, Gavin Dep. Ex. M6 (BCBSM_Ford_0000009825 at 009837–009838; Ex. G, Gavin Dep. 73:8–24.)

## VII. BlueCard and the National Programs

57. All [redacted] (Ex. A, Hedges Dep. 41:25–42:15, 45:5–10.)

58. The [redacted] (Ex. D, Hedges VHS Dep. Jan. 14, 2026, 27:16-23 (BCBSA_FORD_00003977).) All Plans participate [redacted] (Ex. D, Hedges VHS Dep. Jan. 14, 2026 (BCBSA_FORD_00003977).)

59. The [redacted] who receive care outside a [redacted]. (Ex. A, Hedges Dep. 46:15–20.)

60. Ford employees enrolled through BCBSM, wherever they reside, receive [redacted] (Ex. A, Hedges Dep. 47:6–17, 48:1–13.)

61. The [redacted] are how the [redacted] (Ex. A, Hedges Dep. 63:9–18.)

62. Under the [redacted], a participating [redacted]. (Ex. G, Gavin Dep. 126:10–130:3 (Ex. X, Gavin Dep. Ex. M5 (BCBSA_ASO_05115599).)

63. The [redacted] (Ex. A, Hedges Dep. 49:20–52:2.)

**VIII. The Blue Entities' Licenses During the Relevant Period**

64. BCBSM, Anthem, HCSC, BCBS KC, and BCBS TN (or their predecessors) each held a Primary License Agreement with the Association for the entire Relevant Period. (Ex. Y, BCBSA 2d RFA Resp. Nos. 44–47.)

65. The Association did not terminate or suspend the Primary License Agreement of BCBSM, HCSC, BCBS KC, BCBS TN, or Anthem during the Relevant Period. (Ex. Y, BCBSA 2d RFA Resp. Nos. 53–57.) Likewise, [redacted] (Ex. G, Gavin Dep. 70:18–71:4.)

## IX. Ford's Purchase of Insurance from BCBSM

66. BCBSM administers both of Ford's PPO plans: the national PPO for hourly employees represented by United Auto Workers ("UAW") and the traditional plan for salaried employees. (Ex. Z, Piszker Dep. 27:22–29:17, 49:23–50:11.)

67. Ford contracted with BCBSM, including BCN, from at least 2008 through the end of 2023. (Ex. Z, Piszker Dep. 154:18–155:16.)

68. Ford's arrangements with BCBSM for PPO coverage were self-funded administrative services arrangements. (Ex. Z, Piszker Dep. 154:23–25.)

69. Ford and BCBSM [redacted] effective January 1, 2011 and January 1, 2018. (Ex. G, Gavin Dep. 92:8–24 (Ex. AA, Gavin Dep. Ex. M4(c) (BCBSM_Ford_0000002888), 96:22–97:18; Ex. AC, Gavin Dep. Ex. M4(e), (BCBSM_Ford_0000002764), 111:8–113:13; Ex. AB, AD, Gavin Dep. Exs. M4(d), M4(f) (BCBSM_Ford_0000002842, BCBSM_Ford_0000002719).)

70. Under the [redacted] (Ex. G, Gavin Dep. 101:18–102:23, 104:8–16.)

71. As of December 2019, [redacted] (Ex.

AE, Samples Dep. 27:13–16, 27:23–28:2; Ex. AF, Samples Dep. Ex. F1, (BCBSM_Ford_0000018869 at 19).)

72. BCBSM [redacted] (Ex. A, Hedges Dep. 50:4–25, 51:19–52:3.)

73. Ford's spend on insurance products and services [redacted] (Ex. AG, Lawrence Dep. 57:3–8, 64:23-25 - 65:1–14 (Ex. AH, AI, Lawrence Dep. Exs. 32, 35, ECF).)

## X. Ford's Purchases of HMO Coverage From Blue Entities

74. Ford purchased HMO coverage in Michigan from BCBSM's subsidiary BCN for the entire period from 2008 to 2023; the BCN arrangement was fully insured until February 2013 and self-funded thereafter. (Ex. Z, Piszker Dep. 155:7–156:9, 165:14–19.)

