IIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| FORD MOTOR COMPANY<br><br>PLAINTIFF<br><br><br><br><br>v.<br>BLUE CROSS BLUE SHIELD<br>OF MICHIGAN MUTUAL<br>INSURANCE CO, et al.,<br><br>DEFENDANTS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO: 2.23-CV-11286<br><br>JUDGE: Hon. Linda V. Parker<br><br>MAGISTRATE JUDGE: Hon.<br>Elizabeth A. Stafford |

**PLAINTIFF FORD MOTOR COMPANY'S RESPONSE IN OPPOSITION <u>TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Ford Motor Company ("Ford") opposes the Motion for Summary Judgment filed by Defendants Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSM") and Blue Cross Blue Shield Association ("BCBSA" or the "Association") (collectively, "Defendants") (ECF No. 86). For the reasons stated in the accompanying brief, Ford respectfully requests that the Court deny the motion in its entirety.

Dated: November 20, 2026 Respectfully submitted,

DINSMORE & SHOHL LLP

*/s/ William A. Sherman, II*

William A. Sherman, II
Dinsmore & Shohl LLP
801 Pennsylvania Ave, NW
Suite 610
Washington, D.C. 20004
(202) 372-9100
william.sherman@dinsmore.com

Alan H. Abes
Dinsmore & Shohl LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 977-8200
alan.abes@dinsmore.com

J. Travis Mihelick (P73050)
900 Wilshire Drive, Suite 300
Troy, MI 48084
(248) 203-1655
travis.mihelick@dinsmore.com

Brandon Pelligrino (P79112)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084

*Attorneys for Plaintiff Ford Motor Company*

# BRIEF IN SUPPORT OF PLAINTIFF FORD MOTOR COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... vi

STATEMENT OF THE ISSUES PRESENTED .......... xii

CONTROLLING OR MOST APPROPRIATE AUTHORITY .......... xiii

INTRODUCTION .......... 1

COUNTER-STATEMENT OF MATERIAL FACTS .......... 3

ARGUMENT .......... 8

I. The Blue Plans and the Association They Control Are Not a Single Entity. .......... 8

A. Defendants' Single-Entity Argument Is Inconsistent With Well-Settled Case Law and the Factual Record. .......... 8

B. The Challenged Restraints Reach Well Beyond Trademark Governance. .......... 12

II. Ford Need Not Satisfy a Full Rule of Reason Analysis, And, Regardless, Genuine Disputes Preclude Summary Judgment. .......... 13

A. The Challenged Restraints are Per Se Unlawful. .......... 13

B. Defendants Are Collaterally Estopped From Relitigating the MDL Court's Per Se Ruling. .......... 14

C. Under the Rule of Reason, Market Definition is Genuinely Disputed. .......... 17

D. The Record Contains Direct Evidence of Anticompetitive Effects. .......... 19

III. Ford Has Shown Antitrust Injury And Causation. .......... 20

A. Ford is a Direct Purchaser That Paid Supracompetitive Prices. .......... 20

B. Defendants' Trademark Arguments Do Not Defeat Causation. .......... 21

1. Defendants' "reversion" theory fails as a matter of law. .......... 21

2. Trademark rights cannot immunize a horizontal allocation. .......... 23

3. The "reversion" argument rests on legal theory............................... 23

4. The "no right to enter" argument assumes the conspiracy continues. ........................................................................................................ 25

C. The Record Supports a Reasonable Inference That Competition Would Have Lowered Ford's Prices. ........................................................ 26

D. Defendants' Remaining Arguments Go to the Amount of Damages, Not the Fact of Injury. ......................................................................... 28

IV. Ford's Claims Are Timely................................................................ 30

A. Each Overcharge Payment Started a New Limitations Period. ........30

B. Defendants' "Blocked Entry" and "Day One" Arguments Confuse How the Overcharge Is Measured with When Ford Was Injured. ............ 30

V. Ford's Fully-Insured Claims Were Tolled By The *Cerven* Class Action. ............................................................................................................ 31

A. Ford Was A Purported Member of the *Cerven* Injunctive Class. ........................................................................................................ 31

B. A Difference in Remedy Does Not Defeat Tolling. ......................... 32

CONCLUSION ........................................................................................... 34

CERTIFICATE OF SERVICE ................................................................... 36

# TABLE OF AUTHORITIES

US SUPREME COURT CASES

*United States v. Sealy, Inc.*,
388 U.S. 350 (1967) .................................................. 2, 9, 10, 11, 23, 25, 26

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) .................................................. 2, 9, 10, 11, 13, 23, 26

*American Needle, Inc. v. NFL*,
560 U.S. 183 (2010) .................................................. 2, 9, 11, 25

*Timken Roller Bearing Co. v. United States*,
341 U.S. 593 (1951) .................................................. 10, 23

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990) .................................................. 13

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979) .................................................. 15, 16, 17

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .................................................. 17

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) .................................................. 19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .................................................. 20

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) .................................................. 20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) .................................................. 22

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) .................................................. 28

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) .................................................. 28

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971) .......................................................................... 30

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) .......................................................................... 30

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) ..........................................................................31

*Crown, Cork & Seal Co. v. Parker*,
462 U.S. 345 (1983) ............................................................. 31, 33, 34

*Liberty Mut. Ins. Co. v. Wetzel*,
424 U.S. 737 (1976) .......................................................................... 33

**FEDERAL CASES**

*In re Blue Cross Blue Shield Antitrust Litig.*,
308 F. Supp. 3d 1241 (N.D. Ala. 2018) ........................................... *passim*

*In re Blue Cross Blue Shield Antitrust Litig.*,
2024 U.S. Dist. LEXIS 17001 (N.D. Ala. Jan. 31, 2024) ...........................24

*Washington v. NFL*,
880 F. Supp. 2d 1004 (D. Minn. 2012) .......................................... 10, 12, 13

*Spinelli v. NFL*,
96 F. Supp. 3d 81 (S.D.N.Y. 2015) ........................................................ 12

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
817 F.3d 934 (6th Cir. 2016) .................................................................. 11

*Chicago Professional Sports Ltd. Partnership v. NBA*,
95 F.3d 593 (7th Cir. 1996) .................................................................... 13

*City of Mt. Pleasant v. Associated Electric Cooperative, Inc.*,
838 F.2d 268 (8th Cir. 1988) .................................................................. 13

*Williams v. I.B. Fischer Nevada*,
999 F.2d 445 (9th Cir. 1993) .................................................................. 13

*Seabury Management, Inc. v. PGA of America, Inc.*,
878 F. Supp. 771 (D. Md. 1994) ............................................................. 13

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ....................................................13, 22

*United States v. Cooperative Theatres of Ohio, Inc.*,
845 F.2d 1367 (6th Cir. 1988) .................................................... 13

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) .............................................. 13, 21, 22

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
48 F.4th 656 (6th Cir. 2022) ........................................................ 14

*B & T Supplies, Inc. v. Gemj Chehebar Grat, LLC*,
No. 1:23-cv-11241, 2025 U.S. Dist. LEXIS 48435 (S.D.N.Y. Mar. 17, 2025)
.................................................................................................... 15

*In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*,
54 F.4th 912 (6th Cir. 2022) ....................................................15, 16

*Patrick v. S. Cent. Bell Tel. Co.*,
641 F.2d 1192 (6th Cir. 1980) .................................................... 15

*In re Air Crash at Detroit Metro. Airport*,
776 F. Supp. 316 (E.D. Mich. 1991) .......................................... 16

