**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| FORD MOTOR COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY and BLUE CROSS BLUE SHIELD ASSOCIATION,<br><br>Defendants. | Case No. 2:23-cv-11286-LVP-EAS<br><br>Hon. Linda V. Parker<br><br>Magistrate Judge Elizabeth A. Stafford |

**PLAINTIFF FORD MOTOR COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. JOSEPH A. KROCK**

Plaintiff Ford Motor Company ("Ford") opposes the Motion to Exclude the Opinions and Testimony of Dr. Joseph A. Krock filed by Defendants Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSM") and Blue Cross Blue Shield Association ("BCBSA" or the "Association") (collectively, "Defendants") (ECF No. 87). For the reasons stated in the accompanying brief, Ford respectfully requests that the Court deny the motion in its entirety.

## STATEMENT OF THE ISSUES PRESENTED

1. Where Dr. Krock applies a peer-reviewed, published econometric framework that was built on data sources used throughout antitrust enforcement actions, should the Court admit his damages opinions and permit the jury to weigh the opinions at trial?
**Ford Answers: Yes.**

2. Where Dr. Krock defines the National Accounts Health Insurance Market consistent with the market the District of Columbia adopted after a full bench trial in *United States v. Anthem, Inc.*, with the same product scope recognized throughout the industry, and with state-level geographic boundaries that track Defendants' own Exclusive Service Areas, should the Court permit the jury to consider that market definition?
**Ford Answers: Yes.**

3. Where Dr. Krock presents a bounded range of damages scenarios—each driven by varying but-for entry and market share assumptions supported by record evidence and necessary because Defendants' decades-long conspiracy prevents observation of the competitive counterfactual—should the jury be permitted to make a "just and reasonable estimate" of Ford's damages, as the Supreme Court and Sixth Circuit require?
**Ford Answers: Yes.**

4. Where Dr. Krock's extension of the Trish framework to ASO fees applies the same model construction to a related fee stream in the same market, should Defendants' competing views of the model's suitability be resolved by the jury on cross-examination rather than by exclusion under Rule 702?
**Ford Answers: Yes.**

# CONTROLLING OR MOST RELEVANT AUTHORITIES

**Cases**

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946)

*Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 767 F. Supp. 3d 495 (E.D. Mich. 2025)

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)

*In re Se. Milk Antitrust Litig.*, 739 F.3d 262 (6th Cir. 2014)

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981)

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017)

**Rules**

Fed. R. Evid. 702

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED .................................................. ii

CONTROLLING OR MOST RELEVANT AUTHORITIES ............................ iii

TABLE OF AUTHORITIES ........................................................................ vi

INTRODUCTION ........................................................................................ 1

RELEVANT BACKGROUND ..................................................................... 2

I. Ford's Antitrust Claims and the Challenged Conduct ........................... 2

II. Dr. Krock and the Trish-Herring Overcharge Framework .................... 3

III. The Four-Step Analysis ........................................................................ 4

LEGAL STANDARD .................................................................................. 5

ARGUMENT .............................................................................................. 7

I. Dr. Krock's Methodology Is Reliable at Every Step ............................. 7

A. Dr. Krock's National Accounts Market Definition Is Grounded in Judicial Precedent, Industry Practice, and the Challenged Conduct .................................................................................................. 7

B. Dr. Krock's But-For World Rests on Record Evidence and Permissible Economic Modeling ............................................. 12

1. Dr. Krock's entry assumptions are supported by the record and in the evidentiary limits Defendants' restraints created ......................................................................................... 12

2. Dr. Krock's market share-allocation scenarios are transparent, bounded inputs whose lack of empirical precision is the product of Defendants' own restraints ............................ 17

3. Dr. Krock's methodology is testable, replicable, and based on a peer-reviewed framework ........................................18

II. The Model's Outputs Are Reliable and Admissible .............................19

A. A Range of Damages Is Not Only Permissible, But Required When Defendants' Conduct Precludes a Single Point Estimate ...........19

B. Dr. Krock Properly Extended the Trish Framework to ASO Fees ........................................................................................ 22

1. Dr. Krock's extension of the Trish Model to ASO fees is a reasoned application of a reliable methodology ............... 22

2. Defendants' "90% of medical spend" argument misstates the measure of antitrust damages .......................................... 23

CONCLUSION ........................................................................................ 24

CERTIFICATE OF SERVICE ....................................................................... 26

# TABLE OF AUTHORITIES

***US SUPREME COURT CASES***


*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) ........................................................ 2, 6, 15, 20, 24

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................ 5, 11

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................... 5

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) ........................................................................ 6, 20

