**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| FORD MOTOR COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY,<br><br>and<br><br>THE BLUE CROSS BLUE SHIELD ASSOCIATION,<br><br>Defendants. | Civil Action No.: 2:23-cv-11286-LVP-EAS<br><br>District Judge: Hon. Linda V. Parker<br><br>Magistrate Judge: Hon. Elizabeth A. Stafford |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**PAGE**


TABLE OF AUTHORITIES ..... ii
STATEMENT OF THE ISSUES ..... vii
CONTROLLING OR MOST RELEVANT AUTHORITIES ..... viii
INTRODUCTION ..... 1
DEFENDANTS' RESPONSES TO FORD'S STATEMENT OF MATERIAL FACTS ..... 4
STATEMENT OF ADDITIONAL MATERIAL FACTS ..... 8
LEGAL STANDARD ..... 9
ARGUMENT ..... 10
- I. FORD MISSTATES THE ELEMENTS IT MUST PROVE FOR CIVIL LIABILITY AND FATALLY FAILS TO ADDRESS ELEMENTS ..... 10
- II. FORD MISSTATES AND MISAPPLIES THE LAW REGARDING THE ELEMENTS IT DOES ADDRESS ..... 12
  - A. Ford Cannot Prove an "Agreement" ..... 12
  - B. Ford Cannot Prove that the Challenged Conduct Unreasonably Restrained Trade ..... 14
    - 1. The *Per Se* Standard Does Not Apply to the Challenged Conduct ..... 14
      - i. The *Per Se* Standard Has Limited Applicability ..... 14
      - ii. The Blue Plans' Historic Use of the Blue Trademarks Distinguishes this Case from the *Per Se* Cases Ford Cites ..... 16
      - iii. Each Aspect of the Challenged Conduct Is Subject to the Rule of Reason and Cannot Be Aggregated ..... 22
      - iv. Ford's Reliance on the MDL Court's 2018 Standard of Review Decision is Misplaced ..... 29
    - 2. Ford Cannot Prove a Rule of Reason Claim ..... 33

CONCLUSION ..... 35

# TABLE OF AUTHORITIES

## Cases

*1-800 Contacts v. FTC*,
1 F.4th 102 (2d Cir. 2021) ........................................................ 17, 20, 23

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)........................................................................10

*All Care Nursing Serv. v. High Tech Staffing Servs., Inc.*,
135 F.3d 740 (11th Cir. 1998) ........................................................15

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010)................................................................ 12, 13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................9

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)................................................................ 10, 12

*Axis, S.p.A. v. Micafil, Inc.*,
870 F.2d 1105 (6th Cir. 1989) ........................................................10

*Betkerur v. Aultman Hosp. Ass'n*,
78 F.3d 1079 (6th Cir. 1996) ..........................................................34

*Broad. Music, Inc. v. Columbia Broad. Sys, Inc.*,
441 U.S. 1 (1979)............................................................ 15, 17, 18

*Clorox Co. v. Sterling Winthrop, Inc.*,
117 F.3d 50 (2d Cir. 1997) ...................................................... 20, 21, 23

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977)..........................................................................17

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)........................................................................14

*Expert Masonry, Inc. v. Boone Cnty., Ky.*,
440 F.3d 336 (6th Cir. 2006) .................................................. 15, 25

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
243 F.3d 980 (6th Cir. 2001) .................................................................. 10, 11, 34

*FTC v. Actavis*,
570 U.S. 136 (2013)........................................................................... 17, 21, 24

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)..............................................................................................15

*FTC v. Meta Platforms Inc.*,
654 F. Supp. 3d 892 (N.D. Cal. 2023)................................................................18

*Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wis.*,
1993 WL 78756 (N.D. Ill. Feb. 26, 1993) ...........................................................31

*Hodges v. WSM, Inc.*,
26 F.3d 36 (6th Cir. 1994) ....................................................................................10

*Huron Valley Hosp., Inc. v. City of Pontiac*,
666 F.2d 1029 (6th Cir. 1981) ...................................................................... 11, 18

*In re Blue Cross Blue Shield Antitrust Litig.*,
2018 WL 7152887 (11th Cir. Dec. 12, 2018).......................................................30

*In re Blue Cross Blue Shield Antitrust Litig.*,
2022 WL 3221887 (N.D. Ala. Aug. 9, 2022) .........................................................3

*In re Blue Cross Blue Shield Antitrust Litig.*,
2024 WL 4982979 (N.D. Ala. Dec. 4, 2024) .......................................................33

*In re Blue Cross Blue Shield Antitrust Litig.*,
308 F. Supp. 3d 1241 (N.D. Ala. 2018)................................................................30

*In re Blue Cross Blue Shield Antitrust Litig.*,
85 F.4th 1070 (11th Cir. 2023) ...............................................................................3

*In re Blue Cross Blue Shield Antitrust Litig.*,
No. 13-cv-20000, ECF 2203 (N.D. Ala. June 12, 2018).......................................30

*In re Blue Cross Blue Shield Antitrust Litig.*,
No. 13-cv-20000, ECF 3272 (N.D. Ala. Feb. 7, 2025) ........................................33

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 682 (E.D. Mich. 2000) ....................21

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) ....................21

*In re Delta Dental*,
800 F. Supp. 3d 898 (N.D. Ill. 2025) .................... 16, 18, 21, 24, 25, 27

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) .................... 15, 16, 23, 27, 33, 35

*In re Sulfuric Acid Antitrust Litig.*,
703 F.3d 1004 (7th Cir. 2012) ....................16

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
737 F.2d 698 (7th Cir. 1984) ....................29

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) ....................34

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).................... 16, 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................9

*Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*,
922 F.3d 713 (6th Cir. 2019) .................... 3, 14, 15, 16, 23, 27

*NCAA. v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)....................26

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018).................... 14, 15, 26, 27, 33, 35

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990).................... 18, 19, 21

*Polk Bros., Inc. v. Forest City Enters.*, Inc.,
776 F.2d 185 (7th Cir. 1985) ....................18

*Potters Med. Ctr. v. City Hosp. Ass'n*,
800 F.2d 568 (6th Cir. 1986) ....................................................................12

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986)............................................................ 17, 19

*Smith Int'l, Inc. v. Kennametal, Inc.*,
621 F. Supp. 79 (N.D. Ohio 1985)..........................................................35

*Spinelli v. Nat'l Football League*,
96 F. Supp. 3d 81 (S.D.N.Y. 2015) ........................................................13

*State Oil Co. v. Khan*,
522 U.S. 3 (1997)................................................................................ 15, 27

*Texaco v. Dagher*,
547 U.S. 1 (2006)................................................................................ 15, 17

*Timken Roller Bearing Co. v. United States*,
341 U.S. 593 (1951)...................................................... 11, 12, 18, 19, 21, 29

*United States v. Arnold, Schwinn & Co.*,
388 U.S. 365 (1967)..................................................................................17

*United States v. Cadillac Overall Supply Co.*,
568 F.2d 1078 (5th Cir. 1978) .................................................................25

*United States v. Coop. Theatres of Ohio, Inc.*,
845 F.2d 1367 (6th Cir. 1988) .................................................................25

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 (1974)..................................................................................18

*United States v. Sealy, Inc.*,
388 U.S. 350 (1967)................................................ 11, 12, 17, 18, 19, 20, 29

*United States v. Suntar Roofing, Inc.*,
897 F.2d 469 (10th Cir. 1990) .................................................................25

*United States v. Topco Assocs. Inc.*,
405 U.S. 596 (1972).......................................... 11, 12, 17, 18, 19, 20, 21, 30

*US Airways Grp. v. British Airways PLC*,
989 F. Supp. 482 (S.D.N.Y. 1997) ....................15

*Valley Drug Co. v. Geneva Pharms., Inc.*,
344 F.3d 1294 (11th Cir. 2003) ....................18

*Valley Prods. Co. v. Landmark, A Div. of Hosp. Franchise Sys., Inc.*,
128 F.3d 398 (6th Cir. 1997) ....................11

*VMG Enters., Inc. v. F. Quesada & Franco, Inc.*,
788 F. Supp. 648 (D.P.R. 1992)....................23

*Washington v. Nat'l Football League*,
880 F. Supp. 2d 1004 (D. Minn. 2012)....................13

*Worldwide Basketball and Sports Tours, Inc. v. NCAA*,
388 F.3d 955 (6th Cir. 2004) ....................34

**Statutes**

15 U.S.C. § 15....................10

**Other Authorities**

PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (5th ed. 2025)....................19

**Rules**

Fed. R. Civ. P. 56....................9

# STATEMENT OF THE ISSUES

1. Should the Court deny Ford's motion for summary judgment where Ford has not and cannot establish antitrust injury, causation, or damages, which Ford is required to prove as a private litigant, because even absent the challenged conduct, no Blue Plan would be able to use the Blue brand to compete in the locations where Ford purchases health benefits products and Ford's assumptions are based on speculation and assumption?

