# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

Plaintiff,

vs. Case No. 23-11286

BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY, et al.,

Defendants.
______________________________/

**MOTION TO COMPEL DISCOVERY**
**AND FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS**
**(ECF NOS. 70 and 75)**

BEFORE THE ELIZABETH A. STAFFORD
United States Magistrate Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Thursday, October 22, 2026

APPEARANCES:

For the Plaintiff Ford Motor Company:

WILLIAM A. SHERMAN
Dinsmore & Shohl
801 Pennsylvania, NW
Suite 610
Washington, DC 20004
202-372-9117
William.sherman@dinsmore.com

BRANDON PELLEGRINO
Bowman and Brooke LLP
101 W. Big Beaver Road
Suite 1100
Troy, Michigan 48084
248-205-3300
Brandon.pellegrino@bowmanandbrooke.com

(Appearances continued next page)

APPEARANCES: Continued

For the Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company, et al.:

TODD M. STENERSON
Allen Overy Shearman Sterling US LLP
1101 New York Avenue NW
Washington, DC 20005
202-508-8093
Todd.stenerson@aoshearman.com

SOPHIE COPENHAVER
Allen Overy Shearman Sterling US LLP
599 Lexington Avenue
New York, New York 10022
212-848-5167
Sophie.copenhaver@aoshearman.com

To obtain a certified copy of this transcript, contact:
Linda M. Cavanagh, CSR-0131, RPR, CRR, RMR, CRC, RDR
Official Court Reporter
(313) 234-2616 • www.transcriptorders.com

**TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING**
**TRANSCRIBER NOT PRESENT AT LIVE PROCEEDINGS**





TABLE OF CONTENTS

Page

MOTION TO COMPEL DISCOVERY AND FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS (ECF NOS. 70 and 75):

Comments by Mr. Stenerson..........................5
Comments by Mr. Sherman............................13
Further Comments by Mr. Stenerson.................16
Further Comments by Mr. Sherman...................29
Further Comments by Mr. Stenerson.................32
Further Comments by Mr. Sherman...................39
Further Comments by Mr. Stenerson.................41
Further Comments by Mr. Sherman...................48
Comments/Ruling by the Court.......................49

EXHIBITS

| Identification | Marked | Received |
| --- | --- | --- |
| NONE | | |





Detroit, Michigan
Thursday, October 22, 2026
_ _ _
(Proceedings commenced at 11:03 a.m., all parties present)
THE CLERK: The Court calls Case No. 23-11286, Ford Motor Company versus Blue Cross Blue Shield of Michigan Mutual Insurance Company, et al.
Counsel, please state your appearances for the record.
MR. SHERMAN: Good morning, Your Honor. William Sherman, law firm of Dinsmore & Shohl, on behalf of Ford Motor Company, plaintiff.
MR. PELLEGRINO: Good morning, Your Honor. Brandon Pellegrino of the law firm of Bowman and Brooke, also on behalf of Plaintiff Ford Motor Company.
MR. STENERSON: Good morning, Your Honor. Todd Stenerson on behalf of Blue Cross Blue Shield of Michigan from the law firm of A&O Shearman, and I'll be arguing the motion on behalf of defendants today.
MS. COPENHAVER: Good morning, Your Honor. Sophie Copenhaver from the law firm of A&O Shearman on behalf of Blue Cross Blue Shield of Michigan
THE COURT: Good morning to everyone. We're here on Blue Cross Blue Shield's motions, and Mr. Stenerson, you said





that you're arguing.
MR. STENERSON: Yes, Your Honor.
THE COURT: You can come to the lectern. I'm going to ask you and give you a chance to put whatever you want on the record, but are you unfamiliar with the case law indicating that motions to compel that are filed after the discovery cutoff are untimely?
MR. STENERSON: In this case I don't think that would apply, Your Honor, because we followed Judge Parker's rules of asking for permission to file.
And so if I could just back up, the case has been pending for some time. The parties worked very diligently without court involvement. There were no motions for many years. As discovery was ending in March 31st of 2026, the parties had informally agreed that we would raise any issues with the Court by February 5th in order to avoid any issues of timeliness.
THE COURT: February 5th of 2026?
MR. STENERSON: Yes, Your Honor.
THE COURT: Okay. So these motions were filed in -- in August.
MR. STENERSON: Correct, Your Honor. But that is because the -- at that time when we asked Ford to abide by that agreement, they asked for -- for more time to try to deal with the issues. And this is in Exhibit 30 to our motion where

Ford -- Ford wrote us a letter on February 11th and specifically acknowledged our efforts to try to take this issue up to the court, and specifically Ford writes, and this is February 11th, "Ford also takes its discovery obligations and commitments seriously and rejects any claim to the contrary. Ford understands that Blue Cross now agrees to eliminate the prior, self-imposed February 5th, 2026 deadline to raise discovery disputes with the court. Ford recognizes that there are still seven weeks left before discovery closes on March 31st, 2026, and provides several status updates," and the parties are still dealing with this issue. And we did submit our request to Judge Parker's chambers to file a motion prior to the end of discovery, and we believe -- and I think as Your Honor knows, Judge Parker does not permit the filing of a motion to compel without permission, so we felt that we were required to do that.

THE COURT: At the same time, Ford included in its response the argument that discovery had closed and that there needs to be a showing of -- of good faith of why the motion could not be filed within the deadline. I -- I won't -- I don't assume that Judge Parker thought that you would not address that issue. And on top of that, your opponent does not control the schedule, and the schedule affects the court as well as the parties. The -- and there have been stipulations to adjourn the motion cutoff, but no motion or stipulation to





adjourn the discovery cutoff.

Judge Parker referred the motion to compel or the motions to compel to me, but I have no control over the schedule. And, in fact, there was a stipulation just -- the -- the most recent filing is a stipulation to adjourn the discovery -- I'm sorry, the dispositive motion and *Daubert* motion cutoff, but there's silence as to -- to any effort to -- to adjourn the discovery cutoff.

Dispositive motions are due tomorrow, and the amount of discovery that you're seeking is significant, and this is not just "I want to conduct a deposition." It's "I want to engage in significant practice of regarding documents, new searches, significant document production as well as whole new areas of inquiry about the -- the Ford's trademark and -- and post -- decisions that were made post the relevant time period."

So I'm not understanding the decision. If -- if this discovery was so important, why wait until August to -- to move to compel this discovery without seeking to adjourn the discovery deadline and -- and not addressing that issue, at least in your reply brief, when -- when -- when Ford raised it, and -- and there's just silence in your reply brief about why those motions weren't filed until August.

MR. STENERSON: Thank you for that, Your Honor.

Number one, this is discovery. We are not asking for





a change in the summary judgment schedule. We are planning to file tomorrow as scheduled. And this discovery will be -- as I understand Judge Parker's rules, she does not set a trial until those decisions are made, and so this discovery will be completed before that.

But -- but more importantly, Your Honor, just some history that -- that Your Honor was not involved in, there is no dispute that we followed faithfully Judge Parker's chamber rules about motions to compel. There is no dispute that we -- we asked her permission to file the motion prior to the close of discovery. There is no dispute that she had that issue. It then was with Judge Parker for -- for a couple months. And then we had a conference with Judge Parker over the summer where she held an oral status conference, and at that conference we went through these issues based on our contact with her chambers, and Judge Parker granted us permission to file this motion when we did. So the reason --

THE COURT: Sounds like her granting the motion was her saying that your motion was meritorious. What she gave you the chance to do is to make the argument, but you didn't make the argument about the timeliness at all, you didn't address it. Even though Ford raised it, you didn't address it at all in your briefing.