75. Ford purchased a fully insured HMO from BCBS KC for its Kansas City employees from at least 2008 through 2023, covering 5,945 contracts in 2007 and 3,033 contracts in 2013. (Ex. Z, Piszker Dep. 143:3–15; Ex. AJ, Catka Dep. 41:6–11, 83:4–6, 91:9–18, 101:6–13.)

76. Ford purchased a self-funded HMO from Anthem for employees in the Cleveland and Cincinnati areas from 2008 through 2023, covering 2,139 contracts in 2013. (Ex. Z, Piszker Dep. 88:11–89:24; Ex. AJ, Catka Dep. 42:6–14, 101:14–16.)

77. Ford purchased a fully insured HMO from HCSC (Blue Cross and Blue Shield of Illinois) for its Chicago-area employees every year from 2008 through 2023. (Ex. Z, Piszker Dep. 123:9–20; Ex. AJ, Catka Dep. 39:2–20, 83:7–10.)

78. Ford purchased coverage from BCBS TN for hourly employees in Nashville, covering 2,460 contracts in 2007. (Ex. Z, Piszker Dep. 177:3–16, 179:14–18; Ex. AJ, Catka Dep. 22:4–5, 40:10–14, 91:12–23.)

79. Ford understood that the only Plan from which it could purchase a Blue-brand HMO for its Kansas City employees was BCBS KC. (Ex. AG, Lawrence Dep. 49:14–20, ECF.)

80. [redacted] purchased outside Michigan [redacted] (Ex. AJ, Catka Dep. 57:5–12, 174:5–14; Ex. AK, Catka Dep. Ex. 70, (FORD_BCBSMich 000223084).)

## XI. Ford Could Only Obtain a Blue-Brand Proposal For Its National Account From BCBSM

81. No Plan other than BCBSM [redacted] (Ex. A, Hedges Dep. 36:15–18, 38:21–24, 54:5–7.)

82. Absent a cede from BCBSM, Ford could not contract [redacted]. (Ex. AL, Lapinski Dep. 131:22–132:22.)

83. Ford is not eligible for the [redacted] (Ex. AL, Lapinski Dep. 142:25–143:5; Ex. AM, Lieberman Dep. 124:2–9.)

## STATEMENT OF LAW AND ARGUMENT

### Summary Judgment Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 316-18 (6th Cir. 2014) (applying the identical summary judgment standard to a Section 1 Sherman Act claim). Once the moving party makes the requisite showing, "the nonmoving party may not rely merely on allegations or denials in its own pleading, but must – by affidavits or otherwise provided in Rule 56 – set out specific facts showing a genuine issue for trial. *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 623 (E.D. Mich. 2012) (cleaned up).

This standard applies equally to a plaintiff's motion for summary judgment. Where, as here, the moving plaintiff's own evidentiary showing – including Defendants' judicial admissions – eliminates any triable issue as to each element of its claim, judgment must be entered in the plaintiff's favor as a matter of law. *See Hyland*, 771 F.3d at 318-19.

## ARGUMENT

Defendants' restraints of trade described above clearly violate Section 1 of the Sherman Act, 15 U.S.C. § 1. The essential elements of a Section 1 claim are: (1) a contract, combination, or conspiracy; (2) affecting interstate commerce; (3) that imposes an unreasonable restraint of trade. *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983); *accord Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022). As demonstrated below, the undisputed record conclusively establishes each of these elements. Defendants' restraints are unlawful regardless of whether the Court applies per se analysis or the Rule of Reason analysis Defendants seek.

### I. Defendants Entered Into an Agreement Affecting Interstate Commerce.

***Interstate Commerce.*** As a rule, "an insurance company doing business across state lines engages in interstate commerce." *Humana Inc. v. Forsyth,* 525 U.S. 299, 306 (1999). Here, the Association, an Illinois corporation, licenses the Blue Marks to independent Blue Plans that together cover approximately 117 million

people. (SOF ¶¶ 3–6.) BCBSM, a Michigan insurer, sells commercial health insurance and administrative services to Ford, which has employees in all fifty states, in exchange for premiums and fees; [redacted]. (SOF ¶¶ 1–2, 8, 66-73.) “[P]roof of the interstate commerce element as to one conspirator brings the activities of the entire group within the ambit of the Sherman Act.” *United Ruggles*, 1985 U.S. App. LEXIS 25692 at *18. This element cannot be genuinely disputed.