*In re Blue Cross Blue Shield Antitrust Litig.* (MDL No. 2406),
2022 U.S. Dist. LEXIS 246155 (2022) ........................................ 16

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C.), *aff'd*,
855 F.3d 345 (D.C. Cir. 2017) .................................................... 18

*Expert Masonry, Inc. v. Boone Cnty.*,
440 F.3d 336 (6th Cir. 2006) ...................................................... 19

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*,
155 F.4th 795 (6th Cir. 2025) .......................................................21

*Hodges v. WSM, Inc.*,
26 F.3d 36 (6th Cir. 1994) ..................................................... 21, 22

*Axis, S.p.A. v. Micafil, Inc.*,
870 F.2d 1105 (6th Cir. 1989) ............................................... 21, 22

*Valley Products Co. v. Landmark*,
128 F.3d 398 (6th Cir. 1997) ....................................................21, 22

*In re Blue Cross Blue Shield Antitrust Litig.*,
26 F. Supp. 3d 1172 (N.D. Ala. 2014) ....................................................... 23

*Yellowbook Inc. v. Brandeberry*,
708 F.3d 837 (6th Cir. 2013) ..................................................................... 25

*Tumblebus Inc. v. Cranmer*,
399 F.3d 754 (6th Cir. 2005) ..................................................................... 25

*FTC v. Endo Pharmaceuticals Inc.*,
82 F.4th 1196 (D.C. Cir. 2023) ................................................................. 26

*Franz v. NFL*,
2026 WL 2922894 (S.D.N.Y. Sept. 29, 2026) ......................................... 26

*In re Wellbutrin XL Antitrust Litigation*,
868 F.3d 132 (3d Cir. 2017) ...................................................................... 26

*Huron Valley Hospital, Inc. v. City of Pontiac*,
666 F.2d 1029 (6th Cir. 1981) ................................................................... 26

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*,
711 F.3d 1264 (11th Cir. 2013) ................................................................. 26

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
11 F.3d 1460 (9th Cir. 1993) ..................................................................... 26

*Meijer, Inc. v. Biovail Corp.*,
533 F.3d 857 (D.C. Cir. 2008) .................................................................. 26

*Conwood Co. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ..................................................................... 27

*Rodney v. Nw. Airlines, Inc.*,
146 F. App’x 783 (6th Cir. 2005) .............................................................. 28

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ..................................................................... 29

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) .................................................................. 30

*Hamilton Cnty. Bd. of Comm'rs v. NFL*,
491 F.3d 310 (6th Cir. 2007) .................................................................. 31

*Peck v. Gen. Motors Corp.*,
894 F.2d 844 (6th Cir. 1990) .................................................................. 31

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*,
85 F.4th 1070 (11th Cir. 2023) ................................................................ 32

*DeFries v. Union Pac. R.R. Co.*,
104 F.4th 1091 (9th Cir. 2024) ......................................................... 32, 34

*Phipps v. Wal-Mart Stores, Inc.*,
792 F.3d 637 (6th Cir. 2015) .................................................................. 33

*Swierkowski v. Consolidated Rail Corp.*,
168 F. Supp. 2d 389 (E.D. Pa. 2001) ....................................................... 33

*Alaska Air Grp., Inc. v. Anthem, Inc.*,
2023 U.S. Dist. LEXIS 249327 (N.D. Ala. Feb. 21, 2023) ....................... 33

*Todorov v. DCH Healthcare Authority*,
921 F.2d 1438 (11th Cir. 1991) ................................................................ 34

*Weston v. AmeriBank*,
265 F.3d 366 (6th Cir. 2001) .................................................................. 34

*Health Alliance Plan of Michigan v. Blue Cross Blue Shield of Michigan*,
2017 U.S. Dist. LEXIS 50021 (2017) ..................................................... 34

*Chancellor v. Coca-Cola Enterprises, Inc.*,
2008 WL 3307131 (S.D. Ohio Aug. 7, 2008) ............................................ 34

*Bowles v. County of Wayne*,
Nos. 23-cv-10973, 20-cv-12838, 2025 U.S. Dist.
LEXIS 106137 (E.D. Mich. June 4, 2025)............................................... 34

**FEDERAL STATUTES**

15 U.S.C. § 1 (Sherman Act § 1) ............................................................10, 14, 32

15 U.S.C. § 1055 (Lanham Act) ........................................................................ 24

**FEDERAL RULES**

Fed. R. Civ. P. 56(c)(2) ................................................................................ 3

**OTHER AUTHORITIES**

Restatement (Second) of Judgments § 13 cmt. g (1982) ..................................... 16

# STATEMENT OF THE ISSUES PRESENTED

1. Are BCBSA and the independently owned and separately managed Blue Plans that control it a "single entity" incapable of concerted action, where the Plans themselves adopt, interpret, amend by supermajority vote, and enforce the challenged restraints through the Association?

   **Ford's Answers:** No

2. Does Ford's claim challenging horizontal allocation of territories and customers and a restriction on output require proof of a relevant market and anticompetitive effects under a full Rule of Reason analysis, and, if so, has Ford offered evidence creating a genuine dispute on those elements?

   **Ford's Answers:** No. Defendants' restrictions are per se violations of the Act. Alternatively, genuine disputes exist under rule of reason analysis.

3. Do Defendants' asserted common-law and federal trademark rights establish, as a matter of law, that Ford would have suffered the same injury absent the challenged agreements?

   **Ford's Answers:** No.

4. Has Ford, a direct purchaser that paid the restrained sellers more than $1.5 billion during the Relevant Period, offered evidence from which a reasonable jury could find that the restraints caused it injury?

   **Ford's Answers:** Yes.

5. Are Ford's claims for overcharges paid within the limitations periods, as tolled, barred because the restraints were first adopted decades ago?

   **Ford's Answers:** No.

6. Were Ford's claims arising from its fully-insured purchases tolled under *American Pipe* by the *Cerven* class action, whose proposed class included persons "currently insured by any health insurance plan" and which challenged the same conspiracy and overcharges?

   **Ford's Answer:** Yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010)

*United States v. Sealy, Inc.*, 388 U.S. 350 (1967)

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)

*Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951)

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934 (6th Cir. 2016)

*In re Se. Milk Antitrust Litig.*, 739 F.3d 262 (6th Cir. 2014)

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003)

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971)

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)

*Phipps v. Wal-Mart Stores, Inc.*, 792 F.3d 637 (6th Cir. 2015)

*In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala. 2018)

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)

## INTRODUCTION

Defendant Blue Cross Blue Shield Association ("BCBSA" or the "Association") is comprised of over thirty independent Blue Plans which it licenses to use the Blue Cross and Blue Shield marks and names to sell commercial health insurance products and services throughout the United States. Through these license agreements ("Agreements") each Plan, including Defendant Blue Cross Blue Shield of Michigan ("BCBSM"), agreed not to market or sell Blue-brand coverage outside its licensed exclusive service area ("ESA"). They further agreed that each Blue could only bid on national accounts headquartered within its ESA. Additionally, from 2005 through April 2021, each Plan agreed to cap its non-Blue business at one-third of its national net revenue. As the Plans' own leaders explained, ESAs "eliminate[] competition from other Blue plans. Otherwise, there would be open warfare." (Ford SOF ¶ 41[1], ECF 81.)[2]

---

[1] Ford's Motion for Summary Judgment, ECF No. 81, and most of its corresponding exhibits filed on October 23, 2026, and Defendants' Motion for Summary Judgment, ECF No. 86, and most of its corresponding exhibits filed on October 23, 2026 were filed under seal. Accordingly, the PageID numbers for these sealed documents are unavailable. As such, citations in this brief are provided to the applicable ECF numbers, exhibit designation or brief title, and original pagination.