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ................................................................... 6, 20, 24

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ............................................................................... 8

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................................. 10

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ............................................................................. 15


***FEDERAL CASES***


*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017)
..........................................................................................1, 7, 10

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ..................................................... *passim*

*McLean v. 988011 Ontario, Ltd.*,
224 F.3d 797 (6th Cir. 2000) .................................................................. 6

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*,
767 F. Supp. 3d 495 (E.D. Mich. 2025) ....................................... 6, 19, 23

*Elyria-Lorain Broad. Co. v. Lorain Journal Co.*,

358 F.2d 790 (6th Cir. 1966) .................................................................... 6

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ....................................................................10

*Ky. Speedway, LLC v. NASCAR*,
588 F.3d 908 (6th Cir. 2009) ..............................................................10, 11

*Graham Packaging Co., L.P. v. Ring Container Techs. LLC*,
No. 3:23-cv-110-RGJ-RSE, 2026 U.S. Dist. LEXIS 113867 (W.D. Ky. May 22, 2026) ........................................................................................ 11

*In re Automatic Card Shufflers Litig.*,
No. 21-cv-01798, 2026 U.S. Dist. LEXIS 69440 (N.D. Ill. Mar. 31, 2026) ........................................................................................ 15

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ..................................................... 15

*Laumann v. Nat'l Hockey League*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015) ...................................................... 16

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ................................................................. 16

*Castro v. Sanofi Pasteur Inc.*,
134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................... 16

*Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*,
459 F.2d 138 (6th Cir. 1972) ................................................................... 18

*Tamraz v. Lincoln Elec. Co.*,
620 F.3d 665 (6th Cir. 2010) ................................................................... 19

*Berry v. Crown Equip. Corp.*,
108 F. Supp. 2d 743 (E.D. Mich. 2000) .................................................. 19

*In re Platinum-Beechwood Litig.*,
469 F. Supp. 3d 105 (S.D.N.Y. 2020) ...................................................... 21

*Conwood Co. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ................................................................... 21

*Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C.*,
520 F. Supp. 3d 872 (E.D. Mich. 2021) .................................................. 23

***FEDERAL STATUTES***

15 U.S.C. § 1 (Sherman Act § 1) ................................................................ 2, 24

***FEDERAL RULES***

Fed. R. Evid. 702 ........................................................................5, 14, 15, 22

Fed. R. Civ. P. 37(c)(1) ............................................................................ 12

Fed. R. Civ. P. 26(a) ................................................................................ 12

***OTHER AUTHORITIES***

Erin E. Trish & Bradley J. Herring, *How Do Health Insurer Market Concentration and Bargaining Power with Hospitals Affect Health Insurance Premiums?*, 42 J. Health Econ. (2015) ................................................................................3

Fed. R. Evid. 702 advisory committee’s note to 2000 amendment ....................... 5

## INTRODUCTION

Defendants' motion is not a *Daubert* motion. It is a merits brief dressed in gatekeeper's clothing. It asks the Court to resolve a classic battle of economists on a paper record: whether Dr. Krock's National Accounts market is the right one, whether the but-for world should have two, three, or four Blue Plan entrants, how post-entry market share should be allocated, and whether a peer-reviewed overcharge model can be extended from fully-insured premiums to ASO fees. These are jury questions, tested by cross-examination, not wholesale exclusion.

Dr. Krock's methodology is neither litigation-created nor novel. He applies the overcharge framework Defendants' own expert, Dr. Erin Trish, and Dr. Bradley Herring published in the peer-reviewed *Journal of Health Economics* (the "Trish Model"); grounds his market definition in the economic requirements for serving national accounts, consistent with the National Accounts market adopted in *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017), and industry reports; and uses industry-standard NAIC and Bureau of Economic Analysis data. His specification is concrete enough that Dr. Trish critiqued it in detail and proposed an alternative. That is the opposite of "unsupported speculation."

Defendants' lead argument rests on Dr. Krock's one-word answer, [redacted] In the full context of his testimony, he explained that [redacted]

[redacted] Ex. A, Krock Dep. 50:10–51:1, 82:3–7. That describes the evidentiary vacuum Defendants' restraints created, and "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946).

The motion should be denied, and the jury should weigh Dr. Krock's opinions in light of all the testimony at trial.