**Defendants' Answer: Yes.**
**Plaintiff's Answer: No.**

2. Should the Court deny Ford's motion for summary judgment where Ford failed to establish an "agreement" as required by Section 1 of the Sherman Act because BCBSA and the individual Blue Plans act as a "single entity" for the function of governing the federally registered Blue Cross and Blue Shield trademarks and all of the challenged "agreements" fall within that function?

**Defendants' Answer: Yes.**
**Plaintiff's Answer: No.**

3. Should the Court deny Ford's motion for summary judgment where Ford has not carried its burden to show that the challenged conduct should be analyzed under the *per se* standard, rather than the default rule of reason, because the challenged conduct is derived from the Blue Plans' preexisting common law trademark rights and procompetitive collaboration to offer a nationwide health benefits product?

**Defendants' Answer: Yes.**
**Plaintiff's Answer: No.**

4. Should the Court deny Ford's motion for summary judgment where Ford cannot prove a rule of reason claim because Ford has, among other things, failed to establish a properly defined antitrust market and anticompetitive effects in that market, and, at minimum, there is a genuine dispute of material fact as to the challenged conduct's procompetitive benefits?

**Defendants' Answer: Yes.**
**Plaintiff's Answer: No.**

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021)

*Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010)

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)

*Broad. Music, Inc. v. Columbia Broad. Sys, Inc.*, 441 U.S. 1 (1979)

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997)

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980 (6th Cir. 2001)

*FTC v. Actavis*, 570 U.S. 136 (2013)

*In re Delta Dental Antitrust Litig.*, 800 F. Supp. 3d 898 (N.D. Ill. 2025)

*In re Se. Milk Antitrust Litig.*, 739 F.3d 262 (6th Cir. 2014)

*Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713 (6th Cir. 2019)

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018)

## INTRODUCTION

The Blue System traces its origins back nearly a century. Beginning in the 1930s, individual Blue Plans began serving their respective local communities as some of the nation's earliest health plans, offering the precursor of modern health insurance. In using the Blue Cross and/or Blue Shield trademarks, individual plans developed common law rights to use these marks in the areas they served. As the world changed and interstate commerce grew, so did the companies Blue Plans served; employers increasingly became the primary source of health benefits for their employees and their needs evolved to require coverage with a broader geographical reach. To meet the needs of national employers like Ford, which has been a customer of BCBSM since its inception but whose employees gradually came to live and work all across the country, Blue Plans had to find a way to serve customers well beyond their local areas. So the Blues collaborated to create a nationwide Blue System that would combine their local networks, under the Blue brands—something no individual Blue Plan has ever had the right to do alone—for the benefit of Ford and customers like it. Ford ignores this factual history entirely.

Instead, Ford's motion attempts to convince the Court to ignore the fundamental holes in Ford's case and enter summary judgment finding a "*per se*" violation of the antitrust laws.[1] In presenting its argument, Ford skips over multiple

[1] Capitalized terms not defined herein refer to the definition used in Defendants'

elements of its *prima facie* case and neglects additional key facts—including much of the almost 100-year history of the Blue System. In the alternative, Ford argues that, if this Court determines that the rule of reason standard applies, it should still grant summary judgment in Ford's favor. As explained in Defendants' motion for summary judgment, Ford fails to meet multiple required elements of its case; therefore, the Court does not have to reach Ford's standard of review arguments at all. Regardless, the Court should deny Ford's motion because Ford has failed to establish a Sherman Act violation under either the *per se* or rule of reason standard.

***First***, Ford's motion fails to address elements it has the burden to prove under either a *per se* or rule of reason standard: antitrust injury, causation, and damages. As discussed in greater detail in Defendants' summary judgment motion, Ford needs to prove antitrust injury, causation, and damages to establish liability regardless of the standard of review—it is not a straight line from *per se* to civil "liability." To the extent the Court agrees with the Blues, or finds that there is an issue of fact regarding any of these unaddressed elements, Ford's motion must be denied.

***Second***, Ford is wrong that any part of the conduct it challenges constitutes an "agreement" under the antitrust laws. Ford argues that because the Blue Plans are separate companies, the existence of an "agreement" cannot be genuinely

---

Motion for Summary Judgment. Defs.' Mot. for Summ. J., ECF 86 ("Defs. Mot."). Unless otherwise indicated, all internal quotation marks and citations are omitted.

disputed. But as explained in Defendants' summary judgment motion, given the Blues' history and the inability of individual Blues to use the Blue Marks nationwide, the Blues necessarily came together and act as a single entity in governing and administering the federally registered Blue Marks, and the challenged conduct is entirely within that function. Again, if the Court agrees with Defendants on this point or finds that a fact issue exists, Ford's motion must fail.

***Third***, if the Court decides to address standard of review (which it need not do given the dispositive nature of the points above), Ford has not met its burden to show the challenged conduct is "so obviously anticompetitive" that the *per se* standard, rather than the default rule of reason, should apply. *Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713, 724 (6th Cir. 2019). In arguing the *per se* standard applies, Ford heavily relies on a 2018 decision from the MDL court, but it ignores the same court's later decision finding that ESAs—the only aspect of the challenged conduct from which Ford attempts to calculate damages—are subject to the rule of reason.[2] In fact, each individual aspect of the challenged conduct is subject to the rule of reason, and aggregating them together does not change this.

***Fourth***, Ford's motion does not seriously argue liability under the rule of reason, and as explained in greater detail in Defendants' summary judgment motion,

---

[2] *See In re Blue Cross Blue Shield Antitrust Litig.*,2022 WL 3221887, at *5-7 (N.D. Ala. Aug. 9, 2022) ("2022 SOR"), *aff'd sub nom. In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070 (11th Cir. 2023).

Ford plainly lacks sufficient evidence to proceed to trial under such a standard.

## DEFENDANTS' RESPONSES TO FORD'S STATEMENT OF MATERIAL FACTS

The disputes raised below are those pertinent to this motion, not those that would be required to ensure completeness or accuracy of all facts. Where Defendants state that a fact is undisputed for purposes of this motion, or do not dispute a particular characterization, that does not reflect Defendants' assent to Ford's characterizations or agreement that the sources Ford cites support the proposition Ford sets forth. Defendants respond as follows:

1–3. **Undisputed** for purposes of this motion.

4. **Disputed.** Defendants agree that BCBSA owns the federally registered Blue Cross and/or Blue Shield trademarks, which Ford defines as the "Blue Marks" in its motion for summary judgment (Pls. Mot. for Summ. J., ECF 81 ("Ford Mot.") at 1), and licenses use of the federally registered marks to individual Blue Plans. But, as explained in Defendants' motion for summary judgment, individual Blue Plans had historic common law rights to the marks in certain jurisdictions and continue to have reversionary rights to them. Defs. Mot., ECF 86 at 3-4.

5–9. **Undisputed** for purposes of this motion.

10. **Undisputed** for purposes of this motion. For avoidance of doubt, "Blue Entities" is a defined term Ford uses in its motion to refer to BCBSM, BCBS KC, BCBS TN, HCSC, and Anthem and their licensed affiliates.

11–32. **Undisputed** for purposes of this motion. *See supra* ¶ 4 (defining "Blue Marks").

33. **Disputed.** A Blue Plan's service area, or ESA, is the area in which it is licensed the right to use the federally registered Blue Cross and/or Blue Shield marks, which is typically based on where it historically used the marks.[3] Not every Blue Plan is licensed to use both the Blue Cross and Blue Shield marks; some are licensed to use only one.[4] And in some instances (where there are overlapping ESAs), no Blue Plan has exclusive rights to use the federally registered Blue Marks.[5]

34. **Undisputed** for purposes of this motion.

35. **Disputed.** BCBSM can solicit business using non-Blue (*i.e.*, "Green") brands anywhere in the United States.[6] A Blue Plan may use the Blue brand in another Blue Plan's ESA in certain circumstances, as Ford acknowledges (*see supra* ¶ 34).

36–37. **Undisputed** for purposes of this motion.

38. **Disputed.** Blue Plans may compete with one another anywhere in the United States using non-Blue branded business.[7]

39–40. **Undisputed** for purposes of this motion.