MR. STENERSON: I'm certainly not going to speak for Judge Parker, Your Honor. However, I will tell you that I've





been doing this a long time. My firm impression from Judge Parker during the summer conference was the Court, understanding that it had been with her for -- for some time, appreciating that the Court was very busy and that she had concerns about the merits of Ford's position and Ms. -- Ms. McBride, and -- and my impression was Judge Parker had no issue with timeliness and, in fact, recognized that it had been with her in a timely manner.

THE COURT: I'm frankly troubled by the fact that when I ask you why you didn't file until August, first you're trying to blame Ford, and now you're trying to say it's -- it's -- it's Judge Parker's decision. You -- you referred to discussions in February, and there's nothing explaining the months that are going by without you filing the motions or moving to adjourn the discovery. And it's -- it's not credible to say that the amount of discovery that you're seeking will not affect the dispositive motions. I would assume that if you found discovery after the motions were filed, then you'd want to supplement, you'd want it -- the -- the briefing. If -- if Ford found information, then it would want to supplement the briefing.

The -- the deadlines are not mere suggestions. They're to be taken seriously. You can adjourn them with a showing of good cause. My point is that you didn't -- you haven't tried to explain the delay except to say it's Ford's

fault and now it's Judge Parker's fault. And -- and I've asked you -- Ford said in its briefing that Blue Cross had all the information it needed to move to compel months earlier. You haven't addressed the issue of why Blue Cross, acting with diligence, did not bring the motions earlier, even if it's after the discovery deadline. But to -- to wait until August when the deadline was March 31st, you have to take responsibility for whatever the decision-making was in waiting until August to file it, and you haven't said anything except it's their fault. Tell -- tell me why Blue Cross didn't act sooner.

MR. STENERSON: Thank you, Your Honor.

And I -- I did not mean to intend that it was anybody's responsibility other -- other than mine. And I acted the way I acted for two very specific reasons. Number one, I understood Judge Parker's rules that required leave before filing a motion to compel and that I was not permitted to file a motion to compel until I sought that permission. That permission was sought timely, and that permission was granted in July, and as soon as I had permission to file, we filed, and that is the totality of the record as to when we filed when we did.

THE COURT: So the -- the -- the initial request was made when? Judge Parker to address the things that you're requesting, when did you request that?





MR. STENERSON: March 13th, Your Honor. That was an email to chambers and it laid out these exact issues of what are in the motion. We then did not hear back from the Court, and we followed up with Court on June 20th. We then also took some time to hear back from the Court and we had a status conference with the Court in July. She then granted leave to file the motion, and that's why it was filed when it was filed.

THE COURT: Did you discuss with Judge Parker adjourning the discovery cutoff?

MR. STENERSON: That did not come up. The only thing that came up substantively on that call is Judge Parker had read our summary of the issues and she said that she was in the briefing. She wanted to make sure that the parties addressed the alleged conflict of interest of Ms. McBride and she wanted to make sure that Ford had authority for that position.

Other than -- than that, there was agreement on that phone call on when the brief would be filed, when the motions would be filed, and -- and the briefing schedule, and she acknowledged that it had been with her since March 13th and told us that she would address it as soon as she could.

And by the way, during that time the parties were continuing expert discovery, and expert discovery didn't end until October 7th.

And so there was -- as I said, with regard to the schedule, Your Honor is correct, there is trademark information





that I'm -- I very well may believe helps our -- our summary judgment briefing, but, again, we are prepared and we are filing tomorrow without that information.

And with regard to any other part of the schedule, there is no schedule past the summary judgment briefing and the *Dauberts*. And, again, I understand Judge Parker's practice to set trial not until after those are decided, and I would fully expect this discovery, if any is granted here today, will be completed before the Court rules on summary judgment.

THE COURT: I'm going to tell you all that the ECF -- the Court's ECF policies and procedures requires the parties to label the exhibits and not just Exhibit 1, Exhibit 2. So in going forward, that is something to do.

I'm looking now at the March 31st --

MR. STENERSON: I think that's March 13th, 2026

THE COURT: Sorry, 13th -- 13th email. Now, this appears to be -- okay, let me just look at this.

MR. STENERSON: Yes, Your Honor.

(Brief pause)

THE COURT: Mr. Stenerson, do you want to -- I want to hear from Mr. Stenerson on this issue.

MR. STENERSON: I believe Mr. Sherman will address that.

THE COURT: That's what I mean. I'm sorry, Mr. Sherman.





MR. SHERMAN: Good morning, Your Honor.

THE COURT: Good morning.

MR. SHERMAN: May it please the Court, Your Honor, I think Your Honor went to the heart of the matter, which is the timing, and the record will show that Ford has held these positions with regard to discovery since 2024. Blue Cross Blue Shield has been aware that Ford had an issue with the predicament that Ms. McBride would be put in as a senior manager at Ford and a sitting board of director for Blue Cross Blue Shield back in 19 -- back in 2024. We made them aware we had an issue with that.

We made them aware that we would not produce our trademark and branding information. We relied largely on the Court's decision in the motion to dismiss where the Court accurately stated you cannot use trademark to do an end-around around the Sherman Act. We also made it clear that we would produce documents through the filing of the complaint, which is 2023.

The issue is why did they wait so long. Our position was on wavering. We have letters back and forth. The process is to raise the issue, meet and confer, and then ask for the Court's indulgence to make a decision and help the parties resolve their issues.

The parties have worked diligently since the filing of this complaint. We have cooperated on many different

levels, but we have been persistent on these particular issues, and Blue Cross Blue Shield of Michigan chose to wait until March 13th to approach the Court with these issues.

And once fact discovery closed, they again chose to wait. Fact discovery closed March 31st. April went by, May went by, and then in June they reach out to us to reraise these issues. It was reasonable for Ford to assume that these issues had gone by the wayside since fact discovery had closed.

And that is our position. The position is that they have no explanation as to why they waited so long to do what they had the ability to do even years ago. Because we met and conferred, our position was what it still is today and --

THE COURT: Now, that's -- now, you said the McBride issue --

MR. SHERMAN: Yes.

THE COURT: -- was raised. And -- and when was -- were -- did you first discuss the issue regarding the trademark as well as the -- the discovery that the -- the other depositions that were requested and the discovery related to the -- the time period beyond the relevant period here?

MR. SHERMAN: So as far as the trademark issue is concerned, Your Honor, that was discussed back in December of 2024 in our responses to their request for production of documents. We indicated that we would not be producing the trademark information. We said that it was not relevant and





that it was unproportional to the needs of the case and not relevant to any defense or claim.

Likewise, when -- beyond -- I'm sorry. The discovery beyond 2023, again, that was addressed in our written discovery responses where we told them it's not relevant, it's not proportional to the case.

Later on, Your Honor, earlier this year, we even simplified the case and said, look, our damages period is going to stop in April 2021, and you've already gotten --

THE COURT: When did you have those discussions?

MR. SHERMAN: We had those discussions in January of this year.

THE COURT: All right. Thank you.