***Contract, combination, or conspiracy*.** Concerted action “does not turn simply on whether the parties involved are legal distinct entities”; courts ask instead whether the challenged conduct “joins together separate decisionmakers” — that is, “separate economic actors pursuing separate economic interests.” *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 191, 195 (2010). Here, the Association [redacted] (SOF ¶¶ 8-10, 16, 21-23, 29 -31.) The Plans are [redacted]. (SOF ¶¶ 6-7, 38-39.) The existence of an agreement among these independent, competing entities cannot be genuinely disputed.

## II. Per Se Review is the Appropriate Standard

Supreme Court precedent recognizes two standards of review for evaluating a restraint challenged under Section 1 of the Sherman Act. "[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates … the 'Rule of Reason.'" *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 457–58 (1986).

"[A] per se rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla*. ("*NCAA*"), 468 U.S. 85, 100 (1984) (internal quotation omitted). "While the selection of a mode of analysis (per se or Rule of Reason) is a question of law," it may rest on undisputed predicate facts. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala. 2018) (citing *Food Lion, LLC v. Dean Foods Co. (In re Se. Milk Antitrust Litig.)*, 739 F.3d 262, 271 (6th Cir. 2014)).

Once a restraint falls within per se review, the plaintiff need only show "whether there was an agreement" to engage in the conduct, because in that circumstance "the unreasonableness of the restraint is presumed." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545-46 (11th Cir. 1996). No further inquiry into market power, actual competitive effect, or intent is permitted or required. *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). That is the case here.

### A. Per Se Review Applies to Agreements Between Actual or Potential Horizontal Competitors to Allocate Markets or Restrict Output.

It is a fundamental principle of antitrust law that market allocation among actual or potential competitors is unlawful per se. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990) (per curiam); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 357–58 (1967). "Typically, 'horizontal' restraints — restraints 'imposed by agreement between competitors' — qualify as unreasonable per se." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018) (internal quotation omitted). The rule reaches potential competitors as well as actual ones. *See In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 682, 700 (E.D. Mich. 2000).

Three categories of horizontal agreement are at issue here, and each requires per se review. The first is territorial allocation, or "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *accord United States v. Sealy, Inc.*, 388 U.S. 350, 357–58 (1967) (holding territorial allocations are per se unlawful). Such agreements "are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Palmer*, 498 U.S. at 49–50.

The second is customer allocation, which requires identical treatment. *See United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 682, 684 (E.D. Mich. 2000); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007)

The third is output restriction: "An agreement which has the purpose and effect of reducing output is illegal under § 1 of the Sherman Act." *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 247 (3d Cir. 2001). Courts have recognized that output restrictions rank among the "most important per se categories," alongside naked horizontal price-fixing and market allocation. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) (internal citation omitted); *see also Chesapeake & Ohio Fuel Co. v. United States*, 115 F. 610, 624 (6th Cir. 1902). These restraints are discussed below.

**B. Defendants' Restraints Are Horizontal Agreements Among Actual and Potential Competitors**

1. <u>The Blue Plans are actual and potential competitors.</u>

The Blue Plans are [redacted] (SOF ¶¶ 6-7) They are actual competitors. Where their service areas overlap, as th[redacted] (SOF ¶¶ 37, 39.) They are also potential competitors everywhere else. For defendants to be potential competitors, they need not compete in the same market. *See Palmer*, 498 U.S. at 49–

50; *Topco*, 405 U.S. at 608. Any Plan may [redacted] (SOF ¶¶ 40, 56.)

The potential competition among the [redacted] in many states. (SOF ¶¶ 2, 28, 49-50.) When Plan members, [redacted] service those members. (SOF ¶¶ 59-63.) The only thing stopping each Plan from competing with the others for these customers and providers is the prohibition in the License Agreement from doing so.

2. The Blue Plans govern the Association that licenses them.

The Blue Plans are all members of the Association, which they control. The Association's Board consists of each [redacted] (SOF ¶¶ 14-15.) The Plans write and enforce their own restraints. The [redacted] (SOF ¶¶ 16-20.) The Association's corporate designee testified that [redacted]

[redacted]. (SOF ¶¶ 17, 43, 58.)