[2] As explained below, Ford relies in part on the Statement of Undisputed Material Facts supporting its Motion for Summary Judgment filed on October 23, 2026, ECF No. 81. For the reasons explained in Ford's Motion, Ford is entitled to summary judgment. Defendants' Motion for Summary Judgment should be denied accordingly. Nonetheless, to the extent the Court reaches issues such as the Rule of Reason or causation and damages that granting Ford's Motion would preclude,

As a result of these Agreements, Ford could obtain a Blue-brand proposal for its national account from only one Blue plan, Defendant BCBSM. [redacted] (Ford SOF ¶¶ 52-56, 73, 81-83, ECF 81.)

Defendants do not dispute these facts. They ask the Court instead to adopt four legal propositions that would immunize any horizontal market division organized around a shared trademark. Each argument fails.

*First*, the Plans and their Association are not a "single entity." *Sealy* and *Topco* rejected this structure, *American Needle* confirmed that a jointly controlled trademark entity does not insulate competitors' agreements from Section 1, and the MDL court denied Defendants' identical motion. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1263-66 (N.D. Ala. 2018).

*Second*, horizontal territorial and customer allocation is per se unlawful, and the MDL court held the aggregation of the ESAs with the best-efforts output restraints per se unlawful. *Id.* at 1266-73. Having fully litigated and lost that issue, Defendants are collaterally estopped from relitigating it here. Even under the rule of reason, genuine disputes preclude summary judgment.

---

Ford argues below, without waiver, where there would at least be issues of fact precluding summary judgment in Defendants' favor.

*Third*, Ford, a direct purchaser that paid supracompetitive prices to members of a horizontal cartel, is the paradigm antitrust plaintiff. Defendants' contention that the same injury would have occurred anyway assumes that the Plan-controlled Association would keep licensing the Blue marks territory by territory, which is the conspiracy, not a lawful alternative.

*Fourth*, Ford's claims are timely. Each inflated payment started a new limitations period, as this Court has already held, and fully-insured claims were tolled by the *Cerven* class action, which challenged the same restraints on behalf of everyone "currently insured by any health insurance plan" bound by them.

## <u>COUNTER-STATEMENT OF MATERIAL FACTS</u>

Ford incorporates the Statement of Undisputed Material Facts supporting its Motion for Summary Judgment ("Ford SOF") and responds to Defendants' Statement of Material Facts ("Defs.' SOF") as follows. Ford's responses are made for purposes of responding to Defendants' motion only. Ford objects under Fed. R. Civ. P. 56(c)(2) to each paragraph supported by the report of Professor McKenna or the report of Professor Keller, whose opinions are the subject of Ford's motions to exclude and disputes all such paragraphs for the reasons stated in the motions to exclude.

**1.** Undisputed that Blue Plans began using the Blue marks in their local communities in the 1930s. Immaterial and disputed to the extent it implies that any

Plan holds enforceable rights to the Blue marks today independent of its license. Each Plan's right to use the marks in its Service Area is granted by, and defined in, its License Agreement. (Ford Ex. I, 2013 License Agmt. ¶ 5 (BCBSA_ASO_01059446), ECF No. 81-7; Ford Ex. A, Hedges Dep. 18:4-8, 18:19-22, ECF No. 80-2, PageID.5377.) Whether any Plan retains independent common-law rights is genuinely disputed." (*See* Argument III.B.3).

**2.** Undisputed that BCBSM's predecessors used the Blue Cross and Blue Shield marks in Michigan in the 1940s and obtained state registrations in 1949 and 1951. Disputed that BCBSM holds enforceable rights in Michigan other than through its License Agreements, for the reasons stated in Paragraph 1. (Ford Ex. A, Hedges Dep. 17:9-14, 27:3-8, ECF No. 80-2, PageID.5377, 5379; Ford Ex. I, 2013 License Agmt. ¶ 5 (BCBSA_ASO_01059446), ECF No. 81-7.) [redacted] (*See* Defs.' Ex. 1, McKenna Rpt. ¶¶ 19, 22, 31, 76 n.99, 101-102, ECF No. 86-2.)

**3.** Undisputed that the listed Plans or their predecessors used Blue marks locally in the 1930s and 1940s. Immaterial for the reasons stated in Paragraph 1. Disputed to the extent it implies that Blue rights were exclusive locality by locality: Plans hold overlapping Blue rights and compete where they overlap, including in

Ohio. (Ford Ex. A, Hedges Dep. 27:9-28:16, 30:4-32:24, ECF No. 80-2, PageID.5379-80.)

**4.** Undisputed.

**5.** Undisputed.

**6.** Undisputed.

**7.** Undisputed that BCBSA is the registered owner of the Federal Blue Marks; whether they are "incontestable" is a legal conclusion. Disputed to the extent it implies that BCBSA acts independently of the Plans: BCBSA's Board consists of each Plan's CEO plus BCBSA's CEO, its Chair must be a Plan CEO, and the License Agreement may be amended only by three-fourths of the Plans and of their weighted vote. (Ford Ex. A, Hedges Dep. 87:7-12, ECF No. 80-2, PageID.5394; Ford Ex. C, BCBSA Bylaws Art. V § 5 (BCBSA_ASO_00820763), ECF No. 81-3; Ford Ex. I, 2013 License Agmt. ¶¶ 9(c), 16 (BCBSA_ASO_01059448, 059461), ECF No. 81-7.)

**8.** Undisputed that BCBSA licenses the Federal Blue Marks to the Plans and that written license agreements first issued in 1952. Disputed that each ESA tracks a prior area of use; the License Agreement defines each Service Area as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license." (Ford Ex. I, 2013 License Agmt. ¶ 5 (BCBSA_ASO_01059446), ECF No. 81-7.)

**9.** Undisputed.

**10.** Undisputed.

**11.** Undisputed.

**12.** Disputed. Plan executives described the purpose of ESAs as "lessening of competition" and eliminating "competition from other Blue plans. Otherwise, there would be open warfare." (Ex. A, Hedges VHS Dep. Jan. 15, 2026, BCBSA_FORD_00003808, 00003815-16; Ford Ex. P, Hedges VHS Dep. Ex. 302, BCBSA 00115429 at 115431, ECF No. 81-12; Ford Ex. R, Hedges VHS Dep. Ex. 634, BCBSA 00115424, ECF No. 81-14.) The NBE Rule required at least two-thirds of each Plan's national net revenue to be Blue-branded. (Ford Ex. F, BCBSA 1st RFA Resp. No. 3, ECF No. 81-5; Ford Ex. S, 2012 Guidelines, Guideline 2.2 (BCBSM_Ford_0000000036), ECF No. 81-15.)

**13.** Undisputed.

**14.** Undisputed.

**15.** Undisputed that BlueCard gives Ford's members access to a nationwide network by combining the Plans' local networks. Disputed that no Plan could build a national Blue-brand network: the License Agreement forbids each Plan to use the marks outside its Service Area, and the NBE Rule capped non-Blue business. (Ford Ex. I, 2013 License Agmt. ¶ 6 (BCBSA_ASO_01059446), ECF No. 81-7; Ford Ex. F, BCBSA 1st RFA Resp. No. 3, ECF No. 81-5.)