## RELEVANT BACKGROUND

### I. Ford's Antitrust Claims and the Challenged Conduct.

Ford's Section 1 claims arise from a decades-long market-allocation scheme among Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSM"), the Blue Cross Blue Shield Association ("BCBSA" or the "Association"), and the other Blue Plans. Through Exclusive Service Areas ("ESAs") and the National and Local Best Efforts rules, the Blue Plans agreed not to compete with each other for commercial health-insurance business in territories reserved for the incumbent Blue. The Local Best Efforts rule, for example, requires that 80% of a licensee's annual health-insurance revenue come from Blue-branded business. Raiff Rpt. ¶ 38, ECF No. 86-46[1]. By keeping other Blues out, the restraints

---

[1] Defendants' Motion for Summary Judgment, ECF No. 86, and most of its corresponding exhibits, which include the expert reports of Dr. Raiff, Dr. Krock, and Dr. Trish, were filed under seal on October 23, 2026. Accordingly, the PageID

raised the fully-insured premiums and administrative services only ("ASO") fees Ford paid.

## II. Dr. Krock and the Trish-Herring Overcharge Framework.

Dr. Joseph A. Krock is an economist and Managing Director of Stout. "Krock Rpt.", ¶ 1, ECF No. 86-57. He has a Ph.D. in economics from the University of Chicago. *Id.* ¶ 2. He replaced Dr. Matthew E. Raiff as Ford's damages expert and adopted Dr. Raiff's February 27, 2026 report ("Raiff Rpt.", ECF No. 86-46) in full (*Id.* ¶ 8). He also submitted a reply report responding to Defendants' rebuttal experts, Dr. Erin Trish and Dr. Celeste Saravia. *Id.* Dr. Krock was deposed on October 1, 2026 (Ex. A, "Krock Dep."), and Dr. Trish on October 7, 2026 (Ex. B, "Trish Dep."). Dr. Krock applies the overcharge framework developed by Drs. Trish and Herring in *How Do Health Insurer Market Concentration and Bargaining Power with Hospitals Affect Health Insurance Premiums?*, 42 J. Health Econ. (2015), which sits within a broader peer-reviewed literature on insurer concentration and pricing. Raiff Rpt. ¶ 50 & nn.47–49, ECF No. 86-46. Dr. Trish testified that [redacted] Ex. B, Trish Dep. 13.

---

numbers for these sealed documents are unavailable. As such, citations in this brief are provided to the applicable ECF numbers, exhibit designation or brief title, and original pagination.

## III. The Four-Step Analysis.

Dr. Krock performs four steps for each of the six At-Issue States (Michigan, Illinois, Missouri, Ohio, Kansas, and Tennessee):

**Step 1 — Market Definition.** Dr. Krock defines the product market as the National Accounts health-insurance market: the sale of fully-insured and self-insured commercial health insurance to large, multistate employers with more than 5,000 employees. Krock Rpt. ¶ 51, ECF No. 86-57. He defines the geographic market at the state level because the ESAs [redacted] Raiff Rpt. ¶ 34, ECF No. 86-46.

**Step 2 — Regression.** Using NAIC data compiled by Mark Farrah Associates, Bureau of Economic Analysis income data, and other industry sources, Dr. Krock estimates the relationship between insurer concentration and (i) fully-insured premiums and (ii) ASO fees, using the Trish Model's construction. Raiff Rpt. ¶¶ 39–48, ECF No. 86-46; Ex. A, Krock Dep. 244:4–9.

**Step 3 — But-For Entry.** Dr. Krock models a [redacted] *Id.* 94:3–6. The record evidence supporting entry is discussed in Part I.B.1 below.

**Step 4 — Market Share Allocation.** Dr. Krock applies [redacted]

[redacted] *Id.* 50:19–24, 82:1–7.

The [redacted] *Id.* 48:11–15, 123:12–17, 222:20–23.

**LEGAL STANDARD**

Rule 702 requires only that an expert's testimony be "the product of reliable principles and methods" that are "reliably applied" to "sufficient facts or data." Fed. R. Evid. 702. The Court's role is "not to determine whether [the opinion] is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008). "Rejection of expert testimony is the exception, rather than the rule." *Id.* at 530 (quoting Advisory Committee's Note to the 2000 Amendments to Fed. R. Evid. 702).

Three principles frame the inquiry. **First**, the *Daubert* inquiry is "flexible" and does not require perfection. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594–95 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999); *Scrap Metal*, 527 F.3d at 529–30.

**Second**, criticisms of an expert's data, inputs, assumptions, or application go to weight, not admissibility. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). "[I]t is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony," and when experts "reach different conclusions based on competing versions of the facts," the dispute is for the jury. *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 767 F. Supp. 3d 495, 511–12 (E.D. Mich. 2025) (citations and quotation marks omitted).