---

[3] *See* Defs. Mot., ECF 86 at 5-6, ¶ 8.
[4] *See, e.g.*, Defs. Mot., ECF 86 at 3, ¶ 1.
[5] ECF 86-2, Expert Report of Mark McKenna ("McKenna Rep.") ¶ 108.
[6] *See* ECF 81-4, Hedges VHS Dep. (Jan. 14, 2026) at 88:7-10.
[7] *See supra* ¶¶ 33, 35; ECF 81-19, BCBSM_Ford_0000009831; ECF 86-38, Expert Report of Celeste Saravia ¶ 44 n.56.

41. **Disputed.** Defendants dispute that an outdated letter (sent in 1986) reflects how Blue Plan CEOs characterize ESAs; the CEOs speak for themselves.

42. **Disputed.** Defendants dispute this paragraph to the extent it suggests that Standard 10 of the 2013 license agreement remains in effect, as this standard was eliminated in 2021. Defendants do not otherwise dispute this paragraph.

43–46. **Undisputed** for purposes of this motion. *See supra* ¶ 4 (defining "Blue Marks").

47. **Undisputed** for purposes of this motion. BCBSM and BCN complied with the NBE Rule while it was in effect.

48–50. **Undisputed** for purposes of this motion.

51. **Undisputed** for purposes of this motion. Defendants further note that if a National Account changes its location, objective criteria are used to reassess which Blue Plan has the right to use the Blue brand to bid for its business in the National Account's new location.[8]

52. **Disputed.** If a National Account has account locations that are designated to make independent purchasing decisions for health benefits, the local Blue Plan in

---

[8] ECF 80-2, Hedges Tr. (March 27, 2026), at 84:5-86:3. The "Headquarters Rule" was established to allow Blue Plans to continue to operate within their historic service areas while also servicing National Accounts with the Blue brand. *See* ECF 85-1, Expert Report of Kevin Lane Keller ("Keller Rep.") ¶¶ 32, 35, 108; ECF 86-2, McKenna Rep. ¶ 114.

that area can bid for that account location.[9] If the National Account consolidates its benefits purchasing to include all locations and employees across the country, the account has made itself a single consolidated purchaser.[10]

53-56. **Disputed.** *See supra* ¶¶ 38, 52.

57–71. **Undisputed** for purposes of this motion.

72. **Disputed**. BCBSM pays inter-plan fees through BlueCard for Ford's PPO members who receive care in other Blue Plans' service areas. BCBSM does not pay inter-plan fees for services rendered to Ford members enrolled in other Blue Plans' HMOs, such as Anthem's HMO for Ford employees in Ohio.[11]

73. **Undisputed** for purposes of this motion. *See supra* ¶ 10.

74–78. **Undisputed** for purposes of this motion.

79. **Disputed**. Defendants lack knowledge or information sufficient to form a belief as to what Ford understood, which is not a material fact.

80. **Disputed.** While there is overlap, a Blue Plan's PPO and HMO networks are generally not the same, with PPO networks usually being far broader and having significantly different plan designs.[12]

---

[9] ECF 86-27, BCBSA_ASO_05545120 at '272; Ex. 1, Hedges Tr. (July, 23, 2025), at 65:11-23.

[10] *See* ECF 86-27, IPP Policies (BCBSA_ASO_05545120); Ex. 2, BCBSA_ASO_00678026 at '036-37; Ex. 3, BCBSA_ASO_00591986 at 39-40; Ex. 4, De Haan Tr. at 161:3-22.

[11] ECF 86-52, Ford's Supp. & Am. Answers to BCBSM's First Interrogs. at 6, 13.

[12] *See* ECF 81-29, Ford Alternative Plans Analysis (May 2024), FORD_BCBSMich

81. **Disputed.** *See supra* ¶¶ 51-52; Ford Mot., ECF 81 at 14, ¶ 56.

82. **Disputed.** *See supra* ¶¶ 51-52.

83. **Undisputed** for purposes of this motion.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

Defendants incorporate by reference the "Statement of Material Facts" contained in their Motion for Summary Judgment filed October 23, 2026. Defs. Mot., ECF 86 at 3-11. Additionally:

1. ***History of Healthcare Coverage in the United States.*** When the Blue Plans began selling health plans in the 1930s, healthcare was local and Blue Plans sold health insurance to individuals in their local communities.[13]

2. Over time, as interstate commerce and travel increased, health insurance had to evolve to meet the needs of consumers. Now, most Americans receive health insurance through their employers, which increasingly require coverage for employees all over the country depending on where they live and travel.[14]

3. ***Healthcare is a Complex Market, with Health Plans Contracting with Both Subscribers and Providers.*** If a health plan has a higher volume of subscribers, providers are typically willing to accept lower reimbursement rates (to the subscribers' benefit). BCBSM, among other things, uses its volume of subscribers

---

000223086; ECF 86-36, BCBSM materials.

[13] ECF 86-2, McKenna Rep. ¶¶ 35-36.

[14] ECF 85-1, Keller Rep. ¶¶ 30-32, 97; ECF 86-2, McKenna Rep. ¶¶ 113-14.

to negotiate lower provider rates, which reduces medical claims expense for Ford.[15]

4. ***NBE Protected the Blue Brand and Increased Output.*** NBE was designed to protect the Blue brand.[16]

5. [redacted][17] [redacted][18]

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute will preclude summary judgment if that dispute is genuine and concerns material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.[19]

---

[15] Ex. 4, De Haan Tr. at 152:19-153:4 ([redacted]).

[16] ECF 86-22, BCBSA_ASO_03165220 at '226-27; Ex. 5, BCBSA_ASO_04144066 at '068; ECF 86-15, BCBSA_ASO_02209656 at '674; Ex. 6, BCBSA_ASO_04135157 at '160-61; *see also* Defs. Mot., ECF 86 at 8, ¶ 17.

[17] ECF 85-1, Keller Rep. ¶ 195.

[18] Ex. 7, BCBSA_ASO_00152863 at slide 4 ([redacted]); ECF 85-1, Keller Rep. ¶ 196.

[19] Only after the movant has carried its initial burden is the nonmovant required to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)). Evidence must be viewed in the light most favorable to the

# ARGUMENT

## I. FORD MISSTATES THE ELEMENTS IT MUST PROVE FOR CIVIL LIABILITY AND FATALLY FAILS TO ADDRESS ELEMENTS

To establish a violation of the Sherman Act, Ford must prove more than (1) an agreement, (2) affecting interstate commerce, that (3) imposes an unreasonable restraint of trade. Ford Mot., ECF 81 at 21. As a private litigant, irrespective of the standard of review, Ford must also prove antitrust injury, causation, and damages. 15 U.S.C. § 15.[20] For the reasons explained in Defendants' motion for summary judgment, Ford cannot establish any of these elements and does not even attempt to do so here, meaning its request that the Court "grant summary judgment in its favor on the question of Defendants' liability" must be denied from the outset.

Specifically, as set forth in Defendants' motion for summary judgment, Ford cannot establish antitrust injury because it would have the same claimed "injury"—lack of additional Blue competitors in Michigan (and all other at-issue states)—even absent the challenged conduct. Defs. Mot., ECF 86 at 21-25.[21] In Ford's but-for

---

opposing party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).

[20] *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42, 344-46 (1990) ("Respondent has failed to demonstrate that it has suffered any antitrust injury . . . . [t]he allegation of a *per se* violation does not obviate the need to satisfy this test."); *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir. 2001) ("failure to present evidence which could lead to a reasonable verdict for [plaintiff] on the issues of causation and damage provides an independent basis to affirm the district court's grant of [defendant's] motion for judgment as a matter of law").

[21] *See Hodges v. WSM, Inc.*, 26 F.3d 36, 38 (6th Cir. 1994); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989); *Valley Prods. Co. v. Landmark, A Div. of*

world, no Blue Plan could enter Michigan and sell Ford Blue-branded health benefits products. Given that BCBSM developed common law rights to use the Blue Cross and Blue Shield trademarks in Michigan prior to federal registration, which would revert to BCBSM in the but-for world, BCBSM could exclude any Blue Plan that tried. Defs. Mot., ECF 86 at 22. Nor would any individual Blue Plan be entitled to use the federally registered Blue Marks outside of Michigan on the nationwide scale required for Ford's business; it is only BCBSA (or its predecessors) that has ever owned the federally registered Blue Marks, and that federal ownership is not challenged. *Id.* at 24. Nor can Ford establish causation or damages because regardless of whether Ford's hypothesized entry *could* happen, Ford offers no evidence that any other Blue Plan actually *would* enter Michigan or elsewhere, *Huron Valley Hosp., Inc. v. City of Pontiac*, 666 F.2d 1029, 1033 (6th Cir. 1981); Defs. Mot., ECF 86 at 25-30, and Ford's damages theory rests entirely on unsupported assumptions and its theory of harm cannot be presented to a jury. *Ezzo's Invs.*, 243 F.3d at 990-91; Defs. Mot., ECF 86 at 25-30 & n.69.