MR. SHERMAN: They already had information from a third party about why Ford chose to renew their contract. Ford does a market check and they subpoenaed the third-party consultant. They deposed that third-party consultant and they got documentation as to how Ford made the decision, the process by which it went forward with the third-party consultant, so they had the information beyond 2023 with regard to Ford's choices.

With regard to Demmy McBride and -- and the conflict situation, this was raised early on, also in October of 2024, Your Honor, and those discussions have continued on and on and our position has not wavered. Our briefing shows the letters,





the communications.

And it -- it -- one thing I do want to point out, it seemed that Blue Cross Blue Shield claimed ignorance about the -- the issue, but in their letter --

THE COURT: About what issue?

MR. SHERMAN: About the issue of whether or not Ms. McBride was put in a position of a conflict, whether or not there was an ethical obligation on our part not to speak to one of their boards of directors, their letter of June 10th frames the issue perfectly. I'm sorry, of June 26th. It says that "BCBSM understands that the chief reason Ford has not produced Ms. McBride for a deposition is because Ford believes its counsel faces an ethical bar on speaking to Ms. McBride ahead of her deposition given her dual role as both a Ford employee and BCBSM board member." That's exactly the issue and that's always been the issue. And so they've known that since 2024 but still they chose to wait. And I think that the Court accurately pointed out they have no rational or reasonable explanation as to why they demonstrated such lack of diligence on that issue.

THE COURT: Thank you.

Mr. Stenerson, do you want to have any rebuttal?

MR. STENERSON: Yes, please.

So, Your Honor, this is a very large antitrust case that Ford has filed against Blue Cross. The allegations, while





we don't think they're meritorious, are serious. And while the parties have worked very well in discovery for several years, I want to be clear on the record that discovery ended March 31st, 2026. Blue Cross is entitled to take discovery through March 31st, 2026. And Ford produced over half or nearly half of its documents in October and November of 2025.

So the -- the way that -- that we went about this is we were not going to take depositions prior to getting Ford's document production completed. Ford did not certify to us that their document was completed until March 6th of 2026, 25 days before discovery was over. So respectfully --

THE COURT: Are -- are you disputing that -- that Ford had told you that it was not going to -- it objected to the discovery that was requested?

MR. STENERSON: So there's different pieces. The first time I was told that they were not going to definitively produce Ms. McBride was in October of 2025. Mr. Sherman and I discussed it and he said he was going to file a motion for protective order. Ford never did that. But that was the first time I was told definitively that she was not going to be produced.

THE COURT: So you could have sought leave to -- to -- to compel her -- her testimony --

MR. STENERSON: Well --

THE COURT: -- by November of 2025.

MR. STENERSON: Well, the reason we didn't do that, Your Honor, is because I'm aware of -- of the authority in this district that in order to argue that you must produce a witness that's not duplicative, the court typically requires you to take your ten depositions, look at that record so the record is established, so then we have the basis to say we still needed Ms. McBride.

So that's what we did. We proceeded with noticing the 30(b)(6) depositions, we noticed eight depositions of other Ford employees, and those depositions, again, did not go forward until March of 2026 because Ford had not completed and certified their document production until March 6th. So we are in a whipsaw situation where Ford was taking the position, despite the size of this case, they were not going to produce more than ten witnesses. I was familiar with the authority in this district that said we needed to exhaust our depositions before we come to the court for leave for more, and so that's why there's --

THE COURT: I -- I really feel like the -- that the conflict of issue -- interest issue could have been addressed much earlier.

MR. STENERSON: I was told Ford was going to move for protection on that issue. They didn't. But that is an issue that, again, Your Honor, I was first told about in October of 2025. And -- and with regard to the merits of that, Your





Honor, Ms. McBride is a fact witness. All she's being asked to do is testify to the facts within her knowledge that are nonprivileged. I'm not aware of no authority, fiduciary duty or otherwise, that prevents a witness from testifying truthfully about the facts in her possession.

THE COURT: Okay. So let's talk about the meat of it. I'm really surprised that the -- the argument that -- that you're perplexed by the -- the conflict of interest objection. This is someone who is on the board of Blue Cross Blue Shield and who owes a fiduciary duty to Blue Cross Blue Shield and she has a duty to her employer, Ford. How are you not seeing the conflict of interest?

MR. STENERSON: Sure.

THE COURT: And -- and -- and whether it's a fact interest -- witness or not, it would seem to me that Ms. McBride would be concerned about giving any testimony that violated her duties to either party, and -- and the -- the -- whether you're a fact witness or not, bias is always a -- a relevant consideration. If her loyalties are divided, I'm just perplexed about why you are indicating that the conflict of interest argument is so frivolous. It -- it seems substantive to me.

MR. STENERSON: Sure. That's a fair question, Your Honor. I'm just purely going on the facts, and the facts are that Ms. McBride was listed by Ford in their initial





disclosures as a witness that they may use at trial.

THE COURT: That was before. And then after that they told you we're not including her as a witness and we're not discussing -- we're -- we're -- we're putting up sort of a Chinese wall between her and this litigation because of her divided loyalties. And so not -- let's forget about the initial disclosures. Right now you're saying you want this deposition, and then they're saying this is a conflict of interest. And your response is sort of like, "Ah, it's just not -- you know, it's not a substantive issue." I'm not understanding the -- the reason why you're not --

MR. STENERSON: Sure.

THE COURT: -- taking into consideration the fact that this is an employee who -- who has unique, divided loyalties and -- and making it sound like this is just a frivolous issue.

MR. STENERSON: Sure. I -- I don't mean to make it sound frivolous, Your Honor. Number one, factually, she is the most senior Ford employee involved in making the decision about whether or not Ford buys its health care benefits from Blue Cross Blue Shield of Michigan. The core issue in this case is whether or not that sale of health care benefits from Blue Cross to Ford are lawful or somehow an overcharge based on the alleged conduct. She is the -- the senior decision-maker that has been in that role for the last four to five years. She was





in a -- a -- a similar role but not as senior before that.

So she is -- on the Ford side of the equation, she is uniquely positioned to have information as to why they sought an RFP, why they hired the consultant that they hired, why they decision -- they decided to choose Blue Cross over Aetna or United or Cigna or other options in the market. So as a pure factual question, her role at Ford is at the core of the allegations.

And with regard to her role at Blue Cross, I think Your -- Your Honor may know Blue Cross is a fairly unique corporate animal. For many years it was a quasi-state agency, and more recently it -- it converted to a mutual insurance company. But as part of that, the legislation that created it mandated who was on the board, and those mandated board positions include representation of members in the provider community, members of the -- of the customer community. And so Ms. McBride sits in the -- the legislatively mandated seat of a large group employer customer, so that is her role on the Blue Cross board.

And with regard to bias, respectfully, I don't know what Ms. McBride is going to say in her deposition, and -- and I don't know how sitting on the board impacts her decision for Ford Motor Company to be a customer. We love the fact that Ford Motor customer -- Ford Motor Company is a customer of Blue Cross, we want them to be a customer, but in defending this

lawsuit, we need to have access to the witness who was the key decision-maker as to why they --

THE COURT: You're saying key decision maker. They -- they -- Ford says that they were -- that it was a team. Why -- why is -- I mean is she key?