Further, every Plan is bound by the same terms. Each [redacted] (SOF ¶¶ 28-34.) [redacted] at least 2008. (SOF ¶¶ 21-26, 30-31.) The rules restraining each Plan were adopted by and are enforced by the very Plans they restrain.

3. <u>Under *Sealy* and *Topco*, restraints imposed through an association controlled by potential competitors are horizontal.</u>

*Sealy* makes clear that imposing exclusive territories through an association controlled by potential competitors constitutes horizontal activity. In *Sealy*, a licensor corporation allocated exclusive territories among its mattress-manufacturer licensees, who operated independently, owned substantially all the licensor's stock, and controlled its Board of Directors and executive committee. 388 U.S. at 351–53. The Supreme Court concluded that the licensor was "a joint venture of, by, and for its stockholder-licensees," and held that "[t]he territorial arrangements must be regarded as . . . horizontal action by the licensees. It would violate reality to treat

them as equivalent to territorial limitations . . . incident to the sale of a trademarked product. Sealy, Inc., is an instrumentality of the licensees for purposes of the horizontal territorial allocation." *Id.* at 353–54. *Topco* applied the same rule to a cooperative of independent grocers that licensed private-label trademarks to its members on an exclusive-territory basis, explaining that *Sealy* was "on all fours" with the case. 405 U.S. at 609.

This case is likewise on all fours with *Sealy* and *Topco*. The Blue Plans [redacted] (SOF ¶¶ 4, 6-7, 14-20, 24, 28-34.) The Blue Plans, [redacted] (SOF ¶¶ 14-20, 21-26.) On a comprehensive Rule 56 record involving these same Defendants and the same License Agreements, Membership Standards, and Guidelines, the MDL Court reached the same conclusion, holding that the Association "is comparable to the licensee-controlled entities in *Sealy* and *Topco*," and that the ESAs "must be examined as horizontal allocations, not vertical ones." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241. Because the Blue Plans are actual and potential competitors at the same level of the market and control

the terms of their own restraints, those restraints are horizontal as a matter of law, and per se review applies.[2]

### C. Defendants' Agreements to Allocate Markets Are Per Se Violations of the Sherman Act.

#### 1. The Exclusive Service Areas allocate territories.

Through the ESAs, the Plans divide the country among themselves. Each [redacted] (SOF ¶¶ 32-34.) Unless explicitly allowed, a Plan may not use the Blue brands to compete in another Plan's Service Area. (SOF ¶¶ 34-35.) Indeed, outside of the few historically overlapping areas, a [redacted] (SOF ¶ 38.) Because the Association is licensee-controlled (*see* Section II.B, *supra*), this scheme is a horizontal agreement among BCBSM and its potential competitors — the other Member Plans — not to compete for the same customers in the same territory. Such territorial divisions have

---

[2] Defendants have argued that their restraints are procompetitive. But once conduct falls within a per se category its claimed benefits are immaterial, and neither the new-product nor ancillary restraint exceptions apply. *See United States v. Alston*, 974 F.2d 1206, 1209 (9th Cir. 1992) ("The health care market is not an industry [in which horizontal restraints on competition are essential if the product is to be available at all]."); *Sealy*, 388 U.S. at 356 n.3, 357-58 (restraint "cannot be defended as ancillary to a trademark licensing scheme").

long been condemned as per se unlawful. See *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 291-93 (6th Cir. 1898) aff'd, 175 U.S. 211 (1899).

The ESAs' effect on Ford is concrete and undisputed. In each area where Ford bought a [redacted], without competition from other Blue Plans. (SOF ¶¶ 74-80.)

2. <u>The National Account Program allocates customers.</u>

Defendants' restraints reach a second, independent category of per se violation: the National Account Program allocates customers among the Member Plans. The License Agreement [redacted] (SOF ¶¶ 49, 51-52.) Outside overlapping areas, [redacted] (SOF ¶ 54.) [redacted] (SOF ¶ 56.) [redacted] (SOF ¶ 55.) The effects of this restraint are not hypothetical. Ford could not obtain [redacted]

[redacted] (SOF ¶¶ 81-83.) [redacted] (SOF ¶¶ 57-63.)

This is the same kind of customer-allocation agreement courts have condemned as per se unlawful for decades. *See, e.g.*, *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371, 1373 (6th Cir. 1988); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088, 1090 (5th Cir. 1978); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990).