**16.** Undisputed.

**17.** Disputed as to purpose for the reasons stated in Paragraph 12.

**18.** Undisputed.

**19.** Undisputed.

**20.** Undisputed that the national carriers expanded over decades, often by acquisition. Disputed to the extent it implies that a Blue Plan would need decades to compete for national accounts, for the reasons stated in Argument III.C. (Ford SOF ¶ 80, ECF No. 81; Ford Ex. AJ, Catka Dep. 57:5-12, 174:5-14, ECF No. 80-37, PageID.5582, 5590.)

**21.** Undisputed.

**22.** Undisputed.

**23.** Undisputed.

**24.** Undisputed that most of Ford's employees are enrolled in self-insured plans. Ford also purchased fully insured coverage from Blue Care Network ("BCN") (through February 2013), Blue Cross Blue Shield Kansas City ("BCBS KC"), and Health Care Service Corporation ("“HCSC") during the Relevant Period. (Ford Ex. Z, Piszker Dep. 123:9-20, 143:3-15, 155:7-156:9, ECF No. 80-27, PageID.5533, 5538, 5541; Ford Ex. AJ, Catka Dep. 39:2-20, 41:6-11, ECF No. 80-37, PageID.5578.)

**25.** Undisputed

**26.** Undisputed.

**27.** Undisputed.

**28.** Undisputed that the *Cerven* complaint contains the quoted damages-class and group-size definitions. Incomplete: *Cerven* also sought injunctive relief for "[a]ll persons or entities in the United States of America who are currently insured by any health insurance plan" bound by the territorial restrictions. (ECF No. 23-2, PageID.542, ¶ 20.)

**29.** Undisputed as to the damages-class definitions. Immaterial and incomplete: the *Cerven* injunctive class included Ford's fully insured purchases (ECF No. 23-2, PageID.542, ¶ 20.)

**30.** Undisputed for purposes of this motion as to Ford's fully insured plans with BCN, BCBS KC, and HCSC. Immaterial because those purchases fall within the *Cerven* injunctive class. (*See* Argument V.a.)

## <u>ARGUMENT</u>

### I. The Blue Plans and the Association They Control Are Not a Single Entity.

#### A. Defendants' Single-Entity Argument Is Inconsistent With Well-Settled Case Law and the Factual Record.

Defendants contend that the Association and the Blue Plans act as a "single entity" for the function of "governing and administering the Federal Blue Marks," so that the ESAs, the NBE Rule, and the Local Best Efforts Rule are unilateral conduct. (Defs.' Br. at 13-15, ECF No. 86.) That argument asks the wrong question

under *American Needle*, cannot be reconciled with *Sealy* and *Topco*, and ignores a record showing separate economic actors.

*First*, Defendants' focus on who holds title to the Federal Blue Marks is exactly the formalism *American Needle* rejected. The question is not whether the parties act through a single legal entity, but whether the challenged conduct joins together "separate economic actors pursuing separate economic interests." 560 U.S. at 191, 195. Applying that test, the Court held that thirty-two separately owned NFL teams acting through a jointly controlled entity to license intellectual property were capable of concerted action, notwithstanding their shared interest in promoting the NFL brand. *Id.* at 196-202. Defendants' own description of the Blue System places it on the *American Needle* side of the line. Defendants concede that the Plans each held their own common-law rights in the Blue names and "worked together to pool their respective common law rights" to obtain federal registration. (Defs.' Br. at 15, ECF No. 86; Defs.' SOF ¶¶ 1-9, ECF No. 86.) Elsewhere, they insist that those separately owned rights would "revert" to each Plan if the license agreements ended. (Defs.' Br. at 23, ECF No. 86; Defs.' SOF ¶ 9, ECF No. 86.) Separate owners pooling separately held intellectual property in an entity they control and then agreeing through the entity where each may sell, is precisely the conduct *American Needle* held subject to Section 1.

*Second*, the Supreme Court already rejected Defendants' argument, in decisions their brief does not mention. In *Sealy*, mattress manufacturers that controlled the licensor of the Sealy trademark used it to grant one another exclusive territories. The Court held that the licensor was "a joint venture of, by, and for its stockholder-licensees," and that the territorial arrangements "must be regarded as . . . horizontal action by the licensees." *United States v. Sealy, Inc.*, 388 U.S. 350, 352-54 (1967). Similarly, in *Topco*, independent grocery chains that controlled a cooperative owning private-label trademarks used license agreements to give each member exclusive territories. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 598-603 (1972). As in *Sealy*, the *Topco* Court condemned the scheme as a horizontal territorial allocation. *Id.* at 608-09. In both cases, as here, the licensor formally owned the marks, the licensees shared an interest in promoting a common brand, and the restraints were imposed through license agreements. None of that made the arrangements unilateral. "A trademark cannot be legally used as a device for Sherman Act violation." *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 599 (1951).

*Third*, the record here confirms that the Plans are separate economic actors. The Plans are separate companies with their own management, boards, and finances. (Ford SOF ¶¶ 6-7, ECF No. 81); *see* 308 F. Supp. 3d at 1250 (Plans "are financially independent entities"). They compete wherever their rights overlap and under non-

Blue brands (Ford SOF ¶¶ 39-40, ECF No. 81), and their leaders explained that the ESAs exist to prevent "open warfare" among them (*id.* ¶ 41). A single entity does not need a rule to stop its own parts from competing.

*Fourth*, the MDL Court rejected Defendants' identical single-entity argument on the same structure and documents. 308 F. Supp. 3d at 1263-66. It held that forming a single licensing entity "is not dispositive," *id.* at 1263-64; that "[a]n ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label," *id.* at 1265 (quoting *American Needle*, 560 U.S. at 197); and that the record showed genuine disputes as to "the validity and/or enforceability of the Marks," the very "function" Defendants invoke, and evidence that, apart from the ESAs, "the Blues would be competitors under the Blue brand," *id.* It also rejected Defendants' attempt to confine *Sealy* and *Topco* to "formalistic shells or sham entities." *Id.*at 1267-68.

In *Medical Center at Elizabeth Place, LLC v. Atrium Health System*, 817 F.3d 934 (6th Cir. 2016), the Sixth Circuit reversed a grant of summary judgment on a single-entity defense, holding that a reasonable jury could find that affiliated hospitals that kept separate assets and the capacity to compete were separate economic actors. *Id.* at 945. The Plans here, which never merged their assets and actually compete where the restraints allow, are far more independent than the hospitals in *Elizabeth Place*.

### B. The Challenged Restraints Reach Well Beyond Trademark Governance.

Defendants' single-entity argument depends on characterizing every challenged restraint as part of a single function of "governing the Federal Blue Marks." (Defs.' Br. at 13-18, ECF No. 86.) The NBE Rule limited how much business each Plan could do under its *own non-Blue brands*, which the Association concedes it does not otherwise govern. (Ford SOF ¶¶ 40, 43-46, ECF No. 81.) The national-account rules allocate customers based on where they are headquartered and were "designed to help ensure plans avoid situations where one plan is bidding against another." (*Id.* ¶ 55.) The MDL court found "nothing in the Rule 56 record which indicates that there is any valid connection between trademark rights and the National Best Efforts rule," which "specifically restrains the Plans' ability to compete under non-Blue brands." 308 F. Supp. 3d at 1272.