**Third**, damages experts may build on reasonable, record-grounded assumptions. "[T]he role of a damages expert is to calculate hypothetical damages given an assumed set of facts; so long as those assumed facts are reasonably based on the evidence in the record, such assumptions are permissible." *Id.* at 512. That principle has special force in antitrust cases, where a plaintiff is entitled to a "just and reasonable" estimate of its damages and "the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *Bigelow*, 327 U.S. at 265–66; *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–66 (1981); *Elyria-Lorain Broad. Co. v. Lorain Journal Co.*, 358 F.2d 790, 793 (6th Cir. 1966).

## ARGUMENT

### I. DR. KROCK'S METHODOLOGY IS RELIABLE AT EVERY STEP.

#### A. Dr. Krock's National Accounts Market Definition Is Grounded in Judicial Precedent, Industry Practice, and the Challenged Conduct.

Defendants argue that Dr. Krock "borrowed" his market definition from *Anthem* "without any economic analysis." Defs.' Br. 6, 7. That is wrong three times over.

*Anthem's National Accounts market was adopted after a federal merits trial addressing the same product in the same industry*. The *Anthem* court adopted a National Accounts market of health-insurance plans sold to "multistate employers with more than 5000 employees" spread over more than one state, rejecting the objections Defendants reprise here: that there is no "uniform industry definition for what constitutes a national account," that "it is improper to combine ASO and fully[-]insured plans into a single product market," and that the 5,000-employee threshold is "arbitrary." 236 F. Supp. 3d at 195–203, *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). That is the market in which Ford buys, and the market Defendants' conspiracy restrains.

Dr. Krock did not pluck that definition from a hat, and he did not simply borrow it. It is [redacted] Ex. A, Krock Dep. 247:3–8. But the definition is [redacted]; it

is [redacted] that reflects [redacted] Krock Rpt. ¶ 51, ECF No. 86-57. Consistency with judicial findings and industry practice corroborates that analysis; it does not substitute for it. And building on industry practice is itself sound economic practice. *See Scrap Metal*, 527 F.3d at 527–30 (expert properly "treated the adjustments just as the industry participants did").

Dr. Krock's economic reasoning proceeds in three steps. *First*, a product market consists of products that are reasonable substitutes from the purchaser's perspective. Fully-insured and self-insured products share the same core elements, [redacted]; each therefore belongs in a single market. Krock Rpt. ¶¶ 52–53, ECF No. 86-57 (quoting *Anthem* and citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)). *Second*, because a market is limited to firms that are actual reasonable substitutes for the product at issue, it [redacted] *Id.* ¶ 64. As an employer grows, [redacted] *Id.* ¶ 65 (quoting *Anthem*). *Third*, Dr. Krock implemented that principle through objective criteria. He

includes the Blue entities and the largest national insurers (UnitedHealthcare, Cigna, Aetna/CVS, Kaiser, and Humana) that have the scale and network capacity to serve national accounts; includes only plans that covered at least 5,000 employees in the relevant state and year; and limits the set to the 100 largest such plans. *Id.* ¶ 85. Those criteria track how insurers, courts, and the Association itself define a national account: a large, multistate employer with employees in more than one Plan's service area. *Id.* ¶ 86. That is economic analysis, not borrowing.

*The state-level geographic market tracks Defendants' own conduct.* The ESAs [redacted] Raiff Rpt. ¶ 34, ECF No. 86-46, and [redacted] Ex. A, Krock Dep. 105:21–23. The economics point the same way. The discounts and network value that make a carrier's bid competitive for a national account's business are negotiated and generated at the state or local level, and even the largest national carriers write coverage through state-specific entities. Krock Rpt. ¶¶ 57–59, ECF No. 86-57. A state-level market also fits Ford's national account claim because the competition for each piece of a national account's business is [redacted] *id.* ¶ 58, and the Association's [redacted] bars all other Blues by definition[2],

[2] [redacted] Defs. Ex. 17, BCBSM_Ford_0000003224, ECF No. 86-18.

from bidding for Ford's business. *Id.* ¶¶ 16, 67. The lost Blue-on-Blue competition elevates insurer concentration in each state in which Ford buys coverage. The ESAs and the National Account rules eliminate Blue competition in the geographic markets where Ford purchases insurance. Ford's expert cannot be condemned for using the precise geographic markets created by the restraints. Defendants' own authority confirms the point. In *In re Southeastern Milk Antitrust Litigation*, the Sixth Circuit *reversed* the rejection of plaintiffs' geographic-market evidence that tracked the structure of the alleged conspiracy. 739 F.3d 262, 277–82 (6th Cir. 2014).