The cases Ford cites as primary support do nothing to change this conclusion.[22] As an initial matter, the Supreme Court did not create the antitrust

---

*Hosp. Franchise Sys., Inc.*, 128 F.3d 398, 404 (6th Cir. 1997).

[22] *See United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *United States v. Topco Assocs. Inc.*, 405 U.S. 596 (1972); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951).

injury requirement until years after *Sealy*, *Topco*, and *Timken* were decided. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). And because *Sealy, Topco*, and *Timken* were all government cases, these cases would not have addressed antitrust injury (which is only applicable in private actions) even if it had existed at the time. Cases since have made it crystal clear that a plaintiff must establish the separate element of antitrust injury, as well as causation and damages, regardless of which standard of review applies. *Atl. Richfield*, 495 U.S. at 341-42. The bottom line is that Ford omits any discussion of these central, required elements. Thus, Ford has not met its high burden of establishing that it is entitled to judgment as a matter of law on its antitrust claims.

## II. FORD MISSTATES AND MISAPPLIES THE LAW REGARDING THE ELEMENTS IT DOES ADDRESS

### A. Ford Cannot Prove an "Agreement"

Ford acknowledges that to establish a Section 1 violation, the threshold requirement is "proof of conspiracy or concerted activity." *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 572 (6th Cir. 1986). Ford further acknowledges that the existence of an agreement under Section 1 "does not turn simply on whether the parties involved are legal distinct entities," but instead on whether the challenged conduct "joins together separate decisionmakers." Ford Mot., ECF 81 at 22 (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 191, 195 (2010)). What Ford *fails* to acknowledge, however, is that whether the parties are "separate decisionmakers" is

a question that is analyzed function-by-function. As explained in Defendants' summary judgment motion, *see* Defs. Mot., ECF 86 at 13-18, two parties can be separate decisionmakers (and thus actual or potential competitors) for some issues but not others. For example, NFL teams are actual or potential competitors with respect to licensing individual team trademarks to apparel manufacturers,[23] but not with respect to licensing game films owned by the NFL itself.[24]

That is precisely why it is insufficient for Ford to argue (in a single paragraph) that the existence of an agreement for purposes of Section 1 cannot be genuinely disputed simply because "[t]he Plans are separate companies with their own management, separate from the Association and from one another, and they are actual or potential competitors." Ford Mot., ECF 81 at 22. Yes, the Blue Plans are separate companies with their own management separate from the Association and one another; *but* the Blues are not actual or potential competitors with respect to use of the Blue brand nationwide as Ford contemplates. For example, even in Ford's but-for world, no Blue Plan would be able to compete with BCBSM to use the Blue brand in Michigan because it is the "first and only" plan to use the Blue brand there and developed local common law rights to the brand.[25] Thus, the Blue Plans operate

---

[23] *See Am. Needle*, 560 U.S. at 200-01.
[24] *See Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114-17 (S.D.N.Y. 2015).
[25] ECF 86-5, Deposition of Gary Gavin at 26:22-25.

as a "single entity" for certain functions—specifically, governing and administering the federally registered Blue Marks nationwide. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 770 (1984); Defs. Mot., ECF 86 at 13-18. Accordingly, Ford cannot establish an undisputed actionable "agreement" under Section 1.[26]

### B. Ford Cannot Prove that the Challenged Conduct Unreasonably Restrained Trade

The issues addressed above—lack of antitrust injury, causation, damages, and an actionable agreement—are dispositive, so the Court need not go further to deny Ford's motion and grant Defendants' motion. But if the Court chooses to read on, Ford has failed to meet its burden for the *per se* standard to apply. Because the challenged conduct has the "plausibly procompetitive benefit" of protecting the Blues' trademark rights and enabling the Blues to offer a strong national product, Ford has not met its burden to establish that the "rarely appropriate" *per se* standard—rather than the default rule of reason standard—applies. *Elizabeth Place*, 922 F.3d at 724; *Ohio v. Am. Express Co.*, 585 U.S. 529, 552 (2018) ("promotion of interbrand competition . . . is . . . the primary purpose of the antitrust laws").

#### 1. The *Per Se* Standard Does Not Apply to the Challenged Conduct

##### i. The *Per Se* Standard Has Limited Applicability

Courts presumptively apply the rule of reason to determine whether a restraint

---

[26] To the extent the Court finds a genuine dispute of material fact as to whether BCBSA and the Blue Plans act as a single entity when it comes to the conduct at issue in this case, Ford's motion for summary judgment must be denied.

is unreasonable under Section 1.[27] By contrast, "[t]he less common method of determining whether the restraint is unreasonable is the *per se* rule."[28] The *per se* rule is used only when restraints "ha[ve] 'such predictable and pernicious anticompetitive effect,' that there is 'limited potential for procompetitive benefit.'"[29]

It is not enough to use "easy labels" to establish whether a given restraint falls into a *per se* category.[30] Further, in unique circumstances or complex markets (such as those involving two-sided platforms) courts should proceed with special caution to avoid "mistaken inferences of the kind that could chill the very conduct the antitrust laws are trying to protect." *Am. Express*, 585 U.S. at 546; *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("[W]e have expressed reluctance to adopt *per se* rules

---

[27] *Texaco v. Dagher*, 547 U.S. 1, 5 (2006); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273-74 (6th Cir. 2014) ("the Sixth Circuit has an 'automatic presumption in favor of the rule of reason standard'"); *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 343 (6th Cir. 2006) (same); *Elizabeth Place*, 922 F.3d at 724 (applying "the default standard of the rule of reason").

[28] *In re Se. Milk*, 739 F.3d at 271; *US Airways Grp. v. British Airways PLC*, 989 F. Supp. 482, 490 (S.D.N.Y. 1997) (*per se* treatment is "rarely appropriate and should be used sparingly").

[29] *In re Se. Milk*, 739 F.3d at 271; *All Care Nursing Serv. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 748 (11th Cir. 1998) (*per se* treatment applies only to "practices which history has shown have only anticompetitive effects").

[30] *Broad. Music, Inc. v. Columbia Broad. Sys, Inc.*, 441 U.S. 1, 8 (1979); *Expert Masonry*, 440 F.3d at 343-44 ("only if a restraint clearly and unquestionably falls within one of the handful of categories that have been collectively deemed per se anticompetitive can a court be justified in failing to apply an appropriate economic analysis to make this determination"); *All Care*, 135 F.3d at 746 (the Supreme Court "has refused to force various practices into 'pigeonhole[s] and [to invoke] the per se rule'") (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986))).

with regard to 'restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.'").[31]

Accordingly, where the plaintiff seeks a *per se* standard, it is plaintiff's burden to prove "the challenged restraint is so obviously anticompetitive that it should be condemned as per se illegal." *Elizabeth Place*, 922 F.3d at 724. "If, in spite of the plaintiff's efforts, the record indicates that the challenged restraint is plausibly procompetitive, then summary judgment for the defendants is appropriate." *Id.* Where there is a genuine dispute of fact about the nature of the challenged restraint, the rule of reason applies. *In re Se. Milk*, 739 F.3d at 273-74 ("[A] factual dispute exists as to the exact nature of the conspiracy, and as to whether it was obviously anticompetitive. . . . Therefore, especially at the summary judgment stage, this is not a 'clear cut' case of an obviously anticompetitive trade restraint, and thus the district court was correct to apply the default standard of the rule of reason."); *In re Delta Dental*, 800 F. Supp. 3d 898, 906, 914 (N.D. Ill. 2025).

#### ii. The Blue Plans' Historic Use of the Blue Trademarks Distinguishes this Case from the *Per Se* Cases Ford Cites

Ford argues that the *per se* rule should apply because "the Blue Plans are

---

[31] *See also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) ("departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing"); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012) (noting that, even without a "joint venture, there would still be no per se violation for there would still be the legitimate business reasons for the defendants to have cooperated").

actual and potential competitors." Ford Mot., ECF 81 at 25. That is not a sufficient basis to find that the *per se* standard applies, nor is it factually accurate.