MR. STENERSON: She is key because -- and -- and this is in our -- our opening brief, Your Honor. Exhibits 32 to 39 we go through in detail. But she is the most senior person on the health benefits decision-making team. She was the direct contact with Willis Towers Watson, the consultant that Ford hired. She had the -- the -- the interaction with them. She has the most direct interaction with Blue Cross Blue Shield of Michigan's representatives on Ford's health care benefits, and that role gives her testimony unique value at a trial in this action by way of admissions and -- and other things, depending on what she says about her personal views of the health care options that Ford Motor Company has in this market, and that is a core --

THE COURT: I -- I -- I did read, but I guess I -- I would say that I'm not understanding in terms of the proportionality question of -- of how important her testimony is for resolving the issues. I understand you're saying that she was the highest level, but at the same time, I'm not hearing anything, any factual omissions, meaning that -- that you -- you have discovered what I assume to be a substantial





number of emails and other documents. You've taken depositions of other witnesses. And even though Ms. McBride was the -- the highest level representative of the team, I'm not aware of any factual information that you have not been able to discover because she wasn't deposed. I understand that you think that her opinion somehow is -- is more relevant than other people's opinions, but in -- in terms of the factual information of how the decision was made, I'm not understanding what -- what's missing.

MR. STENERSON: Sure. Two things with regard to that. First, Your Honor, they've not produced her custodial documents so we don't have all of her documents to fill in that picture. We know that she has the senior role. We know from the testimony we've taken and some of the emails we've received that she writes substantive emails about the process of bidding out Ford's business.

THE COURT: To who?

MR. STENERSON: What's that?

THE COURT: She writes those emails to whom?

MR. STENERSON: To her team internally and to --

THE COURT: And -- and -- and you've been able to -- you saw production of the emails that her team received?

MR. STENERSON: Correct. But what we don't --

THE COURT: So -- so you're -- you're -- you have a paper trial of what was discussed and what factors were





relevant, and I'm -- I'm trying to figure out what smoking gun or what -- what information you feel -- what factual gap there is that you have not been able to get from the discovery from the custodians and deponents that -- that were provided.

MR. STENERSON: Sure. There's -- there's two things specifically. Number one is -- and Willis Towers was recommending to Ford Motor Company that they go out for an RFP to renew their business more recently. She was the key contact.

THE COURT: More recently?

MR. STENERSON: Within the -- back in September of '25 Ford Motor Company --

THE COURT: So now you're talking -- now -- now we're talking about the -- the post-discovery, the period, so --

MR. STENERSON: Well, it's --

THE COURT: -- that's a -- that's a different -- that's another issue is whether that more recent -- that those more recent decisions are relevant and proportional to the needs of the case, but I'm -- so let's talk first about the time period that the parties agree is relevant.

MR. STENERSON: Well, I -- I -- prior to 2021, we don't have sufficient information from Ms. McBride to pinpoint an issue like Your Honor is asking, but that's because we don't have her custodial documents. All we have are the -- the few pieces that came through other custodians.





THE COURT: A few pieces?

MR. STENERSON: Yes, Your Honor. The -- as -- as you know, the -- when this process goes through the production wheels, only certain documents get produced, and if a witness is not a custodian, it excludes large numbers of their documents. And even for the documents we have, Your Honor, in looking down the road, I -- I've seen this movie, we cannot admit at trial documents from Ms. McBride, emails from her, without a sponsoring witness. When we ask other people about Ms. McBride's emails, they say ask Ms. McBride, right? They're not going to testify -- they're not a sponsoring witness to testify what Ms. McBride said in the emails that we do have and --

THE COURT: The -- the emails are admissible, aren't they?

MR. STENERSON: They -- they may -- they may be admissible as party admissions in certain instances, but to have the direct --

THE COURT: They may -- as long as you authenticate them and there -- there -- there's a witness there to say, "Yes, I received that, this email from Ms. McBride," and then you see what the email says.

MR. STENERSON: Right, but if Ms. McBride is the author, Your Honor, we don't have the ability to examine Ms. McBride on what she meant by the email, and that is an

important evidentiary fact and ability to defend ourselves in this case.

And one incremental approach, Your Honor, would be to have Ford to produce the McBride emails before ordering a deposition so then I can answer your question with -- with a sufficient factual basis. I mean that's part of the problem that -- the challenge that I have is -- is I don't know what I -- I don't have, and the fact that Ford is being so resistant to producing this indicates to me that there's something in there that is material to our defense that Ford doesn't want Blue Cross to have.

And so when I look at the relevance question, right, if we're going back to burden and the obligation, there's no doubt that Ms. McBride is relevant. In fact, that's really beyond dispute in my view.

On proportionality, the question then becomes what is the burden of Ford to produce these documents versus the prejudice to Blue Cross if they don't do it? And that's where when Ford has full information about what is in the files of their most senior executive yet they don't want to produce them, that I think that that calculus weighs in favor of ordering production so Blue Cross can have access -- access to the facts so it has full information to more precisely answer Your Honor's very good questions about her seniority.

I -- I have a very solid and reasonable basis to





believe, again, from the pieces that we do have, that those documents are highly relevant and go right to the core issue of why is Ford choosing Blue Cross Blue Shield of Michigan for its health care benefits, why is it consolidating more of its HMO business outside of Michigan into Blue Cross. These are all decisions that are being made within Ford.

And the fact that they're made after 2021 is even more important because while Ford -- and, again, I don't know why Ford stopped its damages in 2021. I will tell you, in 35 years, it's the first time a plaintiff has ever said out, "I don't want damages after 2021, and because I don't want damages, you don't get my documents." I mean that is a red flag, Your Honor, that there's something --

THE COURT: I mean we're talking about what's -- what's relevant to the claims and defenses. And so if Ford is saying that their claim is -- is for a period through 2021, that is something that I have to -- to take into consideration.

MR. STENERSON: Yes, Your Honor.

THE COURT: You know. And -- I mean and the reason why is not the question. The question is what are the claims and defenses.

And so I -- but let me -- let me -- I want to ask Mr. Sherman a question about Ms. McBride's --

MR. STENERSON: One additional thing on the time period, Your Honor, just so you have it. Yes, they cut off





their damages in -- in April of 2021. Their expert relies on conduct after April 2021 to justify his damages opinions in this case, so their own expert uses information past that period so it's definitely relevant to that.

THE COURT: Well, he's talking about the -- the -- I'm assuming that he's talking about -- he's -- he's using that as reference for how to calculate damages and not as evidence about the alleged antitrust violations. And -- and -- and you're looking to post -- to the -- the period after what Ford is saying is relevant for evidence to dispute that it was -- that there was an antitrust issue.

MR. STENERSON: I agree with you, but this is what --

THE COURT: And -- and one thing that I think that your arguments raise is -- would have the possibility of leading to sort of a sideshow of is -- is -- is there still an antitrust issue after 2021, and let's have a -- a -- a minitrial on what Ford does to protect its trademark. It seems like it's -- these are not really addressing the -- the antitrust allegations for the relevant period but looking to have the jury consider evidence and whether there's, you know, actions that are beyond the scope of the claims here.

But I do want to talk to Mr. Sherman about one issue.

MR. STENERSON: Your Honor, just on that, and this is -- I know --

THE COURT: Just let -- just let me talk to Mr.





Sherman. You're going to be able to come back.

MR. SHERMAN: Yes, Your Honor.