### D. Defendants' Agreements to Restrict Output Are Per Se Violations of the Sherman Act.

Defendants' restraints do not stop at territorial and customer allocation. From June 16, 2005 to April 27, 2021, [redacted] (SOF ¶¶ 42-44, 48.) A Plan fe[redacted] business. (SOF ¶ 45.) In practice, the rule capped the non-Blue-brand business each Plan could place in the market in comparison to its Blue-brand business.

The NBE Rule is precisely the type of agreement among competitors to restrict output that has been recognized as an unlawful restraint on interstate

commerce for over a century. *See* Section II.A, *supra*. Indeed, on a materially identical record, the MDL Court held the NBE Rule to be, standing alone, "a per se violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241.

**E. The Aggregation of the ESAs, National Account Program, and NBE Rule is Per Se Unlawful.**

The Supreme Court has long recognized that agreements providing for "an aggregation of trade restraints" such as those existing in this case are per se unlawful under the Sherman Act. *Sealy*, 388 U.S. at 354–55. Here, it is undisputed that the [redacted] (SOF ¶¶ 28-41, 42-48, 49-56) That combination is, if anything, more restrictive than the arrangements condemned in *Sealy* and *Topco*, because the licensees in those cases remained free to sell any amount of competing private-label products in any territory they chose — a freedom the NBE Rule stringently precludes. See *United States v. Topco Assocs., Inc.*, 319 F. Supp. 1031,

1037 (N.D. Ill. 1970) (Topco licensees remained free to expand using other sources of private-label brands), rev'd on other grounds, 405 U.S. 596, 612 (1972); *Sealy*, 388 U.S. at 352 (Sealy licensees could sell private-label products wherever they chose).

The Supreme Court's decision in *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951), confirms that such layering is per se unlawful. Competitors there combined a territorial division of world markets with price-fixing and import restrictions, and the Court condemned the combination without separately parsing which restraint did the most damage. *Timken*, 341 U.S. 593. The restraints here are no less combined. They are written into each License Agreement, agreed upon by each Member Plan and enforced by the Member Plan controlled Association. The MDL Court concluded that "Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under the per se standard of review." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241. This Court should reach the same conclusion, particularly given the additional National Account restraint present here.

## III. Even if the Rule of Reason Applies, Defendants' Restraints Violate the Sherman Act.

Even under the Rule of Reason, the undisputed record establishes that Defendants' restraints on the market unreasonably restrain trade in violation of

Section 1 as a matter of law. *See Ohio v. Am. Express*, 585 U.S. at 541; *NCAA v. Alston*, 594 U.S. 69 (2021). The Blue Plans, a [redacted] (SOF ¶¶ 5, 13, 57-58; Complaint, ECF No. 1, PageID.25, PageID.28.) The restraints also eliminated competition. No other Plan [redacted] (SOF ¶¶ 32-35, 38, 41, 44-46, 49-55.)

Defendants cannot carry their burden to show a procompetitive justification. The MDL Court rejected their "unique product" and joint-venture rationales, *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1269–70, and a trademark cannot justify a Sherman Act violation, *Timken*, 341 U.S. at 599. Ford is entitled to summary judgment even if the Rule of Reason applies.

**CONCLUSION**

For these reasons, Plaintiff Ford Motor Company respectfully requests that the Court grant summary judgment in its favor as to Defendants' liability under Section 1 of the Sherman Act.

Dated: October 23, 2026

Respectfully submitted,

By: /s/ *William A. Sherman, II*
William A. Sherman, II
801 Pennsylvania Ave, NW, Suite 610
Washington, D.C. 20004
(202) 372-9100
*william.sherman@dinsmore.com*

Alan H. Abes
Dinsmore & Shohl LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 977-8200
*alan.abes@dinsmore.com*

J. Travis Mihelick (P73050)
900 Wilshire Drive, Suite 300
Troy, MI 48084
(248) 203-1655
*travis.mihelick@dinsmore.com*

Brandon Pelligrino (P79112)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Road, Suite 1100 Troy, MI 48084
*brandon.pelligrino@bowmandandbrooke.com*

***Attorneys for Ford Motor Company***

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2026, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/William A. Sherman, II*