Defendants' authorities are inapposite. *Washington v. NFL*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012), and *Spinelli v. NFL*, 96 F. Supp. 3d 81, 114-17 (S.D.N.Y. 2015), involved game footage and photographs of NFL games, products that no team could create alone. The Plans, by contrast, each sell health insurance independently; their only joint "product" is an agreement about where each may sell. *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1271 n.15 ("[C]ollusion between competitors is not essential to the sale of health insurance.") The remaining cases involved a league the court did not hold to be a single entity, a

vertically integrated cooperative whose members were not competitors, and systems controlled from the top. *See Chicago Professional Sports Ltd. Partnership v. NBA*, 95 F.3d 593 (7th Cir. 1996); *City of Mt. Pleasant v. Associated Electric Cooperative, Inc.*, 838 F.2d 268, 276 (8th Cir. 1988); *Williams v. I.B. Fischer Nevada*, 999 F.2d 445 (9th Cir. 1993); *Seabury Management, Inc. v. PGA of America, Inc.*, 878 F. Supp. 771, 777 (D. Md. 1994). Here, control runs the other way.

## II. Ford Need Not Satisfy a Full Rule of Reason Analysis, And, Regardless, Genuine Disputes Preclude Summary Judgment.

### A. The Challenged Restraints are Per Se Unlawful.

Defendants argue that Ford cannot prove a rule of reason claim (Defs.' Br., 18, ECF No. 86) but that argument assumes its own premise. The Rule of Reason is the default only for restraints that do not fall within an established per se category. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273-74 (6th Cir. 2014). Horizontal territorial allocation is a "classic example[] of a per se violation of § 1." *Topco*, 405 U.S. at 608; *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam). Customer allocation is treated the same way. *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371-73 (6th Cir. 1988); *see also In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906-09 (6th Cir. 2003). As shown in Ford's Motion for Summary Judgment, the ESAs, the national-account rules, and the NBE Rule fall squarely within these categories. (*See generally* ECF No. 81.)

Under the per se standard of review, anticompetitive effects "are inferred," *Se. Milk*, 739 F.3d at 270-71, and "no consideration is given . . . to any claimed pro-competitive justifications," *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 666 (6th Cir. 2022) (quoting *In re Cardizem*, 332 F.3d at 906. Defendants' market definition, effects, and brand-protection arguments therefore fail. This Court already held that Ford adequately alleged per se violations of Section 1. (Op. & Order, ECF No. 30, PageID.942, 944-46.) The record now substantiates each of those allegations. (*See* Ford SOF ¶¶ 28-65, ECF No. 81.)

### B. Defendants Are Collaterally Estopped From Relitigating the MDL Court's Per Se Ruling.

Defendants have already litigated, and lost, the question of whether the challenged restraints are subject to per se review. On cross-motions for summary judgment directed to the standard of review, the MDL court held that the Blue Plans' "of ESAs and, among other things, best efforts rules . . . considered together, constitute a per se violation of the Sherman Act." 308 F. Supp. 3d at 1267; *see id.* at 1273 ("[T]he National Best Efforts rule constitutes a per se violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition."); *id.* at 1279 ("Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under

the per se standard of review."). Defendants should not be permitted to relitigate that issue here.

Because the MDL court adjudicated Sherman Act claims under its federal-question jurisdiction, the preclusive effect of its ruling is governed by federal common law. *B & T Supplies, Inc. v. Gemj Chehebar Grat, LLC*, No. 1:23-cv-11241, 2025 U.S. Dist. LEXIS 48435, at *22 (S.D.N.Y. Mar. 17, 2025); *cf. In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 922 (6th Cir. 2022) (applying state preclusion law in successive diversity actions). Under federal law, collateral estoppel applies when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *B & T Supplies*, 2025 U.S. Dist. LEXIS 48435, at *22. Mutuality is not required; a plaintiff may invoke collateral estoppel offensively to prevent a defendant "from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326-29 (1979); *see also Patrick v. S. Cent. Bell Tel. Co.*, 641 F.2d 1192, 1199-1200 (6th Cir. 1980).

Each element is satisfied. The issue is identical: Ford challenges the same ESAs and the same NBE Rule, adopted and enforced by the same Association and

Plans, during an overlapping period. (Ford SOF ¶¶ 28-65, ECF No. 81.) The issue was actually litigated and decided, after full summary-judgment briefing, in a lengthy reasoned opinion. 308 F. Supp. 3d at 1266-73, 1279. Defendants had a full and fair opportunity to litigate it. And the ruling is sufficiently firm to be given preclusive effect: "[t]hat the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion." *du Pont*, 54 F.4th at 926 (quoting Restatement (Second) of Judgments § 13 cmt. g (1982)).

The *Parklane* considerations, which guide the Court's "broad discretion" in applying offensive collateral estoppel, likewise favor preclusion. 439 U.S. at 329-31; *du Pont*, 54 F.4th at 922. *First*, Ford is not a "wait and see" plaintiff. *Parklane*, 439 U.S. at 330. The class settlement in the MDL offered Ford no right to proceed to trial and obtain judgment against Defendants; Ford opted out and pursued its own claims in this Court. *See In re Air Crash at Detroit Metro. Airport*, 776 F. Supp. 316, 325-26 (E.D. Mich. 1991). *Second*, Defendants had "every incentive to litigate . . . fully and vigorously." *Parklane*, 439 U.S. at 332. The MDL subscriber claims alone settled for approximately $2.67 billion, and opt out suits were plainly foreseeable. *In re Blue Cross Blue Shield Antitrust Litig.* (MDL No. : 2406), 2022 U.S. Dist. LEXIS 246155, *33 (2022); *see du Pont*, 54 F.4th at 927 (MDL defendant had

"every incentive" to defend vigorously). *Third*, the MDL ruling is not inconsistent with any prior judgment in Defendants' favor. *Parklane*, 439 U.S. at 330. *Fourth*, this case affords Defendants no "procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 331. Defendants had years of discovery and full summary-judgment briefing in the MDL, and they rely here on the same documents and arguments.

Because Defendants "received a 'full and fair' opportunity to litigate" whether the aggregation of the ESAs and the NBE Rule is per se unlawful, they are collaterally estopped from relitigating that question here. *Parklane*, 439 U.S. at 332-33. At a minimum, the MDL court's thorough analysis of the identical restraints, on a materially identical record, is highly persuasive and should be followed.

### C. Under the Rule of Reason Analysis, Market Definition is Genuinely Disputed.

Defendants argue that Ford cannot define a market because Dr. Krock adopted the national accounts market recognized in other litigation. (Defs.' Br. at 19, ECF No. 86.) However, the record here establishes the core features of a national accounts market. [redacted] (Ford Ex. G, Gavin Dep. 15:2-3, 15:15-16:1, ECF No. 80-8, PageID.5411-12; Ex. B, Gavin Dep. 17:12-22, 84:22-85:11.) "[I]ndustry or public recognition of the submarket as a separate economic entity" is a classic practical indicium of a relevant market. *Brown Shoe*

*Co. v. United States*, 370 U.S. 294, 325 (1962). Defendants likewise concede that only five options for nationwide coverage have ever existed (the Blue System through BlueCard, Aetna, Cigna, United, and Humana), that each of the non-Blue options took decades to build, and that "[n]one" of the many regional plans "ha[s] been able to independently create national provider networks that compete . . . for national commercial business." (Defs.' SOF ¶¶ 19-21, ECF No. 86.) In sum, national accounts, like Ford, cannot practically turn to regional carriers to service their national account needs.

Moreover, the market Dr. Krock adopted was not plucked from an "unrelated legal opinion." (Defs.' Br. at 19, ECF No. 86.) After a full trial with competing economic testimony, the court in *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193-203 (D.D.C.), aff'd, 855 F.3d 345 (D.C. Cir. 2017), found a relevant national accounts market for the sale of health insurance. Nor did Dr. Krock simply borrow that definition. Rather, it is grounded in his own economic reasoning about what an insurer must offer to serve such accounts. (Defs.' Ex. 56, Krock Rep. ¶¶ 51, 85-86, 121, ECF No. 86-57.)[3] At a minimum, the market definition is genuinely disputed.