*Defendants' insistence on a SSNIP test misreads governing law.* Courts recognize multiple accepted techniques for defining a market, including reasonable interchangeability, cross-elasticity of demand, practical indicia, and the hypothetical monopolist test. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Ky. Speedway, LLC v. NASCAR*, 588 F.3d 908, 918 (6th Cir. 2009); *Se. Milk*, 739 F.3d at 277–78. And the *Anthem* court itself considered the hypothetical monopolist test, 236 F. Supp. 3d at 198–199. Dr. Krock's use of its market definition incorporates, rather than circumvents, that test.

*Defendants' "regional plans" argument goes to weight.* Dr. Krock limits the competitive set to insurers and plans capable of serving a national account like Ford. Krock Rpt. ¶¶ 62–64, 85, ECF No. 86-57. Defendants' experts fault him for excluding regional plans such as Priority Health and Medical Mutual, *id.* ¶ 63 &

n.70, yet when they attack his entry assumptions they insist that competition for Ford's business is limited to insurers with substantial scale, provider-network infrastructure, and the operational capability to serve a large, multistate national account. *Id.* ¶¶ 119, 121. Defendants cannot have it both ways. Their own summary-judgment papers concede that "[n]one" of the regional plans "have been able to independently create national provider networks that compete . . . for national commercial business." Defs.' SOF ¶¶ 19–21, ECF No. 86. Whether particular regional plans belong in the competitive set is a dispute resolved by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not exclusion. *Scrap Metal*, 527 F.3d at 529–32 (quoting *Daubert*, 509 U.S. at 596).

*Defendants' authorities confirm the point. Kentucky Speedway* excluded an expert who created his *own* novel, litigation-driven SSNIP variant with "no standards controlling it" and no peer review or general acceptance. 588 F.3d at 917–18. Dr. Krock did the opposite. He grounded his market definition in economic reasoning about the requirements for serving national accounts, consistent with a published federal decision based on bench-trial findings, and he applied a published, peer-reviewed overcharge model.

*Graham Packaging Co., L.P. v. Ring Container Technologies LLC*, No. 3:23-cv-110-RGJ-RSE, 2026 U.S. Dist. LEXIS 113867 (W.D. Ky. May 22, 2026), is a

disclosure case. The court excluded a geographic-market opinion under Rule 37(c)(1) because the report devoted only a few paragraphs to the issue, did not explain the "how" or "why" of the analysis; the report thus "[f]ell far short of the disclosure requirements of Rule 26(a)." *Id.* at *75–79. Here, the Raiff Report identifies and explains the product and geographic markets, Raiff Rpt. ¶¶ 26, 34–35, ECF No. 86-46, and the reply report devotes a full section to them, Krock Rpt. § IV.A, ECF No. 86-57. Because the market definition is properly supported, Defendants' derivative argument that the damages opinions make "no economic sense" falls with it.

### B. Dr. Krock's But-For World Rests on Record Evidence and Permissible Economic Modeling.

Defendants attack on Dr. Krock's entry assumptions, market share allocations, and the "untestability" of his methodology do not merit exclusion. Defs.' Br. 9–15.

#### 1. Dr. Krock's entry assumptions are supported by the record and in the evidentiary limits Defendants' restraints created.

Dr. Krock [redacted] Ex. A, Krock Dep. 94:3–6; 95:6–17. That range is grounded in the record.

*The restraints are the barrier to Blue entry.* Dr. Krock [redacted], Ex. A, Krock Dep. 152:9–16, [redacted]

[redacted] *Id.* 187:6–20. The documentary record confirms it. In 1992, an Association subcommittee discussed Members' use of Association participation to [redacted] Krock Rpt. ¶¶ 28–31, ECF No. 86-57; *see* Ex. A, Krock Dep. 248:6–16. The License Agreement itself provides that a Plan [redacted] Krock Rpt. ¶ 116 & n.159, ECF No. 86-57.

*The Blues' actual market shares.* Blue Plans have the largest market share in 41 states and approximately 60% of national-account enrollment nationwide. In Michigan, BCBSM and its subsidiaries average approximately 80%. Raiff Rpt. ¶ 35, ECF No. 86-46. Dr. Krock's model does not assume market share from nowhere. It reallocates incumbent Blue share to the Blues the restraints kept out.

*Large, multistate Blues with the capability to compete.* The record also shows that capable Blue entrants exist. Several Blue Plans [redacted] by the

Association's Standards and Guidelines. Krock Rpt. ¶ 38 & n.30, ECF No. 86-57. Elevance (formerly Anthem) holds Blue licenses in 14 states, and is licensed to sell some form of health insurance in all 50 states; the [redacted] it from bidding on Ford's national account [redacted] *Id.* ¶¶ 16–17 & n.34. Health Care Service Corporation ("HCSC") operates Blue plans in five states, including neighboring Illinois, and [redacted] *Id.* ¶ 122 & n.35.