First, as a matter of law, Ford is wrong to rely on *Sealy* and *Topco* to equate "horizontal activity" with the application of the *per se* standard. Ford Mot., ECF 81 at 27-29. When *Sealy* and *Topco* were decided, ***all*** market allocations were considered a *per se* antitrust violation without exception.[32] This is decidedly no longer the law.[33] And since then, the Supreme Court has applied the rule of reason in numerous cases where there are plausible procompetitive justifications for an alleged horizontal agreement that would make *per se* condemnation inappropriate.[34]

Second, the Blue Plans are not actual or potential competitors in the sale of Blue-branded products in the manner Ford asserts.[35] As the Blues' common law

---

[32] *See, e.g.*, *Topco*, 405 U.S. at 608 (". . . [I]t is clear that the restraint in this case is a horizontal one, and, therefore, a per se violation of § 1."); *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 374 (1967) (territorial allocation *per se* illegal "without more").

[33] *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58 (1977) ("[W]e conclude that the *per se* rule stated in *Schwinn* must be overruled.").

[34] *See, e.g.*, *Broad. Music*, 441 U.S. at 20; *Texaco*, 547 U.S. at 7-8; *FTC v. Actavis*, 570 U.S. 136, 159 (2013); *see also 1-800 Contacts v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 226 (D.C. Cir. 1986) ("to the extent that *Topco* and *Sealy* stand for the proposition that all horizontal restraints are illegal *per se*, they must be regarded as effectively overruled").

[35] To be clear, even if the Blue Plans may be potential competitors in *certain* limited respects (for example, under the Blue brand where they have overlapping service areas, or under Green brands in other locations), Ford's theory of harm is *solely* focused on conduct limiting Blue Plans' ability to compete *beyond their permitted service areas under the Blue brand*. *See, e.g.*, Ford Mot., ECF 81 at 30-31 ("Ford

history makes plain, the Blue Plans developed as complements, not competitors. Defs. Mot., ECF 86 at 3-4, ¶¶ 1-4. Individual Blue Plans developed common law rights to use the Blue brand in their local service areas.[36] *Id.* In the 1940s, the Blue Plans consolidated those individual rights as a means of applying for federal registration, and today they work together to govern and administer the federally registered marks and to offer a national product to multistate companies, like Ford. *Id.* at 4-8, ¶¶ 5-18.

These origins fundamentally distinguish this case from the cases Ford most heavily relies upon—*Sealy*, *Topco*, *Timken*, and *Palmer*.[37] None of those cases

---

could not obtain a competing, *Blue-Brand proposal* from any Member Plan other than BCBSM" (emphasis added)); ECF 86-48, Krock Tr. at 122:6-8 (assuming only Blue-branded entry).

[36] The mere existence of a company selling the same product does not make it a competitor. *See Huron*, 666 F.2d at 1033 (competitor allegedly blocked from market must have "both the intention and preparedness to compete" in that market); *cf. FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 925 (N.D. Cal. 2023) (an actual potential competitor must: (1) have "available feasible means for entering the [relevant] market other than by acquiring [the target company]"; and (2) those "means offer a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects" (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 633 (1974))). Ford has not provided any evidence that any other Blue Plan is able to enter the relevant market using the Blue brand. Defs. Mot., ECF 86 at 21-26.

[37] In determining the appropriate standard of review, "the reasonableness of agreements under the antitrust laws are to be judged at the time the agreements are entered into." *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003); *Polk Bros., Inc. v. Forest City Enters.*, Inc., 776 F.2d 185, 189 (7th Cir. 1985); *see also Broad. Music*, 441 U.S. at 20-21 (considering the origins of the challenged restraint when determining the appropriate standard of review); *Delta Dental*, 800 F. Supp. 3d at 906 (same).

involve the centralization and codification of rights that were independently developed at common law; instead, in those cases, courts concluded that the challenged agreements reflected an affirmative decision to carve up markets ***with the central purpose of stifling competition that could otherwise take place***.[38] For example, *Sealy* addressed a trademark that was developed and owned by one entity, Sugar Land Industries, which granted independent manufacturers the right to use the Sealy trademark in exclusive territories—something none of them had the right to use before. *Sealy*, 388 U.S. at 351-54. Likewise, in *Topco*, a group of supermarket chains operating in various states formed an association that created and allocated a new trademark to its members to let them sell Topco-brand products within exclusive territorial areas, something they did not have the right to do before forming the association. *Topco*, 405 U.S. at 598, 602.[39] By contrast, when BCBSA was

---

[38] *See Sealy*, 388 U.S. at 356 (parent company "gave to each licensee an enclave in which it could and did zealously and effectively maintain resale prices, free from the danger of outside incursions"); *Topco*, 405 U.S. at 602 (grocers granted themselves "de facto exclusive" territorial marketing license out of whole cloth through their association); *Timken*, 341 U.S. at 595, 598 (prohibiting "agreements providing for a territorial division of the world markets" where the trademark provisions "were subsidiary and secondary to the central purpose of allocating trade territories"); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (competitors entered into a territorial allocation agreement that eliminated competition that previously existed between them immediately before the challenged agreement).

[39] The ongoing vitality of *Sealy* and *Topco* is questionable. *See Rothery*, 792 F.2d at 226; PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (5th ed. 2025) ¶ 1511d3(A) (observing that Chief Justice Burger's dissent in *Topco* "correctly identified the restraints at issue as ancillary rather than naked," explaining that "some lower court

formed, individual Blue Plans had already developed common law rights to use the Blue brand in their respective service areas and the concurrent right to exclude others. Defs. Mot., ECF 86 at 3-4, ¶¶ 1-4. Thus, license agreements entered by BCBSA and individual Blue Plans did not stifle actual or potential competition; they simply protected preexisting rights developed by individual Blue Plans themselves.[40] Defs. Mot., ECF 86 at 3-4, ¶¶ 1-3. Indeed, in finding that the rule of reason standard applied to ESAs, the MDL court in 2022 distinguished *Sealy* and *Topco* on this very basis. 2022 SOR at *4 ("The fact that, here, the Blue Plans had at least some sort of preexisting common law trademark rights to the Blue Marks before the License Agreements memorialized or settled those rights is a distinction *with* a difference.").

Fundamentally, the problem Ford has is that, unlike in the cases it cites, the agreements at issue here all reflect a valid effort by the Blues to preserve individual Blue Plans' preexisting ***local*** rights, while also collaborating to ***increase competition***

---

decisions have repudiated *Topco* in everything but name," and noting that continued reliance on *Topco* is "not necessarily for its principal holding and always in *dicta*").

[40] The Court need not examine whether each and every individual Blue Plan developed common law rights to recognize that this reasoning means that the *per se* standard is inapplicable. Nor must it determine that those common law rights were unimpeachable. After all, courts have repeatedly held that agreements that resolve good faith disputes regarding trademark rights are sufficiently procompetitive to warrant rule of reason treatment. *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55-56 (2d Cir. 1997); *1-800 Contacts*, 1 F.4th at 116. And there can be no question that the license agreements at issue here were entered with the understanding that individual Blue Plans had common law rights in the Blue Cross and/or Blue Shield marks. *See infra* Section II.B.1.iii.

by creating the ability to compete ***nationally*** in a way none of them could do before that collaboration. That is why this case is nothing like the cases cited where courts have found certain agreements to be "shams" or "pretextual" efforts to cloak anticompetitive conduct in the guise of other rights. *See*, *e.g.*, Ford Mot., ECF 81 at 24-25, 28, 33 (citing *Timken*, *Topco*, *Palmer*, and *Cardizem*).[41] Ford points to no evidence, nor could it, suggesting that the Blues' underlying common law trademark rights or the federally registered Blue Marks are a sham or pretext for any illegal market allocation. Rather, the evidence of the Blue System's organic development supports the opposite conclusion. Defs. Mot., ECF 86 at 3-6, ¶¶ 1-3, 5-9.[42]

Far more instructive than Ford's cases is a recent district court decision rejecting a *per se* challenge to a system of dental plans that looks remarkably like the Blue System, but *without* the Blues' common law trademark origins. *See Delta Dental*, 800 F. Supp. 3d at 906-14. There, a putative class of dental care providers

---

[41] The finding of *per se* liability in *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 682 (E.D. Mich. 2000), which Ford argues supports the imposition of the *per se* rule here, is bad law. While it was affirmed by the Sixth Circuit (*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003)), the Sixth Circuit's holding was superseded as to the applicability of the *per se* rule by *Actavis*, 570 U.S. at 158-59.