THE COURT: Mr. -- Mr. Sherman, I understand -- and I will tell you that I'm -- I'm not going to order Ford to produce Ms. McBride in a deposition. I am -- I do wonder why not produce her -- her emails.

MR. SHERMAN: Well, Your Honor, we didn't produce any of her custodial documents. Her emails, if they were in the custody of other witnesses — Ms. Piszker, De Haan, Catka, all of who report up to her — those emails have been produced. So we --

THE COURT: Mr. Stenerson is saying that there will be other emails, and -- and I -- I -- or other communications, that she had communications with -- and I forget the name of it. Did she have any communications with --

MR. SHERMAN: Willis Towers Watson.

THE COURT: -- outside of her team? So why not produce those emails?

MR. SHERMAN: Your Honor, we didn't produce any emails that were in the custody of -- of Ms. McBride. It was just a -- a redline for us.

THE COURT: I'm trying to understand the conflict of interest argument as it applies to her email communication.

MR. SHERMAN: Well, Your Honor, we're not sure what's in her emails communications. We think that her email

communications are strictly relevant to Ford's business, but in order to discover what those are, it would require us to go in and possibly see some other information that we're not privy to. Our -- our problem with Ms. McBride was that we -- and -- and discovery counsel is here. We thoroughly vet the witnesses. We ask them any number of questions about their interactions with --

THE COURT: And I'm not talking about witnesses. I'm -- I'm -- I'm -- now I'm talking about the paper trail, I'm strictly talking about the paper trail. And I imagine that Ford has some message to any employees using the email system that their -- their messages are subject to being viewed by other -- other parties or by -- by Ford.

MR. SHERMAN: Your Honor, to -- to answer your question directly is our position was we're not going to produce any documents that are in the custody of Ms. McBride. Our -- our theory was that most, if not all, of the email communications relevant to this particular litigation will be in the possession of others who report to her, and that if there are some emails with regard to this case, they would be very limited because --

THE COURT: What about the communication between Ms. McBride and the third party? That's -- let's talk specifically about that.

MR. SHERMAN: I would doubt, and -- and I don't know





this for sure, but I would doubt that the third party and Ms. McBride had any substantive communications or any voluminous communications where it was just the third party and Ms. McBride. The third party worked with purchasing, they worked with finance, and they worked with health and -- and the situation where Ms. -- Ms. McBride is the senior official. So it was -- it wasn't that the third party could make communications with just Ms. McBride and actually effectively be doing its job because they had to relay all this information to all three sections that were involved in making the decision as to whether or not to do an RFP or whether or not to continue down the road that they were on.

I -- I -- I think that it -- it would be more relevant or substantive if Ford had made a different decision, but Ford made the same decision that it's made since 2008. And so what Mr. Stenerson --

THE COURT: A different decision.

MR. SHERMAN: A different decision in terms of who do they buy their national insurance product from, who do they buy their national insurance product from. Since 2008, which is the relevant period here, even to the present, it's been Blue Cross Blue Shield Michigan, largely because it's the only option that they have for a Blue product, largely because the -- the employees like the product, the union approves of the product, right, the -- the salaried workers and everybody





find the product convenient, but those are not defenses. Hey, we like the product is not a defense. And so to try to discover why Ford continues to purchase the product I think is not relevant to the defenses or the claims in this case.

THE COURT: All right. Thank you.

Mr. Stenerson, so I mean you did make the argument. Is -- is that all you're looking for is for Mr. -- Ms. McBride to explain why Ford continues to -- to buy Blue Cross Blue Shield after the relevant period?

MR. STENERSON: So that is a relevant issue because Ms. McBride has the direct contact with Mercer, the health care consultants with Willis Towers, the health care consultants, and these are consultants that know about the options in the national market for Ford to choose from. And so those comparisons of those options, the Blue option with Michigan and the non-Blue options with the other nationals, is at the core of this case.

And it also goes to Your Honor's time period issue because the two things that Ford is complaining about most, which Mr. Sherman just alluded to, is they don't think it's proper that their only Blue Cross Blue Shield option is a Michigan Blue option, and that Ford, if they want a Blue option, has to go with Michigan. That conduct, the rules that make that -- that possible are still in place today and continued after 2021. So the very conduct in 2021 to 2025 and





2026 that Ford says is the core of their complaint, that is, Michigan's exclusive use of the trademarks in Michigan and -- and Ford's option for a Michigan Blue, still continues in that post-2021 period and that's why we want that period.

We want Ms. McBride because --

THE COURT: Sounds like they're saying -- my understanding of the complaint is that there was price fixing, and that the -- the manner in which Blue Cross operates under varying entities and has those entities, you know, collaborate for -- for price fixing.

Mr. Sherman, you don't need to get up. Is that what the claim is?

MR. SHERMAN: Yes, Your Honor. We don't use the term price fixing, but I know that the case law does say that it is.

THE COURT: Okay. So what is the relevance -- and -- and -- and I'm -- I'm looking for you to tell me legally if -- if Ford says, look, this is the product that we are going to buy because it's -- it's -- it's going to make sense for our employees, they like it, the union likes it, but we think that Blue Cross is gouging us, I guess I'm -- I'm trying to figure out when you're saying that their -- their reasons why they continue to buy Blue Cross would -- would -- is some sort of defense, or how is that, as a legal matter, going to be a defense?

MR. STENERSON: As a legal matter, I -- I think it

would be odd for Ford to take the position that it's the best value in the market, it's the product we want, it's the product our customers and our employees like, but we're getting gouged. If they're getting gouged, then they should choose the other options in the market. They should use Aetna, they should choose United, they should choose Cigna. So that very issue, from my perspective of -- it -- it's kind of an -- an odd situation to accuse a company, here Blue Cross, that it's the best value in the market that can be purchased but somehow it's over -- overpriced. That -- to me there's a -- there's a inconsistency there that can't be reconciled.

THE COURT: Have a witness testify, yes, we still use Blue Cross, and -- and you can make that argument without delving -- you know, without having a substantial document production and depositions about the reasons for continuing to -- to -- to purchase Blue Cross.

MR. STENERSON: Right. But, again, Your Honor, just the magnitude of what we're talking about here, Ford's -- Ford's health care spend is over a billion dollars a year, $1 billion ever year. The -- the records, the reason why the records are so important and the documents is because there's actual analysis in those documents about the value that they are getting by going with Blue Cross Blue Shield as their option. And the -- and preventing us from having those --

THE COURT: That evidence exists for the relevant





period, right?

MR. STENERSON: It's -- some of it does, but it doesn't exist -- that's only in -- in Ms. McBride's possession. And while she is the most senior person on the health benefits team, there's nobody more senior to her that was a custodian, and the witnesses have testified that Ms. Mc Bride is the one who reports up into the company. So -- right? So from an internal perspective, there are her team emails, which we have some of, there are her emails between her and senior executives that we have none of, and then there are relationships between her and the third-party consultants and Blue Cross itself that we, you know, believe would be unique to this production.

THE COURT: I -- I -- I -- I think that the question of why Ford decided to contract with Blue Cross is relevant. At the same time, it's -- it's not -- it's not actually a defense to an antitrust case. I mean you haven't told me that it's legally -- this is a -- you know, an affirmative defense that if -- if the -- the -- the corporation decided to buy a product that it claims is overpriced, that that's going to be a defense in an antitrust case. And so -- and -- and I'm not hearing that you can't make that argument to say, well, it was obviously the best value and you chose -- you didn't have to choose it, you could have chosen something else, but I'm not understanding the proportionality.