---

[3] In his report, Dr. Krock explains that serving a national account requires an established presence in multiple states and the capacity to cover at least 5,000 employees in each relevant state, and he limits the market to insurers and plans with the scale and network capacity to meet those requirements. (Defs.' Ex. 56, Krock Rep. ¶¶ 51, 85-86, ECF No. 86-57.)

### D. The Record Contains Direct Evidence of Anticompetitive Effects.

Defendants' argument rests on Dr. Krock's statement that he offers no opinion on anticompetitive effects. (Defs.' Br. at 20, ECF No. 86.) But anticompetitive effects may be shown by any competent evidence, and "proof of actual detrimental effects . . . can obviate the need for an inquiry into market power." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *see Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 343 (6th Cir. 2006).

The record here contains direct evidence of anticompetitive effects: [redacted] (Ford SOF ¶¶ 41, 43-46, 52-55, 81-83, ECF No. 81.) [redacted] (*Id.* ¶¶ 81-82.) That was not for lack of desire. Ford's healthcare benefits manager testified that, "as a national employer, we would be seeking a national healthcare solution, so that would be United, CIGNA, Aetna, or another Blue plan." (Ex. C, De Haan Dep. 163:16-18.) With no other Blue Plan permitted to bid, BCBSM's prices to Ford rose. According to Defendants' expert, [redacted]. (Defs.'

Ex. 48, Trish Rep. ¶ 18 n.30, ECF No. 86-49.) Ford's damages expert estimates an overcharge of 5.3 to 7.9 percent on the $1.47 billion in fully-insured premiums Ford paid from February 2008 to April 2021 (approximately $78 to $116 million), and of 8.5 to 12.9 percent on the $171 million in self-insured administrative fees it paid from November 2016 to April 2021 (approximately $15 to $22 million), before prejudgment interest. (Defs.' Ex. 45, Raiff Rep. ¶¶ 17-18, ECF No. 86-46; Defs.' Ex. 56, Krock Rep. ¶ 8, ECF No. 86-57 (adopting Dr. Raiff's methodology, analyses, and conclusions).) After the MDL settlement's injunctive relief removed some of the restraints, ASO fees charged by Association Members decreased by 11 percentage points relative to the ASO fees charged by non-Association Members. (Defs.' Ex. 56, Krock Rep. ¶¶ 19 n.8, 73, ECF No. 86-57 (citing Raiff Rep. ¶¶ 87-89, 97-98, 103, ECF No. 86-46).) [redacted] (Defs.' Ex. 48, Trish Rep. ¶ 18 n.31, ECF No. 86-49) [redacted]. The competitive bids Ford would have solicited, from other Blue Plans was prohibited.

## III. Ford Has Shown Antitrust Injury And Causation.

### A. Ford is a Direct Purchaser That Paid Supracompetitive Prices.

A purchaser that pays more because competitors agreed not to compete suffers "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-42 (1979); *Cardizem*, 332 F.3d at 910-11. The Sixth Circuit recently

described direct purchasers who pay a cartel's overcharge as "the 'preferred plaintiffs' who suffer the core antitrust injury." *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, 155 F.4th 795, 809 (6th Cir. 2025).

Defendants' reliance on *Academy of Allergy* (Defs.' Br. at 20-21, 26, ECF No. 86) is therefore misplaced. The plaintiff there was an upstream supplier of medical services claiming injury from a scheme directed at others. *Acad. of Allergy*, 155 F. 4th at 801-806. In holding that the plaintiff could not show proximate cause, the court contrasted the plaintiff with the purchasers who are the natural enforcers of the antitrust laws. *Id.* at 814-20. Ford buys directly from the Plans whose restraints are at issue, the restraints target the market in which Ford buys, and there is no more directly injured party. Ford thus falls squarely within the second category. *See id.* at 806-09.

### B. Defendants' Trademark Arguments Do Not Defeat Causation.

Defendants contend that Ford would have suffered the same injury without the challenged agreements because BCBSM's common-law rights would "revert" to it and because no Plan could use the Federal Blue Marks without the Association's license. (Defs.' Br. at 22-25, ECF No. 86.) Both arguments fail.

#### 1. Defendants' "reversion" theory fails as a matter of law.

Defendants rely on *Hodges v. WSM, Inc.*, 26 F.3d 36, 38-39 (6th Cir. 1994), *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111-12 (6th Cir. 1989), and *Valley Products Co. v. Landmark*, 128 F.3d 398, 404 (6th Cir. 1997), which involved an

actual, independent, and lawful cause that was the sole cause of the injury. But the Sixth Circuit has explained the limits of those cases. In *Cardizem*, the defendants argued that the purchasers' injury was caused not by their unlawful agreement but by a lawful alternative: the generic manufacturer could have stayed off the market on its own out of concern about patent-infringement liability. 332 F.3d at 911-12. The Sixth Circuit rejected that argument. It explained that in *Axis*, *Hodges*, and *Valley Products*, the defendant "had taken an action that it was lawfully entitled to take, independent of the alleged antitrust violation, which was the actual, indisputable, and sole cause of the plaintiff's injury," and that "[i]n none of these cases was a complaint dismissed . . . based on a defendant's claim that it *could* have caused the same injury without committing the alleged violation." *Id.* at 914. At summary judgment a plaintiff need only show that the violation was "a material cause" of its injury, and it "need not exhaust all possible alternative sources of injury." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 & n.9 (1969); *see Se. Milk*, 739 F.3d at 284-86 (reversing summary judgment for lack of antitrust injury).

Unlike the plaintiffs in *Hodges*, *Axis*, and *Valley Products*, Ford does not complain of a single firm's exercise of its own lawful rights. Here, the obstacle to competition is the competitors' agreement not to compete. Whether BCBSM would

have asserted, and could have enforced, common-law rights to exclude every other Plan from Michigan is an untested legal theory.

**2. Trademark rights cannot immunize a horizontal allocation.**

*Sealy*, *Topco*, and *Timken* each rejected the contention that trademark rights justify territorial division among competitors. 388 U.S. at 356-57; 405 U.S. at 608-11; 341 U.S. at 598-99. Applying these principles, the MDL court rejected Defendants' argument that the Plans' common-law trademark rights defeat the allocation claims. *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1183-85 (N.D. Ala. 2014). This Court likewise declined to dismiss Ford's claims on the basis of Defendants' trademark defense. (Op. & Order, ECF No. 30, PageID.942-43.) Defendants offer nothing in the summary-judgment record that changes the legal analysis. Their "reversion" theory is the same justification restated as a causation argument. It assumes that, even without the License Agreements, the trademark structure would reassert itself and produce the same territorial exclusivity. *Timken* forecloses this line of argument: the restraints cannot "be justified as reasonable steps taken to implement a valid trademark licensing system." 341 U.S. at 598.

**3. The "reversion" argument rests on legal theory.**

Even on its own terms, Defendants' theory requires the Court to find, as a matter of law, that BCBSM held enforceable statewide common-law rights, that those rights survived seventy years of Association-controlled licensed use, and that

they would revert intact, if the License Agreements disappeared. The record compels none of those findings.

*First*, the ESAs are defined by the area each Plan served on June 30, 1972, not by historical common-law use. (Ford SOF ¶ 32, ECF No. 81.) Defendants' premise that the ESAs merely codify pre-existing common-law territories is, at best, disputed.