Defendants' demand that Dr. Krock identify *which* Blues would have entered and *when* is not a Rule 702 requirement; it is a demand for the counterfactual precision the Supreme Court has held antitrust plaintiffs need not supply. Nor does Ford offer the Elevance and HCSC evidence as a prediction that those Plans, or any particular Plan, would have entered a particular state at a particular time. Which Blue would enter which market [redacted] Krock Rpt. ¶ 18, ECF No. 86-57. [redacted] Ex. A, Krock Dep. 48:11–15.

Courts have rejected the precise demand Defendants make. In *In re Automatic Card Shufflers Litigation*, No. 21-cv-01798, 2026 U.S. Dist. LEXIS 69440, *20–23 (N.D. Ill. Mar. 31, 2026), the court held that the plaintiffs' damages expert need not identify the particular would-be entrants or when they would have entered and allowed his damages evidence to go to trial. That follows from *Zenith Radio Corp. v. Hazeltine Research, Inc.*, which permits the factfinder to find damages "as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business." 395 U.S. 100, 123–24 (1969) (quoting *Bigelow*, 327 U.S. at 264).

Defendants' reliance on *Klein v. Meta Platforms* fails for the same reason. There, the expert's but-for world depended on "gesturing at perceived anticompetitive effects." He opined that competition would have forced Meta to pay users roughly $5 per month for their data, though no market participant had ever competed that way and Meta had never seriously considered it. 766 F. Supp. 3d 956, 963–65 (N.D. Cal. 2025). Dr. Krock assumes no untried practice. He assumes that Blue Plans would sell the Blue-brand insurance they already sell in territories from which license terms exclude them. Krock Rpt. ¶ 116 & n.159, ECF No. 86-57. The real-world absence of Blue-on-Blue entry is not a basis for exclusion under Rule 702; it is the *consequence* of the challenged conduct.

Nor does *Laumann v. National Hockey League*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015), help Defendants. The expert there built his but-for world from simulated consumers driven by mathematical assumptions, without surveys or actual data on consumer preferences that could have been collected. *Id.* at 306–08, 315–19. *Laumann*'s requirement that an expert use sufficient data "no matter how burdensome or difficult" to collect, *id.* at 315, presupposes data that exists. [redacted] Ex. A, Krock Dep. 222:10–19; Krock Rpt. ¶¶ 114–16, ECF No. 86-57.

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), is equally inapposite. The expert there posited a hypothetical 50/50 duopoly, treated any share above 50% as anticompetitive, ignored the defendant's 75% share before the challenged programs began, and disregarded unrelated market events such as recalls and an industry merger. *Id.* at 1047–49, 1055–58. Dr. Krock's but-for world starts from the market shares the Blues actually hold. Raiff Rpt. ¶ 35, ECF No. 86-46. Courts distinguish *Concord Boat* where, as here, the challenged conduct eliminated any competitive benchmark. *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 837 (D.N.J. 2015) (admitting but-for model where no period or comparable market was free of the challenged conduct).

**2. Dr. Krock's market share-allocation scenarios are transparent, bounded inputs whose lack of empirical precision is the product of Defendants' own restraints.**

Defendants build their motion [redacted] Ex. A, Krock Dep. 50:25–51:1. [redacted] *Id.* 50:12–24. [redacted] *Id.* 82:3–7. No economist could derive a uniquely "correct" market share split for a market Defendants' restraints have prevented from ever existing. [redacted] *See supra* Background § III (Step 4).

That is a transparent sensitivity analysis. [redacted] Ex. A, Krock Dep. 82:8–25. [redacted] *Id.* 210:3–10. A methodology whose inputs can be identified, varied, and challenged is testable by definition.

In *Scrap Metal* defendants argued that plaintiff's damages expert used indices in a manner that was not completely accurate and produced "erroneous" conclusions. 527 F.3d at 530. The Sixth Circuit allowed admission because those critiques would go "to the accuracy of the conclusions, not to the reliability of the methodology," and "are more properly questions on cross-examination." *Id.* at 530–32. Here, Defendants may argue the scenarios overstate the entrants' market share, and Ford may cross-examine Dr. Trish on her own counterfactual assumptions.