[42] Indeed, *Timken* itself distinguishes the trademark agreement at issue there from a "valid trademark licensing system." *Timken*, 341 U.S. at 598. And as subsequent courts have observed, the antitrust problem in *Timken* was not that competitors reached an agreement as to their rights to use a particular trademark, but that the trademark agreement there was a sham and "auxiliary to an underlying illegal agreement between competitors." *Clorox*, 117 F.3d at 60.

challenged Delta Dental's rules for "Member Companies."[43] *Id.* at 904. The court conducted a detailed analysis of the history of the Delta Dental system and concluded the rule of reason applies. *Id.* at 906-10. The court found that "the labels plaintiffs attach to defendants' conduct mask both the history of defendants' association and the nuances of their collaboration." *Id.* at 906. Examined as a whole, the Delta Dental system did not reflect "a conspiracy among erstwhile competitors who combined to stifle competition," but instead plausibly represented "a legitimate collaboration . . . , which evolved over time to meet the needs of a changing market and developed operational efficiencies that allowed them to compete effectively with national insurers." *Id.* at 908. That same logic applies with even more force here.

**iii. Each Aspect of the Challenged Conduct Is Subject to the Rule of Reason and Cannot Be Aggregated**

Analyzing each aspect of the challenged conduct drives home the flaws in Ford's theory.

***ESAs are Subject to the Rule of Reason.*** Ford argues ESAs are subject to the *per se* standard because they "divide" territories among actual or potential

---

[43] Delta Dental is comprised of 39 "Member Companies" plus the Delta Dental Plan Association. *Delta Dental*, 800 F. Supp. 3d at 904. Member Companies (i) are licensed to use the Delta Dental brands only in specific geographies (also called "ESAs"), including that multi-state employers must contract with the Member Company in whose ESA the employer is headquartered; (ii) participate in a rate-sharing framework for provider reimbursement rates across Member Company ESAs; and (iii) follow rules about "second brand" business that allegedly operated as an output restriction on non-Delta Dental-branded business. *Id.* at 904-05.

competitors. Ford Mot., ECF 81 at 29. But as explained, the ESAs do not allocate territories—they merely reaffirm each Blue Plan's ability to use the federally registered Blue Marks where they historically used the marks prior to federal registration, effectively settling any potential dispute as to the extent of those rights. *See supra* Resp. to SOF ¶ 33; ECF 86-17, BCBSM_Ford_0000002374 at '379 ("The rights hereby granted are exclusive to the Plan within the geographical area(s) served by the Plan on June 30, 1972"); *see also* Defs. Mot., ECF 86 at 3-6, ¶¶ 1-10. ESAs are thus far from the type of "obviously anticompetitive" agreement that would be subject to the *per se* standard.[44] *See, e.g.*, *Elizabeth Place*, 922 F.3d at 718. Indeed, agreements to protect trademarks are presumptively procompetitive.[45] *Clorox*, 117 F.3d at 55-56 (trademark agreements "are common, and favored, under the law" and do not implicate the *per se* rule); *1-800 Contacts*, 1 F.4th at 116 ("[T]he restraints at issue here could plausibly be thought to have a net procompetitive effect because

---

[44] Importantly, the Court need not define the exact nature of the Blues' common law trademark rights to reach this conclusion. That is because the decades-long history that the license agreements address *at least describes preexisting rights* in the Blue Cross and Blue Shield trademarks, which is sufficient to apply rule of reason or at minimum cause a disputed issue of material fact. *See* 2022 SOR at *4-5; *see supra* n.40; *see infra* Section II.B.1.iv.

[45] Ford argues that procompetitive benefits of the challenged conduct are "immaterial" if the conduct "falls within a per se category." Ford Mot., ECF 81 at 29 n.2. But which standard of review applies in the first instance is a different question than whether to consider procompetitive benefits in a case where the standard of review has already been determined to be *per se*. *In re Se. Milk*, 739 F.3d at 271, 274 (considering procompetitive effects in determining standard of review); *Elizabeth Place*, 922 F.3d at 724 (same).

they are derived from trademark settlement agreements."); *VMG Enters., Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 651, 657 (D.P.R. 1992) (trademark holders' agreement not to sell products bearing the marks in each others' territories did not violate antitrust laws because it "enforced its common law rights in the trademark territory [each] had developed" and "only thereafter was an agreement reached"); *cf. Actavis*, 570 U.S. at 159 (recognizing the value of patent settlement agreements).

***The Headquarters Rule Is Subject to the Rule of Reason.*** Ford incorrectly describes the Headquarters Rule as a "customer allocation," and says it is thus subject to the *per se* standard.[46] But as Ford acknowledges, the Headquarters Rule is simply a way to apply ESAs to national customers like Ford by using objective criteria to identify where the purchasing entity is located for purposes of the right to bid Blue.[47] Ford Mot., ECF 81 at 8, 13-14, ¶¶ 28, 49, 51. The *Delta Dental* court

---

[46] When the Blues originated in the 1930s, healthcare was local. Statement of Additional Material Facts ("SAMF") ¶ 1; *see also* Defs. Mot., ECF 86 at 3, ¶ 1. Fifty years later, healthcare looked very different: most Americans were receiving health insurance as a benefit through their employers, who were becoming increasingly national in scope. SAMF ¶ 2. Because Blue Plans continued to operate within their historic service areas, consistent with the commitment made in protecting the Blue brand through federal registration, the System needed a way to apply ESAs to this new type of purchaser. *See supra* Resp. to SOF ¶ 51 n.8. This led to the Headquarters Rule. *Id.*; *see* Ford Mot., ECF 81 at 13-14, ¶¶ 49, 51.

[47] The rule looks to the National Account's headquarters—a location within its control and generally where health benefit decisions are made. Ford Mot., ECF 81 at 13-14, ¶¶ 49, 51. If the National Account wants to change its location, the objective criteria reassess which Blue Plan has the right to use the Blue brand to bid

did not separately analyze the analogous "headquarters" rule in that case, instead analyzing ESAs and holding they serve "a plausible procompetitive purpose" and thus "must be evaluated under the Rule of Reason." 800 F. Supp. 3d at 909. That is the appropriate treatment here.

Setting the ESAs aside, the Headquarters Rule is still not a customer allocation that falls "unquestionably" within the category typically found to be *per se*. *Expert Masonry*, 440 F.3d at 343-44. Under the Headquarters Rule, Ford and its employees have purchasing options—local Blue Plans can use the federally registered Blue Marks to sell to any employee who wants to purchase as an individual, as well as to any local account location Ford has designated to make its own purchasing decision. *See supra* Resp. to SOF ¶ 52. It is only where a National Account like Ford *chooses* to consolidate its benefits purchasing to include all locations and employees across the country (as most do), that the Headquarters Rule comes into effect for Blue Plans. *Id.* And, of course, the Headquarters Rule has no impact on *non-Blue* companies like United, Aetna, Cigna, and Humana bidding for Ford's business.[48] Indeed, rather

---

for its business in light of its new location. *See supra* Resp. to SOF ¶ 51.

[48] The cases Ford cites to support its argument that the Headquarters Rule is a *per se* illegal customer allocation are inapposite. Ford Mot., ECF 81 at 31 (citing *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078 (5th Cir. 1978); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469 (10th Cir. 1990)). Each of these criminal appeals decisions came after a jury or judge found a naked allocation agreement, without any plausible procompetitive justification, that foreclosed all competition including inter-brand competition. None of these cases decided that licensees who did not

than suppressing competition, the Headquarters Rule facilitates additional *inter-brand* competition for National Accounts between the Blues and the non-Blue national health plan competitors that would not otherwise exist.[49]

***NBE is Subject to the Rule of Reason.*** Ford states in one conclusory sentence without any analysis that NBE was an unlawful output restriction. The only support Ford cites for that proposition is that "on a materially identical record, the MDL Court held the NBE Rule to be, standing alone, 'a per se violation of the Sherman Act.'" Ford Mot., ECF 81 at 32. Ford is wrong again.

NBE, a membership standard in force from 2005 to 2021, was not an output restriction. It was a brand-protection mechanism designed to ensure that Blue Plan licensees derived at least two-thirds of their revenue from Blue-branded businesses; this ensured that all were dedicated to investing in their local Blue-branded provider networks and selling Blue-branded products that could then be combined to compete for National Accounts like Ford. Defs. Mot., ECF 86 at 8, ¶¶ 16-17 & n.26. To compete for National Accounts under the Blue brand, each Blue Plan relies on the others to: (a) build the Blue-branded provider network in its respective ESA; (b) negotiate the most favorable provider discount rates possible (savings that directly

---

compete for customer accounts under a shared brand name were competitors.