MR. STENERSON: It goes to the anticompetitive





effects that Ford must prove to show a violation, and that is if -- if Ford believes certain conduct, here the -- use of the trademarks, is an antitrust violation, they next need to show that that alleged violation, if proven, had anticompetitive effects. That bucket of their element of anticompetitive effects goes directly to the options that were in the market, what they paid, what their analysis was for, and why they chose Blue Cross.

THE COURT: During the relevant period.

MR. STENERSON: During the relevant period, yes, Your Honor. And -- and -- and, again, in the post-21 period, they only allege -- and I -- I appreciate the record here, Your Honor doesn't have access to it, but if I may, their damages model and the damages that they're seeking from Blue Cross only relate to Blue Cross's exclusive use of the trademark in Michigan and their complaint that Blue Cross is the only Blue that can serve Ford. That's the only rules they -- they can't blame damages on. The post-21 period maintains those rules in the exact same forum that they existed prior to 2021. So the reason we want the post-21 --

THE COURT: And you have evidence of that?

MR. STENERSON: Yes, Your Honor.

THE COURT: So why -- and again, so I -- I don't want to keep going, beating this dead horse, but you have evidence of that, and -- and I -- I think it's a sideshow to have





substantial -- introduce substantial evidence of post-2021 decision-making. So I want to move on to -- well, I've already addressed the post-2021.

And the use of the trademarks, again --

MR. STENERSON: May I address that, Your Honor?

THE COURT: I've already told you that I think that that's a sideshow. And on -- and as -- the allegation is not that Ford has engaged in -- in antitrust violations; it's that it -- it protects its trademark. And -- and I -- I just don't see how having witnesses testify about how Ford protects its trademark is going to be relevant.

And on top of that, if you're -- you talked about trademark issues, then we're going to be talking about privileged doc -- you know, documents that -- and evidence that Ford will want to protect because of the competitive marketplace. So I really am going to have to understand a lot more of why you think that these -- that evidence will be relevant.

MR. STENERSON: Sure. In 1939, 1940, Blue Cross Blue Shield of Michigan was the first entity to use the Blue Cross marks here in Michigan. They've used them continuously for almost a hundred years. They have a right to them. They have a right to protect them, they have a right to promote them. Ford Motor Company --

THE COURT: Is there a claim that -- that Blue Cross

Blue Shield does not have a right to -- to protect its trademark?

MR. STENERSON: That's absolutely Ford's number one complaint against us. They are complaining that we shouldn't be the only Blue Cross in Michigan, and our position is we were the first and only, and we're absolutely entitled to be the first in Michigan, just as if somebody came in and tried to start selling Ford Broncos that was not affiliated with Ford Motor Company, Ford would be up in arms and say, you know -- or they'd want Chevrolet to build Corvettes in their Ford Mustang plant. This issue of how Ford promotes and protect its trademarks is the exact mirror of why we think what Blue Cross does is absolutely lawful. And having -- this is a very narrow request, Your Honor. We're just asking for their policies and procedures.

THE COURT: The request was not that narrow, but go ahead.

MR. STENERSON: We'll narrow it if that helps.

But -- and, again, we're -- we're looking for their core policies and procedures to compare that to what the Blues do and show that this is conduct that is -- is ubiquitous and completely normal in the trademark sense. And Ford being a very famous brand itself we think will have very relevant evidence in that regard. We are not seeking information about litigation or privilege information. We are just seeking --





and, again, I don't know exactly what Ford calls it, but a lot of companies call it the brand book, right. They have internal policies and procedures which are not --

THE COURT: So they -- they -- don't they protect their -- come on, they -- they protect their -- their -- their...

MR. STENERSON: Of course.

THE COURT: Okay.

MR. STENERSON: Yeah, of course they protect them. And they're entitled -- we are not going to argue that Ford is not entitled to protect their trademark. What we want to show, if this case ever went to trial, is that what Blue Cross is doing is identical to what Ford is doing, or at least similar enough to show that this is not an issue. The fact that Michigan has been the one and only in Michigan for about a hundred years should surprise no one, and -- and the idea that Ford gets to decide where to put their dealers and how to license their trademark are all issues that go to the core defense against why the alleged conduct here is not anticompetitive, and it's a direct corollary to that, Your Honor.

THE COURT: Mr. Sherman, do you want to talk, speak to this?

MR. SHERMAN: Your Honor, the -- the trademark issue is a red herring. Ford's conduct with regard to its trademarks





is not at issue here. What is at issue really isn't even what the Blues do with their trademarks. What is at issue is they're using this trademark structure as a cover for dividing markets. So to say that, well, Michigan has always had the right to use its trademarks in Michigan, fine. But why can't Michigan use its trademarks in Ohio, and why can't Anthem, who has a Blue Cross Blue Shield trademark, use their trademark in Michigan? That's the issue. It's not really about the trademarks. The trademarks are kind of this -- this veil or a red herring that they say, hey, Court, don't look at the impact of how we've set up this system to use trademarks only in certain areas, which actually end up dividing markets and allocating customers, don't look at that. Look at the trademark law.

And the judge in this case in her decision on the motion to dismiss said we're not even going to entertain it because courts have ruled that you cannot use trademark to circumvent the antitrust laws, and that's exactly what they're doing. They're using the trademark to say this is about trademark, this is not about anticompetitive behavior, but it really is about anticompetitive behavior, whether trademarks are involved in it or not. The result is Michigan, Blue Cross Blue Shield Michigan is Ford's only option for a national Blue insurance product. Ford cannot go to Anthem in Ohio, a neighboring state, and say, hey, can you sell us insurance?





No. And it doesn't matter if Anthem says, well, our trademark doesn't allow us to. No, it's the entire system that the Blues have set up that doesn't allow Anthem to sell insurance to Ford. And so the trademark issue, again, Your Honor, is a red herring in my opinion.

THE COURT: Okay. Mr. Stenerson, I'll give you one more chance to -- to rebut and to -- to put anything you think needs to be put on the record.

MR. STENERSON: Thank you, Your Honor.

I think Mr. Sherman just proved why we need this discovery. He explained to you what Ford's theory is. We don't have to take Ford's theory at face value. We disagree with Ford's theory. Our position is this is completely legitimate use of the trademarks, and that's why discovery into Ford's protection or promotion is relevant discovery that would be unduly prejudicial to us if we don't get the chance to explore it. What -- he can make his arguments at trial, but what Ford is doing is they're preventing us from getting discovery to use in our defense to rebut what he just said and which I adamantly disagree with. That's the best argument I've -- I've seen for why we're entitled to it.

THE COURT: You disagree with -- that -- that -- with Mr. Sherman's argument that their claim is that the trademarks are -- are used to set up an anticompetitive system?

MR. STENERSON: Correct.