*Second*, the MDL court has already held that the Plans' asserted common-law rights turn on genuine disputes of material fact, including whether the first users of the marks "acquiesced in these other Plans' use of the Marks in other markets" or "granted licenses without appropriate controls." *In re Blue Cross Blue Shield Antitrust Litig.*, 2024 U.S. Dist. LEXIS 17001, *18 (N.D. Ala. Jan. 31, 2024) (denying provider plaintiffs' motion for partial summary judgment on defendants' common-law trademark rights). Overlapping Blue rights in Ohio and Kansas further show that Blue rights were not exclusive, locality by locality. (Ford SOF ¶¶ 37, 39, ECF No. 81.) And multiple Plans sell Blue-brand coverage in the same areas today, including in California, Idaho, New York, Pennsylvania, and Washington, and in parts of Georgia and Ohio. 308 F. Supp. 3d at 1252.

*Third*, settled trademark principles raise serious questions about what, if anything, would "revert." A trademark is inseparable from the goodwill it symbolizes; its scope is limited to the area of actual use and reputation; and rights

may be lost through abandonment or through licensing without adequate control by the owner. *See Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 844-48 (6th Cir. 2013); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 764-66 (6th Cir. 2005). For decades, use of the Blue marks in Michigan has been licensed by and controlled through the Association, and under the Lanham Act a licensee's controlled use inures to the benefit of the licensor. 15 U.S.C. § 1055. Whether BCBSM retains any residual common-law right, and its geographic scope, are at minimum disputed questions.

**4. The "no right to enter" argument assumes the conspiracy continues.**

Defendants argue that, even absent the challenged agreements, the Association would remain the owner of the Federal Blue Marks and no Plan could use them without a license. (Defs.' Br. at 24-25, ECF No. 86.) But the Association's licensing decisions are the Plans' decisions. (Ford SOF ¶¶ 14-20, ECF No. 81.) A but-for world in which the Plan-controlled Association continues to license only one Plan per territory and to prohibit Blue-on-Blue bidding for national accounts is not a world without the challenged conduct; it is the challenged conduct. The relevant but-for question is what would have happened had the Plans not agreed, through their Association, to divide territories and customers. *See Am. Needle*, 560 U.S. at 196-202; *Sealy*, 388 U.S. at 352-54. The License Agreements already provide for overlapping service areas, and multiple Plans already sell Blue-brand coverage in

the same areas in several states. 308 F. Supp. 3d at 1252. The one-Plan-per-territory rule is a choice the Plans made, not a command of trademark law.

*FTC v. Endo Pharmaceuticals Inc.*, 82 F.4th 1196 (D.C. Cir. 2023), is not to the contrary. That case involved a single patentee's exclusive license within the scope of a statutory patent grant, decided on a motion to dismiss. It did not involve competitors acting through a licensor they control to divide markets, which is the conduct *Sealy* and *Topco* condemn. Defendants' remaining authorities, including *Franz v. NFL*, 2026 WL 2922894, at *4-5 (S.D.N.Y. Sept. 29, 2026) (consumer challenge to NFL licensing policy; no plausible allegation of higher prices), and *In re Wellbutrin XL Antitrust Litigation*, 868 F.3d 132, 165-70 (3d Cir. 2017) (third party's patent independently blocked generic entry), are distinguishable for precisely the same reason.

### C. The Record Supports A Reasonable Inference That Competition Would Have Lowered Ford's Prices.

Defendants next argue that Ford's theory is speculative because Dr. Krock did not identify which Plans would have entered which territories, when, or how. (Defs.' Br. at 26-29, ECF No. 86.) This argument misapplies the potential-entrant cases.

*Huron Valley Hospital, Inc. v. City of Pontiac*, 666 F.2d 1029, 1033 (6th Cir. 1981), asked whether a would-be competitor was prepared to enter. *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013), and *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d

1460, 1465 (9th Cir. 1993), likewise turned on whether an excluded firm was ready to enter. *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008), held that a purchaser suing an incumbent monopolist for excluding a particular nascent competitor must show that the excluded firm was willing and able to supply it.

Ford's claim is different in kind. It alleges that existing, established insurers, each of which already operates a provider network, already serves national account members through BlueCard, and already competes with the others wherever their rights overlap, agreed not to compete for Ford's business. (Ford SOF ¶¶ 39-40, 57-62, ECF No. 81.) The governing Sixth Circuit standard therefore does not require Ford to identify a particular entrant waiting in the wings. To establish antitrust injury, a plaintiff must show "(1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 788 (6th Cir. 2002). Ford satisfies both elements: an agreement among the Plans not to bid against one another for national accounts reduces competition for those accounts, and Ford's overcharge injury flows directly from that loss of competition.

Even under Defendants' standard, the record shows willing and able competitors. The Plans' own leaders warned that, without the ESAs, Plans "will be fighting among themselves" and there "would be open warfare." (Ford SOF ¶ 41,

ECF No. 81.) The Plans' networks overlap almost completely; the Blue HMOs Ford purchased outside Michigan use the same networks as BCBSM's national PPO, in some cases overlapping by 99.5 percent. (*Id.* ¶ 80.) Cede and designation agreements show that non-home Plans can and do serve national accounts headquartered elsewhere. (*Id.* ¶ 56.) [redacted] (*Id.* ¶ 83.) Defendants' evidence that building a national network "from the ground up" took Aetna, Cigna, and United decades (Defs.' Br. at 29, ECF No. 86) is beside the point; the Blue Plans would not have needed to build anything. They simply would need to agree to continue to share their provider networks.

### D. Defendants' Remaining Arguments Go to the Amount of Damages, Not the Fact of Injury.

An antitrust plaintiff must prove the fact of injury with reasonable certainty, but the amount of damages may be a just and reasonable estimate. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-66 (1946). Once injury is shown, it is "enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see also Bigelow*, 327 U.S. at 264-66 (the wrongdoer "shall bear the risk of the uncertainty which his own wrongdoing has created"). "A plaintiff need not calculate a specific damage figure so long as he proposes an acceptable method for calculating damages." *Rodney v.*

*Nw. Airlines, Inc.*, 146 F. App'x 783, 791 (6th Cir. 2005); *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-34 (6th Cir. 2008).

*Entrant shares.* Defendants' criticisms of Dr. Krock's entry assumptions (Defs.' Br. at 28-29, ECF No. 86) go to the amount of the overcharge, not whether an injury in fact occurred. [redacted] (Defs.' Ex. 56, Krock Rep. ¶¶ 8, 19 & n.8, 42-47, 132, ECF No. 86-57; Defs.' Ex. 48, Trish Rep. ¶¶ 24-28, ECF No. 86-49.) The absence of historical Blue-on-Blue entry is the effect of the restraints, not evidence that entry was infeasible. (Defs.' Ex. 56 Krock Rep. ¶¶ 16, 38, 48, 117, 122-123, ECF No. 86-57.)

*Claims costs.* [redacted] (Defs.' Br. at 30, ECF No. 86) [redacted] (Defs.' Ex. 48, Trish Rep., ECF No. 86-49) [redacted] Dr. Krock explains that Ford's damages are overcharges on premiums and ASO fees, not the claims Ford paid providers, and that Dr. Trish's offset theory ignores forces that raised provider prices under the restraints. (Krock Rep. ¶¶ 96-98, 101-102, ECF No. 86-57.)