In *Elder-Beerman* the expert assumed the plaintiff would have captured sales in proportion to the stores' overall sales ratios without accounting for competing brands the plaintiff already carried, built his formulae from information counsel supplied before trial, and when asked where one formula came from, answered, "my head." 459 F.2d at 148–51; *id.* at 160–61 (Edwards, J., concurring in part and dissenting in part). [redacted] Ex. A, Krock Dep. 244:4–7. That is applied economics, not guesswork.

### 3. Dr. Krock's methodology is testable, replicable, and based on a peer-reviewed framework.

Defendants' "untestability" argument fails on the record. Dr. Krock's specifications, data sources, and scenario inputs are set out in the Raiff Report and its appendices. [redacted]

[redacted] Ex. B, Trish Dep. 55:7–9, [redacted] Ex. A, Krock Dep. 210:3–10. Her complaint that she [redacted] Ex. B, Trish Dep. 79:10–19, [redacted] *id.* 54:11–12, whose basis in the record is tested at trial. *Chrysler Pacifica*, 767 F. Supp. 3d at 512.

Defendants' remaining authorities involved experts with *no* reliable methodology. *Tamraz v. Lincoln Electric Co.* excluded a causation opinion built on a chain of speculation, suggesting "by analogy the possibility of B, which might also apply to C, which if we speculate about D, could eventually trigger E." 620 F.3d 665, 669–72 (6th Cir. 2010). *Berry v. Crown Equipment Corp.* excluded a forklift design-defect expert with no engineering degree or relevant experience who never tested the forklift or reviewed the manufacturer's testing. 108 F. Supp. 2d 743, 750–52 (E.D. Mich. 2000). Defendants do not challenge Dr. Krock's qualifications, and the published, peer-reviewed model he used has withstood the opposing expert's detailed critique.

## II. THE MODEL'S OUTPUTS ARE RELIABLE AND ADMISSIBLE

### A. A Range of Damages Is Not Only Permissible, But Required When Defendants' Conduct Precludes a Single Point Estimate.

Defendants complain that Dr. Krock's model generates "as many as 54 speculative damages scenarios, ranging from $93 million to $138 million." Defs.' Br. iii. But every scenario is generated by the same regression applied to the same

data. The scenarios differ only in the assumed number of entrants and market share distribution. Dr. Krock presents [redacted] Ex. A, Krock Dep. 222:20–23; 123:12–17. That is a sensitivity analysis, not fifty-four freestanding theories, and a bounded range of this kind is a textbook "just and reasonable" estimate. *Story Parchment*, 282 U.S. at 563; *Bigelow*, 327 U.S. at 265; *J. Truett Payne*, 451 U.S. at 565–67 (antitrust plaintiffs relieved of "an unduly rigorous standard" of proving the amount of damages).

A jury persuaded by Defendants' witnesses on market share allocation can select a figure at the low end of the range. A jury persuaded by Dr. Krock's regression and Ford's proof of robust counterfactual entry can select a figure at the high end. That the model yields a range is a *feature* of its transparency, not a reason to withhold it from the jury. The range also reflects settled economic theory that [redacted] and that [redacted] Krock Rpt. ¶ 20 & nn.9–14, ECF No. 86-57. Removing the restraints [redacted] and Dr. Krock's scenarios [redacted] *Id.*; *see id.* ¶ 49.

*In re Platinum-Beechwood Litigation*, 469 F. Supp. 3d 105 (S.D.N.Y. 2020), the court excluded hypothetical investor-redemption scenarios that had "no empirical support" in the record, *id*. at 129, and even then permitted the expert to testify about damages more generally, *id*. Defendants themselves acknowledge that "[i]n the right situation a range may be useful to the jury when it is based on differing reasonable interpretations of documents or data." Defs.' Br. at 16. Dr. Krock's regression coefficients are estimated from NAIC-based market data spanning 2010 to 2024, Raiff Rpt. ¶ 41, ECF No. 86–46; his entry assumptions are tied to the restraints and to the Blues' own communications acknowledging that they prevented Blue-brand entry, Krock Rpt. ¶¶ 28–31, ECF No. 86-57; and his market share scenarios reallocate the market shares the Blues actually hold.

It doesn't matter that [redacted] Ex. A, Krock Dep. 123:18–125:18. [redacted] *Id*. 222:10–23. It is [redacted] *See id*. 48:11–15 ("it's up to the trier of fact to determine what the correct entry scenario would be"). In *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 794–95 (6th Cir. 2002), the Sixth Circuit affirmed a $350 million monopolization verdict within the plaintiff's expert's $313 million to $488 million range, which turned on which of two growth rates was used. Dr.