[49] *Leegin Creative Leather Prods.*, 551 U.S. at 895 ("the antitrust laws are designed primarily to protect interbrand competition"); *Am. Express*, 585 U.S. at 552 (same); *see NCAA. v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103 (1984) ("[A] restraint in a limited aspect of a market may actually enhance marketwide competition.").

benefit Ford and other National Accounts that are self-insured, and thus pay the medical claims for their employees); and (c) make that Blue provider network and discounts available to all Blue members.[50] *Id.* at 7, ¶¶ 13-15. For this collaboration to work, Blue Plans need assurance that each sister Blue Plan is committed to the brand and to their common mission. NBE was thus part of a broader efficiency-enhancing collaboration that allowed the Blues to function as a single cohesive national competitor in a market that undisputedly has few national competitors. Defs. Mot., ECF 86 at 8-9, ¶¶ 19-21; *see Am. Express*, 585 U.S. at 538-39, 551 (restraints are not "inherently anticompetitive" where they "promote interbrand competition" with dominant competitors). At the very least, NBE was "plausibly" or "arguably" ancillary to a procompetitive endeavor at the time it was adopted, and that is all that is required for the rule of reason to govern.[51]

---

[50] Blue Plans, including BCBSM, can use their National Account subscriber base to negotiate favorable discount rates with providers, to the direct benefit of self-insured National Accounts (including Ford, which pays its own claims costs) and all other Blue subscribers. SAMF ¶ 3; Ford Mot., ECF 81 at 15-16, ¶¶ 59, 62; Defs. Mot., ECF 86 at 7, 10 ¶¶ 14-15, 24. In the context of this highly complex relationship between provider and subscriber prices, especially for self-insured National Accounts, it would be clear error to assume that a directive to focus on the Blue brand necessarily or always decreased output of commercial health benefits products (the proper benchmark). *See Am. Express*, 585 U.S. at 545-46 (warning about the "mistaken inferences" that could be drawn about competitive effects in complex, and particularly two-sided, markets); *Delta Dental*, 800 F. Supp. 3d at 914, 922-23, 925 & n.26 (rule of reason applied where the dental industry indisputably "exhibits the essential features of a two-sided market" through the interrelationship between subscribers and providers); *see also State Oil*, 522 U.S. at 10.

[51] *In re Se. Milk*, 739 F.3d at 273-74 (rule of reason applied because "a factual dispute

Moreover, there is no evidence NBE *actually* restricted output. Ford has put forth no evidence showing that any Blue Plan reduced its Green offerings or decided not to invest in its Green business because of NBE. [redacted] SAMF ¶ 5. [redacted] *Id.* Thus, Ford cannot (and has not attempted to) show that Blue or Green output was restricted, let alone overall output of commercial health benefits products to National Accounts. This is consistent with the challenged conduct having no harmful effects on market-wide competition.[52]

***The Challenged Conduct Cannot be Aggregated.*** In a final bid for the *per se* standard, Ford argues the aggregation of the challenged conduct is *per se* unlawful.

---

exists as to the exact nature of the conspiracy, and as to whether it was obviously anticompetitive"); *Elizabeth Place*, 922 F.3d at 718 ("To be per se illegal, a defendant's conduct has to be so obviously anticompetitive that it has no plausible procompetitive features—a high hurdle for plaintiffs.").

[52] To the extent NBE restricted output of Green business at all, this is irrelevant to Ford's claims. Ford has made clear that it is only seeking damages related to Blue-branded business, not Green business. ECF 86-48, Krock Tr. at 149:13-17 ("Q. And you don't calculate any damages based on a theoretical increase in green business, correct?" A. "We do not."); *see also id.* Krock Tr. at 122:6-8. Since Ford has not calculated any damages related to Green business (and by extension NBE) and is not seeking injunctive relief, if the Court were to find that NBE was subject to the *per se* standard, Ford would have no damages to claim for this conduct.

But even Ford's own case law does not support that. The cases Ford cites simply stand for the proposition that where ***one*** component of an "aggregation" of restraints is *per se* unlawful, the combination of restraints together can be *per se* as well.[53] As explained above, none of the individual challenged restraints is *per se* unlawful. Therefore, Ford's cases do not apply. Nor can it be said that the challenged rules were innocuous in themselves, but were "combined in such a way as to perpetuate [conduct] that the Supreme Court ha[s] held was a per se violation."[54] To the contrary, the rules worked together to enable the Blues to compete for National Accounts, thereby increasing inter-brand competition for the very product Ford itself purchases. They are thus part of a classic efficiency-enhancing enterprise that, to the extent constituting an "agreement" at all, would be subject to the rule of reason.

**iv. Ford's Reliance on the MDL Court's 2018 Standard of Review Decision is Misplaced**

Rather than carefully consider the facts of this case and the most recent case law, Ford urges this Court to rely on a 2018 decision of the MDL court that arose in a different context, was flawed, and has since been revisited by that very court. Ford Mot., ECF 81 at 28-29, 32-33.

***The MDL Court Decisions***. In April 2018, the MDL court concluded that the

---

[53] *See, e.g.*, *Timken*, 341 U.S. at 596-98 (combination of horizontal price-fixing and territorial allocation was *per se* unlawful); *Sealy*, 388 U.S. at 357 (same).

[54] *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 709 (7th Cir. 1984) (affirming dismissal of alleged restraints, even as aggregated).

aggregation of NBE and ESAs was subject to the *per se* standard. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1279 (N.D. Ala. 2018) ("2018 SOR"). It expressly "decline[d] to examine the Blues' ESAs, best efforts rules, or brand restrictions in isolation" and instead based its decision on a supposed "aggregation of competitive restraints." 2018 SOR at 1258, 1267; *see also* 2022 SOR at *1 (stating that in 2018 "[t]he court concluded th[e] combination of restrictions was to be analyzed under the per se rule"). Even at that time, the MDL court acknowledged "there is substantial ground for difference of opinion" and certified the issue for interlocutory review.[55]

Four years later, in 2022, the MDL court held that ESAs are subject to the rule of reason when not aggregated together with NBE. 2022 SOR at *6-7. The MDL court explained ESAs "do no more than regulate how the Blue Mark may be used" and "the rule of reason applies to ESAs because (1) courts presumptively apply a rule of reason analysis, (2) trademark agreements are common, and favored, under the law, and (3) trademark agreements do not immediately appear obviously anticompetitive." 2022 SOR at *6-7.[56]

---

[55] *In re Blue Cross Blue Shield Antitrust Litig.*, No. 13-cv-20000, ECF 2203 (N.D. Ala. June 12, 2018); *see also In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 7152887, at *1 (11th Cir. Dec. 12, 2018) (declining interlocutory appeal).

[56] The MDL court also distinguished the Blues from cases like *Topco*, given their preexisting common law trademark rights. *See* 2022 SOR at *4-5. The court further held that it "need not define the exact nature or extent of the Blue Plans' common law rights in the marks" to reach this conclusion. 2022 SOR at *6.

***The MDL Court Decisions Do Not Help Ford on ESAs, the Headquarters Rule, or NBE***. First, as discussed above, the MDL court revisited ESAs in 2022 and found that ESAs were subject to the rule of reason. The same reasoning applies to the Headquarters Rule, which is a mere application of ESAs. *See supra* Section II.B.1.iii.

Second, as to NBE, the MDL court never held, as Ford claims, that NBE was subject to *per se* review "standing alone." Ford Mot., ECF 81 at 32. While it did hold (in 2018) that NBE should be *per se* when coupled with ESAs, that aggregation was incorrect as a matter of law for the reasons explained above. Moreover, the MDL court was considering NBE in a different context—limited to the impact on the market for a putative class of fully-insured subscribers—which is not the market at issue here (National Accounts, which are primarily self-insured and are the very customers NBE was implemented to support).[57] And as discussed above, there is no evidence NBE operated as an output restriction as to National Accounts—rather, it served to increase output in the National Accounts market, as it was intended to do.