THE COURT: That -- that's not their claim?
MR. STENERSON: It is their claim. I disagree with that that's the end of the story, Your Honor. The -- the -- our -- part of our defense is that we are not using trademarks improperly. We are protecting and promoting the history of the system as it developed and as it could be so that we can provide Ford with the product that they keep buying and that they like.
THE COURT: So I assume that you're going to have an expert witness to talk about how trademarks are protected in the industry.
MR. STENERSON: We -- we do, Your Honor. We have a trademark expert that shows the history of the use of the trademarks in Michigan and nationally, and we have an expert that shows how brand protection is used.
THE COURT: So what I understand, you -- you put in your motion that the way that other companies protect their trademarks is relevant, but is -- do you have an opinion that says that it's a defense to prove that the entity alleging anticompetitive violations, how they -- how that -- how the plaintiff specifically protects its trademark?
MR. STENERSON: Where it's a defense, Your Honor, it's the protection of the intellectual property and what those rights mean and whether or not --
THE COURT: I asked you a very specific question.





MR. STENERSON: Sorry.
THE COURT: I think that the -- the manner in which trademarks are protected in the industry is your argument, that that's relevant.
MR. STENERSON: Yes.
THE COURT: But you're not just saying in the -- in the industry. You're saying that you need specifically evidence of -- of how Ford protects its trademarks. And I'm asking you to present an opinion that says that on top of having the expert testimony suggesting that Blue Cross's -- the way that it uses its trademarks is standard in the industry, that you need to -- to delve into the specific manner in which Ford protects its trademark.
And -- and the thing about it is that it would seem to me that the question would be whether Ford protects its trademark in the same manner, in the manner that -- in a similar manner as Ford alleges Blue Cross uses trademarks to engage in anticompetitive actions. You're not saying that there's any evidence that Ford uses its trademarks in the same way. You're saying that it protects its trademarks.
And -- and -- and so you're -- again, you -- you're seeking discovery that would lead to a whole lot of fights about protecting Ford's intellectual property, and -- and it would -- there'd be a lot of -- you know, the -- the document review, the -- the log of -- of documents that Ford would claim





is confidential or privileged, this would be not just simply Ford giving documents. I foresee a lengthy fight over Ford's confidential materials that would cause further delay, but no actual argument that -- Blue Cross's defense that we're using our trademarks, we're protecting our trademarks, and what you're claiming to be anticompetitive activity is just trademark protection. You're not saying that that -- that Ford protects its trademarks in the same way. You're just saying let's look at them.
And so I -- and, again, I asked you whether you can cite to an opinion that says that the plaintiff's methods of protecting its trademark are -- are relevant to -- or are a defense to the allegations against Blue -- Blue Cross.
MR. STENERSON: Let me be specific. We are alleging they use it in a similar way as Blue Cross, and I'll tell you how. And I'm -- I understand the Court's concern about breadth, so I'm willing to be very specific and narrow this request to the general brand books that Ford has and the policies and procedures on how they license their brand and decide where to put their car dealers.
THE COURT: That sounds -- that sounds like a whole lot of documents.
MR. STENERSON: Well, Your Honor, where they put their car dealers and who they license to be able to sell Ford dealerships and Ford cars is exactly what they're complaining





Blue Cross does wrong.
THE COURT: Yeah, which is the --
MR. STENERSON: And they're saying Blue Cross is -- shouldn't have an exclusive in -- in Michigan. And so how they license the -- and decide where they sell their cars is the same thing that Blue Cross is doing to decide where we sell health benefits to -- to national employers, and we think that's something that -- that we're entitled to explore.
THE COURT: Okay.
MR. STENERSON: That's all I have on trademarks, Your Honor.
May I address the -- well, is there anything else Your Honor would like me to answer?
THE COURT: No, you can go ahead and -- and -- and complete all of your arguments that you want me to consider.
MR. STENERSON: Yeah. And I mean we talked about Ms. McBride, and I think the distinction between the documents and the deposition, we don't need to -- to rehash that.
We talked about the trademark RFP 51. We talked about the RFP 53, which is the post-2021 documents or the post-24 documents.
The only remaining issue is Ford has taken the position that we are not entitled to any more than the ten default depositions in this case, and they have put ten people on their witness list in this case, five of whom we could not

depose because of the limit. We've only taken eight of our ten depositions. And, again, part of the reason we took those depositions first before moving from Ms. McBride and the trademark witness is that this -- this jurisdiction requires you to exhaust those. So -- so we did that in a way to be efficient. And so now we're in a position to where we believe we should get those two depositions to get to ten.

THE COURT: I'm not understanding what you're saying, this jurisdiction. So you're saying that in the Sixth Circuit, there -- I'm trying to remember the -- the terminology they use to say that the head of the company doesn't have --

MR. STENERSON: Apex, apex.

THE COURT: Apex. That doesn't apply in the Sixth Circuit?

MR. STENERSON: No, we're not talking about the apex.

THE COURT: So -- so what -- why are you saying that you had to take all these other depositions before you could seek Ms. McBride's or any others?

MR. STENERSON: I'm aware of -- of authority in this district that says — I believe it was a case by Judge Grey that I'm referring to — but where if you're asking for more than ten depositions, the Court doesn't want you to ask for 15 or 20 depositions until you've already taken ten so you can establish that there's --

THE COURT: No, I'm telling you, I've been in this





position for -- for 12 years next month and I don't remember ever seeing that. So you're saying that Judge -- you -- you found -- it was one opinion from a district judge saying that you had to take all of the depositions before you could move to compel what you're claiming is the most important deposition?

MR. STENERSON: No, Your Honor. I'm -- right now I'm only talking about the five. We've -- we've properly noticed Ms. McBride, it was within the ten. We properly noticed the trademark, it was within the ten. So I -- I believe that that's not what I'm talking about. There's --

THE COURT: Okay. But you -- you did say earlier that you had to exhaust those other depositions before you could move for -- to -- to compel Ms. McBride's deposition, and -- and you're saying hers is the most important, and I'm not understanding -- I'm looking for what case law you relied on that said first you had to take these other depositions before you sought to compel Ms. McBride's.

MR. STENERSON: The reason we did that is because we wanted to create the record to demonstrate that, in fact, Ms. McBride had unique information that we were entitled to, and that's what we did.

THE COURT: There was no legal requirement for you to do that?

MR. STENERSON: I -- I -- I don't believe there's a strict legal requirement, yes.





THE COURT: All right. Thank you.

MR. STENERSON: And so then the -- the -- the last set of depositions we're asking for is leave to take an extra five depositions from the default ten, given the magnitude of this case, to depose the five people on Ford's witness list that we've not deposed. And we compromised -- we offered a compromise with them. We said we have no interest in those depositions unless they're going to be called as witnesses at trial. We also offered to defer those until Ford was more certain. That was not acceptable to Ford. And so we're asking that we be granted leave to take those five depositions. And, again, if Ford removes them from the witness list, we're -- we're not requesting them.

THE COURT: Thank you.

MR. STENERSON: Thank you.

THE COURT: Mr. Sherman, you...

MR. SHERMAN: Just something on that issue, Your Honor.

THE COURT: All right.

MR. SHERMAN: It really all goes back to the timing. If -- you know, Ford had a duty in its initial disclosures to disclose the names of people who had relevant information, and, yes, it was 10, 12 of that number. The defendant chose who they wanted to depose and they took those depositions. They also subpoenaed third parties. They -- they subpoenaed Aetna,





Cigna and United for depositions as well. And so actually they exhausted their -- their -- their number of depositions. But they only took eight depositions per se. They got declarations from Aetna, Cigna and United.