## IV. Ford's Claims Are Timely

### A. Each Overcharge Payment Started a New Limitations Period.

In a continuing conspiracy, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). In a price-fixing conspiracy, each overt act that injures the plaintiff, "e.g., each sale to the plaintiff, starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). The Sixth Circuit applies the same rule. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009). This Court has already held that Ford's overcharge claims "are not barred by the statute of limitations, as they would restart after each new payment." (Op. & Order, ECF No. 30, PageID.950.)

Ford seeks damages only for overcharges paid within the limitations period, as tolled. For its self-funded purchases, that means payments made on or after September 6, 2017, (BCBSM and Blue Cross and Blue Shield of Kansas City) or September 6, 2018, (the other Blue Plans), and for its fully-insured purchases, payments within the period tolled by *Cerven* (Part V, *infra*).

### B. Defendants' "Blocked Entry" and "Day One" Arguments Confuse How the Overcharge Is Measured with When Ford Was Injured.

Defendants argue that Ford's claims really concern entry blocked in the 1940s and 1950s, and that because Dr. Krock's model assumes hypothetical entrants held

their market share on the first day of the damages period, Ford "necessarily admits that its claims accrued before the statutory period." (Defs.' Br. at 30-33, ECF No. 86.) Both arguments confuse how an overcharge is measured with when Ford was injured. An expert's but-for world describes what prices would have been absent the conspiracy, not when injury occurred. Defendants' cases each involved a completed act with lingering effects, not a purchaser paying a new inflated price on each transaction. *See Hamilton Cnty. Bd. of Comm'rs v. NFL*, 491 F.3d 310, 317-19 (6th Cir. 2007) (single stadium lease); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (per curiam) (continuing effects of a past exclusion).

## V. Ford's Fully-Insured Claims Were Tolled By The *Cerven* Class Action

### A. Ford Was A Purported Member of the *Cerven* Injunctive Class.

A class action "suspends the applicable statute of limitations as to all asserted members of the class," *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974), including those who later sue individually, *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350-54 (1983), for claims within the class definition of which the defendant had notice (Op. & Order, ECF No. 30, PageID.951-52).

Ford's fully-insured claims meet that standard. The *Cerven* complaint, filed February 7, 2012, sought to enjoin the same territorial restraints on behalf of "[a]ll persons or entities in the United States of America who are currently insured by any health insurance plan that is currently a party to a license agreement with BCBSA that restricts the ability of that health insurance plan to do business outside of any

geographically defined area." (ECF No. 23-2, PageID.542, ¶ 20.) Ford was an entity insured by Blue Care Network, Blue Cross and Blue Shield of Kansas City, and Health Care Service Corporation, each bound by such an agreement. (Ford SOF ¶¶ 64, 74-75, 77, ECF No. 81.) The decisions excluding self-funded accounts from *Cerven* rested on the premise that those accounts "do not buy health insurance" and so are "not necessarily 'insured by [a] health insurance plan.'" *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1084, 1097-98 (11th Cir. 2023); *see* ECF No. 30, PageID.953 (*Cerven* class limited to "full-service" insurance). Ford's fully-insured coverage is precisely what those courts found *Cerven* covered. The individual and small-group market allegations Defendants invoke framed only the North Carolina damages class; the nationwide injunction class was defined by the restraint. (ECF No. 23-2, PageID.542, 576-77, ¶¶ 20, 130-31.) At a minimum, the definition "arguably" includes Ford, and that ambiguity is resolved in favor of tolling. *DeFries v. Union Pac. R.R. Co.*, 104 F.4th 1091, 1095, 1099 (9th Cir. 2024).

### B. A Difference in Remedy Does Not Defeat Tolling.

Defendants argue that a Section 4 damages claim is not the same "claim" as the *Cerven* class's Section 16 claim for injunctive relief. (Defs.' Br. at 33-35, ECF No. 86.) But Sections 4 and 16 supply remedies. The substantive claim, in *Cerven* and here, is the same violation of Section 1 of the Sherman Act. "[A] complaint asserting only one legal right, even if seeking multiple remedies for the alleged

violation of that right, states a single claim for relief." *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743 n.4 (1976). Because a class complaint gives defendants notice of the number of claims and the potential plaintiffs, tolling creates "no potential for unfair surprise, regardless of the method class members choose to enforce their rights." *Crown, Cork*, 462 U.S. at 353 (citation omitted). Applying these principles, *Swierkowski v. Consolidated Rail Corp.*, 168 F. Supp. 2d 389, 395 (E.D. Pa. 2001), held that membership in an injunctive-relief class tolled the member's damages claim. *See also Phipps v. Wal-Mart Stores, Inc.*, 792 F.3d 637, 643-45, 648-49 (6th Cir. 2015) (applying *American Pipe* to a follow-on class action by members of a decertified class). Tolling follows class membership and notice, not the remedial label.

*Cerven* gave Defendants that notice. It challenged the same conspiracy, restraints, and overcharge theory, and it alleged that the restraints answered competition from insurers that offered "uniform nationwide contracts, which were attractive to large employers." (ECF No. 23-2, PageID.551, ¶ 51.) The MDL court held that tolling turns not on "the allegations of the complaint, but rather the parameters of what the earlier class action gave Defendants notice about." *Alaska Air Grp., Inc. v. Anthem, Inc.*, 2023 U.S. Dist. LEXIS 249327, at *73 (N.D. Ala. Feb. 21, 2023).

Defendants' authorities are not to the contrary. *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1452-55 (11th Cir. 1991), addressed antitrust standing, not tolling. *Weston v. AmeriBank*, 265 F.3d 366, 368-69 (6th Cir. 2001), limits tolling to "substantive claims that were raised, or could have been raised," in the class complaint. It is undisputed that the Section 1 claim here was raised in *Cerven*. *Health Alliance Plan of Michigan v. Blue Cross Blue Shield of Michigan*, 2017 U.S. Dist. LEXIS 50021, *10 (2017), involved monopolization, tortious-interference, and lost-profits claims that were "separate and distinct" from the class's overcharge claim. And *Chancellor v. Coca-Cola Enterprises, Inc.*, 2008 WL 3307131, at *4 (S.D. Ohio Aug. 7, 2008), rested on individualized damages, which do not defeat tolling, *Crown, Cork*, 462 U.S. at 353.

Nor did later filings end tolling. Tolling continues "unless and until a court accepts a new definition that unambiguously excludes them," *DeFries*, 104 F.4th at 1099; *see also Bowles v. County of Wayne*, Nos. 23-cv-10973, 20-cv-12838, 2025 U.S. Dist. LEXIS 106137, at *18 (E.D. Mich. June 4, 2025). Defendants identify no order adopting a definition that unambiguously excludes Ford.

## CONCLUSION

For the foregoing reasons, Ford respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

Dated: November 20, 2026

Respectfully submitted,

DINSMORE & SHOHL LLP

*/s/ William A. Sherman, II*

William A. Sherman, II
Dinsmore & Shohl LLP
801 Pennsylvania Ave, NW
Suite 610
Washington, D.C. 20004
(202) 372-9100
william.sherman@dinsmore.com

Alan H. Abes
Dinsmore & Shohl LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 977-8200
alan.abes@dinsmore.com

J. Travis Mihelick (P73050)
900 Wilshire Drive, Suite 300
Troy, MI 48084
(248) 203-1655
*travis.mihelick@dinsmore.com*

Brandon Pelligrino (P79112)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
*brandon.pelligrino@bowmandandbrooke.com*

*Attorneys for Plaintiff Ford Motor Company*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2026, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of the filing to all counsel of record.

Respectfully submitted,
DINSMORE & SHOHL LLP

*/s/ William A. Sherman, II*