Krock's range, like the range in *Conwood*, turns on a few clearly identified assumptions and the reliable market share data available. Whether to pick $93 million, $138 million, or something else is for the jury.

### B. Dr. Krock Properly Extended the Trish Framework to ASO Fees.

Defendants argue that the Trish Model was "not designed" for ASO fees and that Dr. Krock "ignores" claims costs that make up roughly 90% of Ford's medical spend. Defs.' Br. 20–21. Both arguments fail.

#### 1. Dr. Krock's extension of the Trish Model to ASO fees is a reasoned application of a reliable methodology.

Rule 702 contemplates that an expert will apply reliable methods "to the facts of the case." Fed. R. Evid. 702(d). ASO fees and fully-insured premiums are sold in the same Fully and Self-Insured National Accounts market, by the same carriers, to the same customers. Raiff Rpt. ¶¶ 26–27, ECF No. 86-46; Krock Rpt. ¶ 53, ECF No. 86-57. As Dr. Krock explains, the two are economically linked and recognized by courts and academic research (including Dr. Trish's own work) as reasonable substitutes: an employer facing higher premiums may switch to ASO services, and vice versa, so insurers facing less competition gain leverage in both. Krock Rpt. ¶ 101 & n.134, ECF No. 86-57. His analysis finds that greater concentration is associated with higher ASO fees. *Id.* He [redacted] Ex. A, Krock Dep. 243:21–244:7.

Dr. Trish's objection that the model [redacted] Ex. B, Trish Dep. 55:7–23, 101:14–102:22, is a disagreement about *application*, not *methodology*. [redacted] Ex. A, Krock Dep. 243:21–244:3. Dr. Trish [redacted] Self-insured employers still purchase network access, claims processing, and other services whose price depends on competition. Krock Rpt. ¶¶ 99, 102, ECF No. 86-57. That is a battle of experts for the jury. *Chrysler Pacifica*, 767 F. Supp. 3d at 511–12; *Scrap Metal*, 527 F.3d at 530–32; *Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C.*, 520 F. Supp. 3d 872, 884–885 (E.D. Mich. 2021).

Defendants' assertion that Dr. Krock offers no economic rationale for the extension is simply wrong. His reply report devotes several pages to it. Krock Rpt. ¶¶ 99–105, ECF No. 86-57. Dr. Krock applied an accepted model, using the same construction, to a related fee stream in the same market. That the model's author would have applied it differently is grist for cross-examination, not a basis for exclusion.

**2. Defendants' "90% of medical spend" argument misstates the measure of antitrust damages.**

Defendants' "90% of medical spend" argument misunderstands what Dr. Krock measures: the *overcharge on the premiums and* ASO *fees Ford paid to the*

*Blues*. Ex. A, Krock Dep. 162:1–5; 174:2–5 ([redacted]). That overcharge is a cognizable antitrust injury on its own. Nothing in the Sherman Act requires Ford to prove that the *net* cost of its self-insured plan was higher after accounting for every downstream effect of a counterfactual world Defendants' conspiracy prevented; that is the kind of counterfactual precision antitrust plaintiffs need not supply. *Bigelow*, 327 U.S. at 265–66; *J. Truett Payne*, 451 U.S. at 566–67.

In any event, Defendants' offset theory is only a possibility. Their own expert testified [redacted] Ex. B, Trish Dep. 83:3–84:25. A "possible" offset is a matter for cross-examination and Defendants' case at trial, not a ground for exclusion. *Scrap Metal*, 527 F.3d at 530–32.

**CONCLUSION**

For these reasons, Ford respectfully requests that the Court deny Defendants' Motion to Exclude Dr. Krock's opinions and testimony in its entirety.

Dated: November 20, 2026

Respectfully submitted,

DINSMORE & SHOHL LLP

*_/s/ William A. Sherman, II_*
William A. Sherman, II
Dinsmore & Shohl LLP
801 Pennsylvania Ave, NW
Suite 610
Washington, D.C. 20004
(202) 372-9100
william.sherman@dinsmore.com

Alan H. Abes
Dinsmore & Shohl LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 977-8200
alan.abes@dinsmore.com

J. Travis Mihelick (P73050)
900 Wilshire Drive, Suite 300
Troy, MI 48084
(248) 203-1655
*travis.mihelick@dinsmore.com*

Brandon Pelligrino (P79112)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
*brandon.pelligrino@bowmanandbrooke.com*

*Attorneys for Plaintiff Ford Motor Company*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2026, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of the filing to all counsel of record.

Respectfully submitted,
DINSMORE & SHOHL LLP

*/s/ William A. Sherman, II*