Third, it is simply not the case that the MDL court found NBE to be subject

---

[57] The 2018 decision relied in part on *Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wis.*, 1993 WL 78756, at *12 (N.D. Ill. Feb. 26, 1993), to find that NBE was subject to the *per se* standard. But *Garot* concerned a different restraint that specifically eliminated competition in an entire sector of the economy. NBE, by contrast, did not foreclose competition—instead it protected the Blue brand to further inter-brand competition.

to the *per se* standard on a "materially identical record." *Id.* at 32. One of the MDL court's key findings in the 2018 decision, which it reevaluated in 2022, was that the record in that case lacked evidence of a "valid connection between trademark rights and the National Best Efforts Rule." 2018 SOR at 1272; 2022 SOR at *5. That is plainly not the case here—there is significant evidence in the record that NBE and the Blue brand are inextricably intertwined[58] and the importance of protecting the Blue brands was a constant theme in the internal discussions leading up to adoption of NBE.[59] Thus, the purpose of the best efforts rule that ultimately became NBE

---

[58] *See* SAMF ¶ 4. For instance, a 1996 Report of the Special Committee on Protection and Enhancement of the Licensed Marks and Names ("1996 Report") discussed proposed best efforts rules as "strong measures to preserve these Marks." *Id.* (ECF 86-22, BCBSA_ASO_03165220 at '226). It explained that "[t]hese proposals aim to make explicit and unmistakable the fundamental principle embodied in the current License Agreements—that the value of the Marks to all Plans depends on the commitment and strength of each Plan." *Id.* Indeed, if a "Plan retains its license but no longer remains committed to the marks, instead focusing its development and marketing efforts on differently-branded health business," that Plan "place[s] the Marks' value at risk." *Id.* (ECF 86-22, BCBSA_ASO_03165220 at '227). A subsequent 1999 memo further explained: "The overall success of the Brands is dependent on Plans' putting their best efforts into growing the Blue Brands. . . . An enterprise-wide, best-efforts clause would further strengthen the Brands." *Id.* (ECF 86-15, BCBSA_ASO_02209656 at '674).

[59] *See* SAMF ¶ 4. A 2001 memo explained that "Plan CEOs are united in their desire to strengthen the Blue brands," and that supporters of a "'national best efforts' requirement . . . argue that such a requirement will assure the commitment from all Plans that is necessary to grow the Blue brands." *Id.* (BCBSA_ASO_04144066 at '068). [redacted] *Id.* (Ex. 6), BCBSA_ASO_04135157 at '160). [redacted]

was that "[redacted]"[60] Simply put, the MDL court's decision should not be read to suggest that the *per se* standard can be applied in this case.

Finally, more recently, the MDL court has stated new facts and case law might lead it to reach a different conclusion today.[61] Thus, if this Court elects to consider the standard of review (which it need not do), it should review the issues anew and recognize that Ford cannot meet its burden to establish the *per se* standard applies.

**2. Ford Cannot Prove a Rule of Reason Claim**

Ford cannot seriously contend that it has carried its burden to obtain judgment as a matter of law on its Sherman Act claims under a rule of reason standard. In a rule of reason antitrust case, the burden is on Ford, as the plaintiff, to establish that the challenged conduct had a "substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 585 U.S. at 541; *In re Se. Milk*, 739 F.3d at 272 (listing elements of plaintiff's *prima facie* case under rule of reason). A court "will not infer competitive injury." *Am. Express*, 585 U.S. at 549. Here,

---

[redacted] *Id.* at '162.

[60] SAMF ¶ 4 (Ex. 6, BCBSA_ASO_04135157 at '161).

[61] *See In re Blue Cross Blue Shield Antitrust Litig.*, 2024 WL 4982979, at *19 (N.D. Ala. Dec. 4, 2024) (suggesting "the concept of two-sided platforms" was "a body of law that did not exist" at the time of the 2018 decision); *In re Blue Cross Blue Shield Antitrust Litig.*, No. 13-cv-20000, ECF 3272 at 23 (N.D. Ala. Feb. 7, 2025) (noting the court would "have to deal with this two-sided platform issue and what effect that would have on the . . . *per se* standard before 2021 [*i.e.*, when NBE was in place]").

Ford relies on two short paragraphs at the end of its motion to argue that it is "entitled" to summary judgment under the rule of reason. These conclusory assertions are woefully deficient to make a *prima facie* showing of each element that Ford has the burden of proving under this standard.[62]

As explained in Defendants' motion, Ford lacks sufficient evidence to support a rule of reason claim because—at minimum—it failed to establish a properly defined antitrust market and anticompetitive effects in that market.[63] Regarding the relevant market, Ford offers no evidence of its own and instead hopes that this Court will simply adopt the same market used in a separate litigation on different facts—something that the law does not permit. Defs. Mot., ECF 86 at 18-20. And regarding anticompetitive effects, Ford's expert admitted that he is not offering an opinion on the anticompetitive effects of the challenged conduct and Ford has not identified any other evidence sufficient to carry its burden. *Id.* at 20.

Finally, even if the Court found that Ford had presented sufficient evidence to establish a *prima facie* case and shift the burden to Defendants, Defendants have

---

[62] *Ezzo's Invs.*, 243 F.3d at 988 (affirming summary judgment because plaintiff "virtually ignore[d]" an element under the rule of reason because it felt *per se* review should have applied); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1088 (6th Cir. 1996) (affirming summary judgment for defendants where plaintiff, insisting that *per se* analysis applied, "ha[d] not produced the detailed evidence that would be necessary to support a 'rule of reason' analysis of her claim.").

[63] *See Worldwide Basketball and Sports Tours, Inc. v. NCAA*, 388 F.3d 955, 962-63 (6th Cir. 2004); *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009); Defs. Mot., ECF 86 at 18-20.

ample evidence that the challenged conduct has been procompetitive (both generally and as to Ford) to shift the burden back to Ford. *See In re Se. Milk*, 739 F.3d at 272; *Am. Express*, 585 U.S. at 542. The challenged conduct is precisely what has allowed the Blues to compete for National Accounts like Ford against other national health plan competitors (Aetna, Cigna, United, and, formerly, Humana) and negotiate competitive provider reimbursement rates to the direct benefit of self-insured customers like Ford. Defs. Mot., ECF 86 at 8-9, ¶¶ 16-20; *see also* SAMF ¶ 3. This is, at minimum, sufficient evidence of procompetitive benefits to create a dispute of material fact for a jury to decide.[64]

## CONCLUSION

For the foregoing reasons, Ford's motion should be denied.

Dated: November 20, 2026

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP
By: */s/ Karin A. DeMasi*
Karin A. DeMasi (*Adm. in E.D. MI.*, NY Bar 2831303)
Lauren R. Kennedy (*Adm. in E.D. MI.*, NY Bar 4932851)
Hannah L. Dwyer (*Adm. in E.D. MI.*, NY Bar 5711841)

BODMAN PLC
By:*/s/ Sarah L. Cylkowski*
Sarah L. Cylkowski (P75952)
Alexandra C. Markel (P81705)
1901 St. Antoine Street
6th Floor at Ford Field
Detroit, MI 48226
(313) 392-1088

[64] *Smith Int'l, Inc. v. Kennametal, Inc.*, 621 F. Supp. 79, 90 (N.D. Ohio 1985) (denying cross-motions for summary judgment because "genuine issues of material fact exist[ed]" as to whether the challenged license and exclusive-territory agreements were "a joint effort in restraint of trade, or [were] unilaterally designed and imposed . . . to increase . . . economic efficiency . . . and render th[e] market more competitive").

Two Manhattan West
375 Ninth Avenue, New York, NY 10001
(212) 474-1000
kdemasi@cravath.com
lkennedy@cravath.com
hdwyer@cravath.com

SCHENK & BRUETSCH PLC
Brian C. Summerfield (P57514)
211 West Fort Street
Suite 1410
Detroit, MI 48226
(313) 774-1000
brian.summerfield@sbdetroit.com

*Attorneys for Defendant Blue Cross Blue Shield Association*

amarkel@bodmanlaw.com
scylkowski@bodmanlaw.com

ALLEN OVERY SHEARMAN
STERLING US LLP
Todd M. Stenerson (P51953)
Brian C. Hauser (*Adm. in E.D. MI*, D.C. Bar 1024406)
1101 New York Avenue, NW
Washington, D.C. 20005
(202) 508-8000
todd.stenerson@aoshearman.com
brian.hauser@aoshearman.com

Rachel Mossman Zieminski (*Adm. in E.D. MI*, TX Bar 24131967)
2601 Olive Street, Suite 1700
Dallas, TX 75201
(214) 271-5777
rachel.zieminski@aoshearman.com

Susan Loeb (*Adm. in E.D. MI*, NY Bar 5570940)
Sophie Copenhaver (*Adm. in E.D. MI*, NY Bar 6004766)
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000
susan.loeb@aoshearman.com
sophie.copenhaver@aoshearman.com

*Attorneys for Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, I caused the foregoing document to be served via ECF on all attorneys of record. I declare under penalty of perjury that the foregoing statements are true and correct.

By: *<u>/s/ Sarah L. Cylkowski</u>*
Sarah L. Cylkowski (P75952)