But, again, the issue goes back to the initial issue that you raised. If these depositions were important, there is a mechanism by which the defendant could have raised it with the Court and the Court could have helped us out, either granting or not granting the permission to take five additional depositions. At this point Ford is not certain because we are not required yet to list who we plan to testify at trial.

Secondly, the individuals that they're naming, their information is not outside of the parameters of the information that the defendants have already gotten documents -- documents about. They know which departments these individuals work in and who they work for because they were all mentioned in the depositions, so there's no element of surprise if one or two of these individuals end up on Ford's ultimate trial witness list.

And so I think that what they're asking for is far outside of the rules and that it should be denied.

THE COURT: Thank you.

I am going to deny the motions. I'm going to deny the motion primarily because of the lack of diligence. The discovery deadline was March 31st of 2026 and that's ECF No. 63. The parties have stipulated to adjust the schedule since

then but nothing about the discovery deadline, and Mr. Stenerson or Blue Cross could have moved to extend the discovery deadline, especially when Mr. Stenerson saying, well, we -- we asked for a status conference in March, March 13th, and -- and then we checked back in June, and -- and then we didn't have the status conference until July. But at no point did Mr. Stenerson move to adjourn the discovery deadline and instead stipulated to accept the dispositive motions deadline for tomorrow. The -- the amount of discovery requested is substantial and -- and it's -- it's really -- some of it is opening up new avenues for discovery, in -- in particular the trademark issue and the -- the post-2021 evidence. There's just no reason why Blue Cross Blue Shield could not have initiated the discovery motions much earlier.

I don't think I have it here, but I -- in preparing for this case, I know that I've -- I've read opinions that stated that even when the opposing party agrees informally to extend discovery, that's not good cause to -- to allow a -- a motion to compel after discovery has closed.

I am perplexed why no response to Ford's argument about the motion being filed so late was addressed in the reply. That is a waiver actually. And I did allow Blue Cross to argue about the specific evidence to see whether Blue Cross Blue Shield would be unfairly prejudiced by having this evidence denied. So I -- I -- I did allow the parties to





address the substantive arguments, but when it comes down to it, Blue Cross Blue Shield waived any argument that it had good cause to move to compel by not addressing that at all in its briefing, even though Ford raised it in its response.

There is ample case law, and -- and I'll refer initially to *Pittman vs. Experian*, 901 F.3d 619, and that's a 2018 case in the Sixth Circuit in which the court says that the district court may properly deny a motion to compel where the motion was filed after the close of discovery. And some of the -- the cases that the court cited were where a district court denied a motion to compel that was filed after the close of discovery, and the plaintiffs provided no explanation for the delay and had reason to know of the evidence sought prior to the deadline. There's been no dispute that -- that Blue Cross Blue Shield knew about the discovery and now seeks well before the deadline and knew that -- that Ford was objecting to disclosing it.

Another opinion denied the plaintiff's motion to compel made four months after the close of discovery and five days before the hearing on the defendant's motion for summary judgment. This is especially true where the moving party had information it needed to file the discovery motion and its late filing would prejudice the other party.

I do think that -- that we -- we -- the courts have found that requiring a party to reopen discovery after it's





closed is a prejudice to that party. And, again, the dispositive motions are due tomorrow, and allowing the substantial discovery that the defendant seeks now would disrupt the schedule.

In the *Pittman* case, the court found no error in the denial of a motion to compel that was made after the close of discovery and explained that prior to his motion, Pittman did not seek a modification of the scheduling order. The motion was filed five months after the discovery motion deadline and almost four months after the deadline to complete discovery. This motion too was filed four months after the close of discovery. Another opinion, *Hall vs. Navarre*, 118 F.4th 749, Sixth Circuit 2024, referencing and reinforcing *Pittman's* holding.

Okay. So then I want -- want to -- I'll -- I'll -- I will address the substantive arguments though briefly because I also find that the motion to compel, there -- generally speaking, I will say that for Ms. McBride, I may have agreed that her documents should have been produced. They were on Ford's system, and I would imagine that she would not have communication, from her role at Blue Cross Blue Shield, in that email system that would be confidential as it relates to Ford.

But I don't believe that the -- the information I've heard has made -- I don't believe there's a compelling case that her testimony would be so essential to disregard the





conflict of interest argument that -- that Ford makes. I -- I think that her -- the conflict of interest for her testifying, I think it is apparent. And if Ford -- I mean, I'm sorry, if Blue Cross Blue Shield thought that her testimony was so important, I just don't understand why it waited until March to even begin the process of trying to move to compel her testimony.

For the reasons I already stated, I think the trademarks argument could become a sideshow, and I -- I think that -- that Blue Cross can make its arguments about what the practices are in the industry without delving into Ford's protection of its trademarks and having the type of confidential documents that we see in trademark cases disclosed, and all the -- the -- the fights over what should be disclosed and what should not, I -- I do think it's a sideshow. I don't think it is proportional to the needs of the case. It does not stop Blue Cross from making the argument based upon evidence in the industry.

The post-2023 discovery, again, Ford -- Blue Cross Blue Shield is saying, well, Ford continued to engage with Blue Cross Blue Shield. That argument can be made without having a sideshow of the reasons why Blue Cross Blue Shield continued to use -- I'm sorry, Ford continued to contract with Blue Cross Blue Shield after that period.

Mr. Stenerson made the argument if -- if it's -- if

the prices are -- well, I'll put it this way. The argument that Ford must believe that the product that Blue Shield, Blue Cross Blue Shield provides is a good -- a good bargain, that the -- the product is what its employees want, the union wants, that argument can be made without hearing about all the discussions and -- and the deliberations that folks at -- at Ford had when making the choice to continue to contract with Blue Cross Blue Shield.

I'm going to say it again that the -- there's no reason to wait until the middle of March to seek to produce more witnesses for depositions. And the -- the scheduling order is -- is supposed to -- it's -- it's not a trifle, it's -- it -- the deadlines are meaningful, and in order to have efficient court processes, the courts tend to treat the -- the schedules as being important and for there to be a showing of good cause for extending the schedule. Judge Parker has extended the schedule. The discovery deadline was extended once, but Blue Cross Blue Shield had the chance to move to extend discovery. It could have moved in March when these -- when it first raised with -- with Judge Parker the issue about wanting to compel more -- more documents. It didn't do so. And -- and -- and I do think that allowing substantial additional discovery would complicate the summary judgment process.

So I am -- I'm going to deny the motions on the --





those bases.

Mr. Stenerson, is there anything else you want to say for the record before I wish you a good rest of your day?

MR. STENERSON: No.

THE COURT: Anything else, Mr. Sherman?

MR. SHERMAN: No, Your Honor. Thank you.

THE COURT: Thank you.

THE CLERK: All rise. Court is adjourned.

(Court in recess at 12:30 p.m.)

_ _ _





C E R T I F I C A T I O N

I, Linda M. Cavanagh, Official Court Reporter for the United States District Court, Eastern District of Michigan, do hereby certify that the foregoing pages 1 through 55 comprise a full, true and correct transcription, to the best of my ability, of the digital sound recording taken in the matter of Ford Motor Company vs. Blue Cross Blue Shield of Michigan Mutual Insurance Company, et al, Case No. 23-11286, on Thursday, October 22, 2026.

s/Linda M. Cavanagh
Linda M. Cavanagh, RPR CRR RMR CRC RDR
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date: November 12, 2026
Detroit, Michigan